Alexis Holyweek SAREI, Paul E. Nerau, Thomas Tamuasi, Phillip Miriori, Gregory Kopa, Methodius Nesiko, Aloysius Moses, Raphael Niniku, Gabriel Tareasi, Linus Takinu, Leo Wuis, Michael Akope, Benedict Pisi, Thomas Kobuko, John Tamuasi, Norman Mouvo, John Osani, Ben Korus, Namira Kawona, Joanne Bosco, John Pigolo, and Magdelene Pigolo, individually and on behalf of themselves and all others similarly situated, Plaintiff,

v.

RIO TINTO PLC and Rio Tinto Limited, Defendants.

No. CIV.00–11695 MMM.

United States District Court, C.D. California,

July 9, 2002.

Steve W. Berman, Jeffrey T. Sprung, Hagens & Berman, Seattle, WA, Brent R. Walton, Hagens & Berman, Los Angeles, CA, Paul Luvera, Joel D. Cunningham, Luvera Barnett Brindley, Beninger & Cunningham, Seatle, WA, Kevin P. Roddy, Hagens & Berman, Los Angeles, CA, for plaintiff.

Charles Ernest Patterson, Morrison & Foerster, Los Angeles, CA, James J. Brosnahan, Jack W. Londen, Morrison & Foerster, San Francisco, CA, Anthony L. Press, Morison & Foerster, Los Angeles, CA, for defendants.

Vincent M. Garvey, Amanda Quester, U.S. Department of Justice, Washington, DC, for movant.

## AMENDED ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MORROW, District Judge.

Plaintiffs, who are current and former residents of the island of Bougainville in Papua New Guinea, filed this putative class action against defendants Rio Tinto plc and Rio Tinto Limited under the Alien Tort Claims Act, 28 U.S.C. § 1350. Plaintiffs allege that defendants' mining operations on Bougainville destroyed the island's environment, harmed the health of its people, and incited a ten-year civil war, during which thousands of civilians died or were injured. They assert that defendants are guilty of war crimes and crimes against humanity, as well as racial discrimination and environmental harm that violates international law. Defendants have moved to dismiss the complaint, arguing that the court lacks subject matter jurisdiction and that plaintiffs have failed to state a claim upon which relief can be granted. Defendants contend alternatively that the action should be dismissed on *forum non conveniens* grounds, because its raises questions that are nonjusticiable under the act of state or political question doctrines, and because the court should

abstain under the doctrine of international comity.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

Bougainville is an island in the South Pacific located just off the main island of Papua New Guinea ("PNG").[2] Like other regions of PNG, Bougainville is rich in natural resources, including minerals such as copper and gold.[3] Bougainville's rivers are also a key natural resource.[4] Plaintiffs allege that, for many years, one of these—the Jaba River—"was a major source of food for many residents of Bougainville, and use of the riches of the Jaba River was an integral part of the way of life of many." [5]

Defendants Rio Tinto plc,[6] a British corporation, and Rio Tinto Limited,[7] an Australian corporation (collectively "Rio Tinto Group" or "Rio Tinto"), are part of an international mining group headquartered in London, which operates over sixty mines and processing plants in forty countries worldwide, including the United States.[8] During the 1960's, the Rio Tinto Group decided to build a mine in the village of Panguna on Bougain-

ville.[9] Plaintiffs allege that Rio Tinto needed the cooperation and assistance of PNG's government to do so, because constructing the mine necessitated displacing villages and destroying massive portions of the rain forest.[10] To obtain the required assistance, Rio Tinto allegedly offered the government 19.1% of the mine's profits.[11] PNG accepted, and plaintiffs allege that thereafter, the mine became "a major source of income for PNG and provided [an] incentive for the PNG government to overlook any environmental damage or other atrocities Rio committed." They also assert that "[t]he financial stake of the PNG government effectively turned the copper mine into a joint venture between PNG and Rio [Tinto] and allowed Rio [Tinto] to operate under color of state law." [12]

To hold its interest in and operate the Panguna Mine, Rio Tinto established Bougainville Copper Limited ("BCL"), a Papua New Guinea company and a majority-owned subsidiary of Rio Tinto Limited.[13] So that it could operate the mine, the Australian Colonial Administration [14] granted BCL leases over 12,500 hectares

---

1. The facts recited in this section are taken from the first amended complaint, as defendants do not, for purposes of their jurisdictional attack, take issue with the facts alleged by plaintiffs.

2. See First Amended Complaint, ¶ 2.

3. See *id.*

4. See *id.*, ¶ 99.

5. *Id.*

6. Before June 1997, Rio Tinto plc was named RTZ Corporation plc or "RTZ." (See *id.*, ¶ 42.)

7. Before June 1997, Rio Tinto Limited was called Conzinc Riotinto of Australia or "CRA." (See *id.*, ¶ 43.)

8. See *id.*, ¶¶ 50–51.

9. See *id.*, ¶ 3.

10. See *id.*, ¶ 4.

11. See *id.*

12. *Id.*, ¶ 4:2–5.

13. See *id.*, ¶ 101. Although the Rio Tinto Group has reduced its holdings in Rio Tinto Limited (and thus BCL) over the years, plaintiffs allege that it "exercised complete, effective and pervasive control" over the corporation at all times relevant to their claims. (*Id.*, ¶ 46.) Indeed, as of 1999, they assert that the Rio Tinto Group still owned a 53.6% interest in BCL. (*Id.*)

14. Papua New Guinea was a colony of Australia until 1975.

of Bougainvillean land.[15] In 1967, BCL and the PNG government entered into a formal agreement "concerning the development of certain mineral deposits in Bougainville," which was ultimately codified as the "Mining (Bougainville Copper Agreement) Act of 1974" ("the Copper Act").[16] Among other things, the Copper Act regulated the disposal of waste from mining operations, and vested in PNG's Department of Minerals and Energy the power to control and monitor pollution generated by the mine.[17]

### A. Impact Of The Mine On The People And Environment Of Bougainville

Plaintiffs assert that, from the inception of the project, Bougainville residents resisted Rio Tinto's efforts to build the mine. When a Rio Tinto exploration team set up camp on Bougainville in 1965, islanders allegedly destroyed the camp and expelled the team.[18] The Australian government purportedly responded by imprisoning approximately two hundred Bougainvilleans.[19] Islanders also refused to surrender land to Rio Tinto. A group of Bougainvilleans—the Rorovana—were allegedly told that if they did not accept Rio Tinto's offer of $105 per acre and $2 per coconut tree, their land would be taken without compensation.[20] When the Rorovana refused, plaintiffs assert that

> "[o]ne hundred riot police, especially trained and equipped by the Australian government, were flown to Bougainville to help the surveyors mark out the areas of land owned by the Rorovana people that [BGL] wanted. On August 1, 1969, surveyors, supported by police wearing gas masks and carrying truncheons, drove in the first concrete peg.... On August 5, 1969, riot police carrying batons, shields, rifles and respirators attacked a group of about 65 unarmed villagers, men, woman and children. The police fired a barrage of 150 tear gas cannisters at them, yet the people stood firm. Then the police charged them with their batons, clubbing both men and women who were forced off their land." [21]

In addition to forcing many villagers off their land, Rio Tinto allegedly destroyed huge portions of the rain forest while constructing the mine.[22]

By 1972, construction was complete, and operations at the Panguna Mine commenced.[23] The mine pit was approximately one-half kilometer deep and seven kilometers wide.[24] Plaintiffs allege that each day, approximately 300,000 tons of ore and waste rock were blasted, excavated, and removed from the pit,[25] producing 180,000

---

**15.** First Amended Complaint, ¶ 101.

**16.** See Appendix to Defendants' Request for Judicial Notice in Support of Motion to Dismiss ("Defs.' RJN"), Ex. JJ. Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of facts that are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" without converting a motion to dismiss into a motion for summary judgment. FED.R.EVID. 201. See also *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001).

**17.** See *id.,* Ex. JJ, ¶ 15.

**18.** See First Amended Complaint, ¶ 104.

**19.** See *id.*

**20.** See *id.,* ¶ 105.

**21.** *Id.,* ¶¶ 106–07.

**22.** See *id.,* ¶ 125.

**23.** See *id.,* ¶ 7.

**24.** See *id.,* ¶ 127.

**25.** See *id.*

tons of copper concentrate and 400,000 ounces of gold annually.[26] Jean Michael Cousteau, who observed the mine in 1988, described it as follows:

> "Surrounded by dense rain forest and tropical stillness lies one of the world's largest man-made holes in the ground. When the ore is completely extracted, the pit will measure nearly 8,000 feet across and around 1,200 feet deep. It would take two Golden Gate Bridges to span the hole, and if the Empire State Building were set at the bottom, only the antenna on top would rise above the rim of the mine.... Though it amounts to a vast treasury of copper ... the ore is extremely low grade.... Thus, to make the mine profitable, it must turn out a tremendous volume. That requires an operation using immense equipment and 4,000 people working in three eight-hour shifts seven days a week."[27]

Within ten years of commencing operations, the Panguna Mine was one of the largest copper mines in the world. Plaintiffs allege that it was highly profitable for Rio Tinto.[28] Indeed, they contend that, by the early 1980s, BCL was responsible for approximately 23% of the Rio Tinto Group's profit despite the fact that it represented only 9.4% of the group's total assets.[29]

Plaintiffs assert that, in addition to copper and gold, the mine produced more than one billion tons of waste.[30] After the waste (i.e., waste rock and tailings) was removed from the mine pit, it was allegedly deposited into the Kawerong–Jaba river system.[31] Plaintiffs contend that, in this fashion, fertile river valleys were turned into wasteland, entire forests died, and three thousand hectares of land were completely destroyed.[32] They further contend that a significant portion of the tailings placed in the Jaba River were ultimately deposited into Empress Augusta Bay, destroying the fish that were a major food source for the Bougainvilleans.[33]

Mining operations in Bougainville allegedly polluted not only the island's waterways, but also its atmosphere.[34] Plaintiffs assert that "[d]ust clouds from the mining operations combined with emissions from the copper concentrator, [and] created a poisonous mix which polluted the air."[35] As a result of this air pollution, the number of Bougainvilleans suffering from respiratory infections and asthma purportedly increased.[36] Additionally, pollution from the mine allegedly changed the island's climate, damaged its crops, caused fish to develop ulcerations and die, and forced many animals out of their habitats.[37] The diminished food supply that resulted purportedly caused many Bougainvilleans to suffer health problems.[38]

26. See *id.*, ¶ 138.

27. *Id.*, ¶ 6.

28. See *id.*, ¶ 134.

29. See *id.*, ¶ 136.

30. See *id.*, ¶ 138.

31. See *id.*, ¶¶ 128–33. Plaintiffs allege that BLC also dumped chemicals from the copper concentrator into the Kawerong River. (See *id.*, ¶ 148.) These chemicals purportedly include dissolved copper, residual lime, aluminum, mercury, cadmium, lead, zinc, arsenic, xanthates, methyl isobutyl carbinol, and polyacrylmide monomer. (*Id.*)

32. See *id.*, ¶ 140.

33. See *id.*, ¶¶ 141–42.

34. See *id.*, ¶ 150.

35. *Id.*

36. See *id.*, ¶¶ 150, 156

37. See *id.*, ¶¶ 150–51.

38. See *id.*, ¶ 151.

Plaintiffs contend that Rio Tinto's operation of the Panguna Mine impacted the entire island of Bougainville. They assert that Rio Tinto not only destroyed the land and polluted the environment, but also undermined the physical and mental health of the islanders. Plaintiffs allege:

"Deaths from upper respiratory infections, asthma and TB increased. Many children had impaired hearing due to chronic middle ear infections. Coughs and colds became commonplace, especially among children. Obesity, particularly among women, became common when they had to abandon their traditional diet for European tinned and packaged foods .... A deep sense of social malaise set in which expressed itself in clan tensions, depression, alcohol abuse, rage, traffic accidents and incidents of violence—all distress signals of people severed from their roots." [39]

Stated otherwise, plaintiffs maintain, Rio Tinto's destruction of the island's land and environment "ripped apart" the culture, economy, and life of Bougainville.[40]

## B. Rio Tinto's Employment Practices

Between 1966 and 1971, approximately 6,300 people, primarily construction workers, traveled to Bougainville to work in the mine.[41] Plaintiffs contend the fact that a majority of the persons working at the mine were not local islanders caused a great deal of tension. They assert that local Bougainvilleans, who were black, were paid significantly lower wages than white workers recruited off island.[42] After the Australian Minister of Labor visited the mine in 1969, he purportedly accused Rio Tinto of paying black workers "slave wages." [43] Plaintiffs allege that Rio Tinto paid black workers less because it regarded them as inferior and expendable.[44] Indeed, they contend, it was the notion that Bougainvilleans were an inferior people that caused Rio Tinto to "treat[ ] the land with wanton disregard." [45]

## C. Events Leading To The Mine's Closure And Civil War

Plaintiffs allege that, by 1988, operations at the Panguna Mine had severely impacted Bougainville's environment. In March of that year, Perry Zeipi, PNG's Minister of the Environment, visited Bougainville and purportedly described the amount of pollution in the Jaba River as "dreadful and unbelievable." [46] Minister Zeipi allegedly observed that all aquatic life had been destroyed by chemicals and waste dumped into the Jaba River, and that the water was no longer safe for drinking or bathing.[47] Zeipi purportedly expressed regret that his department could do nothing about this environmental destruction since the Copper Agreement gave the Department of Minerals and Energy power to control and monitor environmental pollution.[48]

At approximately the same time, the Panguna Land Owners Association ("PLOA") allegedly organized a march against BCL.[49] Five hundred landowners participated, and presented a petition to

39. *Id.,* ¶ 156.

40. See *id.,* ¶ 155.

41. See *id.,* ¶ 171.

42. See *id.*

43. See *id.*

44. See *id.,* ¶ 174.

45. *Id.,* ¶ 175.

46. See *id.,* ¶ 178.

47. See *id.*

48. See *id.*

49. See *id.,* ¶ 177.

BCL "demanding localization of employment and greater control of environmental degradation and pollution."[50] Plaintiffs assert that, when BCL failed to respond to the petition, the PLOA organized a one-day sit-in at the mine, which temporarily halted mining operations.[51] Thereafter, BCL hired a consulting company to conduct a survey regarding the effects of the mine on Bougainvilleans' health and the island's environment.[52]

When the consulting company issued its report, Francis Ona, PLOA's secretary and a former BCL surveyor, declared it a "whitewash."[53] The report allegedly skirted many crucial issues, including the effect of chemical pollutants on the island's food crops.[54] Plaintiffs allege that, as a result, militant Bougainvilleans stole dynamite from BCL, blew up the mine's infrastructure and machinery, and engaged in other acts of sabotage.[55] The violence escalated, ultimately forcing the mine to close and provoking a popular uprising on the island.[56] Plaintiffs allege that the uprising was the result of many years' frustration, as Bougainvilleans watched their homeland being destroyed. They quote the following news report:

> "Australia, and later Papua New Guinea, ignored local protests and gave a subsidiary of the British mining giant Rio Tinto Zinc (now just 'Rio Tinto') the go-ahead to excavate the world's largest open-cast copper mine in the middle of the island in 1967; it opened in 1972.

> The population galvanized as never before. Bougainvilleans watched their land dying beneath them as over a billion tons of toxic waste [were] dumped into the river system. Compensation and jobs at the mine did little to make them feel better about it, and after 16 years of frustrated protest the landowners, led by Francis who was also a surveyor at the mine, decided to take matters into their own hands."

> "They decided to close it down by carrying out explosive attacks of sabotage upon its machinery and infrastructure. As the violence escalated, Papua New Guinea, panicked about the loss of export earnings, sent in the Defense Force. The Bougainville Revolutionary Army consolidated itself and secession was called for. War was on."[57]

On November 24, 1988, a few days after the first attack on the Panguna Mine, BCL chief Don Carruthers allegedly warned the PNG government that "Rio would seriously reconsider future investment in PNG in light of ... the acts of terrorism on Bougainville resulting from ... unrealistic expectations on the part of landowners."[58] Citing this comment, plaintiffs assert that, essentially, Rio Tinto threatened to close the mine and withdraw all other investment in PNG if the government did not quell the uprising so that the company could recommence operations.[59] They allege that, given the mine's economic importance to PNG,[60] Rio Tinto knew that its

50. *Id.,* ¶ 177:21–22.

51. See *id.,* ¶ 179.

52. See *id.*

53. See *id.,* ¶ 181.

54. See *id.,* ¶ 180.

55. See *id.,* ¶ 181.

56. See *id.,* ¶ 182.

57. *Id.*

58. *Id.,* ¶ 185.

59. See *id.,* ¶¶ 185–87.

60. "[T]he mine provided 18% of PNG's total revenue on a yearly basis during the period of its operation, 36% of its export earnings and

requests would be "taken as commands by the PNG government," and maintain that Rio Tinto "understood and intended that this ultimatum [would] result in military action by PNG . . . even if it meant the death and/or injury of residents." Plaintiffs further assert that Rio Tinto knew "it had a great deal of control over the situation [i.e., that] if Rio did not direct and/or encourage a military response, . . . none would have been initiated." [61]

Allegedly acceding to Rio Tinto's requests, PNG sent a defense force to Bougainville in early 1989 to put down the uprising.[62] Plaintiffs assert that Rio Tinto assisted the PNG military by supplying helicopters and other vehicles, transporting troops to the island, and providing economic assistance.[63] The PNG army mounted an attack on February 14, 1990—the St. Valentine's Day massacre—in which many civilians, including a Uniting Church pastor, were killed.[64] Plaintiffs contend that, in response to this massacre, the Bougainville Revolutionary Army ("BRA") consolidated, Bougainvilleans called for secession from PNG, and "the struggle to close the mine became a struggle for independence"[65] that continued for almost a decade.

### D. Conduct During The War

Plaintiffs allege that, during the ten-year struggle for independence, PNG, at the behest of its joint venture partner, Rio Tinto, committed atrocious human rights abuses and war crimes. In April 1990, the PNG government allegedly imposed a

blockade on Bougainville to isolate the island and force the revolutionaries to surrender.[66] Plaintiffs assert that Rio Tinto conspired with PNG to impose the blockade, and advocated that it be maintained because it believed the tactic would allow PNG to win the war and reopen the mine.[67] A top Rio Tinto official purportedly "encouraged continuation of the blockade to 'starve the bastards out some more [so] they [would] come around.'"[68] In addition, the Australian government provided assistance, donating speedboats to PNG to tighten the blockade.[69]

Plaintiffs allege that the blockade "prevented medicine, clothing and other essential supplies from reaching the people [of Bougainville]. . . ." They state that "[t]he local Red Cross in central Bougainville estimated in November 1992 that the blockade, through lack of medicines and vaccines, had caused the death of more than 2,000 children in its first two years of operation."[70] Plaintiffs contend that, as time passed, the number of deaths from preventable diseases grew.[71] One of the few reporters who witnessed the events in Bougainville allegedly noted:

"Some [Bougainvilleans] were killed in combat or in civilian massacres by the PNGDF, but most died because of the lack of basic medical treatment caused by the blockade on an island where all hospitals were soon destroyed and all qualified doctors dead or gone. When we visit, everyone has a horror story to remember—a wife and baby dying in an

10% of Gross Domestic Production." (*Id.,* ¶ 110.)

61. *Id.,* ¶¶ 185–86.

62. See *id.,* ¶ 183.

63. See *id.,* ¶¶ 183, 193.

64. See *id.*

65. *Id.*

66. See *id.,* ¶ 191.

67. See *id.,* ¶¶ 191–94.

68. *Id.,* ¶ 192.

69. See *id.,* ¶ 189.

70. *Id.,* ¶ 196.

71. See *id.*

unattended jungle birth, a husband thrown into the sea from an Australian-supplied helicopter, a child hit by a dum-dum bullet, a daughter raped and then mutilated by the PNGDF. Yet no one is especially willing to tell such stories. Bougainville is winning now and they are more eager to show us their resourcefulness." [72]

Plaintiffs allege that, as of 1997, an estimated 10,000 Bougainvilleans had died as a result of the blockade.[73]

In addition to denying Bougainvilleans access to medical and other essential supplies, plaintiffs assert that the blockade prevented news of events on Bougainville—particularly human rights violations committed by PNG and Australian forces—from reaching the public.[74] They allege that, throughout the conflict, the PNGDF, with the assistance of Australian pilots and helicopters, attacked Bougainvillean towns and villages with mortar bombs, guns, grenades, and ammunition,[75] and state: "In the absence of public scrutiny, PNG troops continued to commit human rights violations with impunity." [76] The human rights violations and war crimes purportedly committed include: "(a) Aerial bombardment of civilian targets; (b) Wanton killing and acts of cruelty; (c) Burning of houses and villages; (d) Making the civilian population and individual civilians objects of attack; (e) Outrages upon personal dignity, acts of rape, humiliating and degrading treatment; (f) Perfidious use of the Red Cross emblem; and (g) Pillage." [77] Plaintiffs allege that an esti-mated 15,000 civilians, or 10% of Bougainville's population, were killed during the war.[78]

Although the war ended in 1999, plaintiffs assert that its aftermath has been devastating. They contend that the land is ravaged, that thousands of Bougainvilleans have died, and that many others fled the island.[79] Of the Bougainvilleans that remain, plaintiffs assert that several suffer health problems,[80] and that an estimated 67,000 live in "care centers" or refugee camps.[81]

### E. Plaintiffs' Lawsuit

On November 2, 2000, Alexis Holyweek Sarei, a current California resident who lived in Bougainville between 1973 and 1987, and twenty-one individuals who continue to reside in Bougainville or elsewhere in PNG, filed this putative class action against Rio Tinto plc and Rio Tinto Limited. Shortly thereafter, plaintiffs filed a first amended complaint asserting claims under the Alien Tort Claims Act, 28 U.S.C. § 1350. Specifically, their complaint pleads claims for crimes against humanity; war crimes/murder; violation of the rights to life, health, and security of the person; racial discrimination; cruel, inhuman, and degrading treatment; violation of international environmental rights; and a consistent pattern of gross violations of human rights.[82] Additionally, the complaint alleges claims for negligence, public nuisance, private nuisance, strict liability, equitable relief, and medical monitoring.[83]

**72.** *Id.,* ¶ 197.

**73.** See *id.,* ¶ 196.

**74.** See *id.,* ¶¶ 191, 203.

**75.** See *id.,* ¶ 200.

**76.** *Id.,* ¶ 203.

**77.** *Id.*

**78.** See *id.,* ¶ 12.

**79.** See *id.,* ¶ 206.

**80.** See *id.,* ¶¶ 15–39.

**81.** See *id.,* ¶ 206.

**82.** See *id.,* ¶¶ 210–66.

**83.** See *id.,* ¶¶ 267–93.

Plaintiffs contend defendants' mining operations have destroyed Bougainville's environment and the health of its residents and that defendants are liable as a consequence. They also assert that, because the mine was a joint venture between Rio Tinto and the PNG government, and because Rio Tinto's threats led PNG to use military force against the Bougainvilleans, defendants are responsible for human rights violations and war crimes committed during the revolution.

The complaint contains specific allegations regarding each of the named class representatives. The following are examples of the conduct in which Rio Tinto allegedly engaged, and the injuries it allegedly caused:

- Alexis Holyweek Sarei resided in Bougainville from 1973 to 1980, and from 1985 to 1987. During that time, he was allegedly exposed to toxic chemicals and tailings at the mine and in the rivers, which caused him to develop pneumonectomy. In addition, Sarei was purportedly placed under arrest, had a gun put to his forehead, was warned that his head would be blown open, and was ordered to leave the island. These events took place in the presence of his wife and daughter. During the war, his adopted son was allegedly shot and killed. Sarei sues on behalf of himself, his son, and his blood relatives.[84]
- Paul E. Nerau resided in Bougainville until 1989. During the conflict, Nerau allegedly received death threats, which forced him to flee Bougainville and relocate in Port Moresby, PNG. While in Bougainville, Nerau was purportedly exposed to toxic chemicals placed in the environment by Rio Tinto. Nerau's parents allegedly died as a result of the blockade, and five of his nephews were killed during the conflict between the PNGDF and the BRA. He brings this suit on behalf of himself, his parents, and his blood relatives.[85]
- Gregory Kopa is a resident of Bougainville. He is the paramount chief of the Moroni village, which was located in the area that is now the Panguna Mine. Kopa states: "Despite our people's resistance, land for the mine was forcefully taken from our people. My mother was at the forefront of the fight against bulldozers and other heavy machinery used to force our people off the land. Where our village was is now a big hole. We have lost our land, the environment is destroyed, fishing rivers [are] contaminated and destroyed, sacred grounds [have been] destroyed and normal village life [has been] disturbed and destroyed through relocation. Relocation was done against our wishes to places unsuitable for farming, etc. A number of people in my village have died of unknown diseases. During the blockade, many people including babies died of preventable diseases including malaria, diarrhea, etc."[86]
- John Osani is a resident of Bougainville. His sister, Agnes Tasoro Hop, suffered from post-operation complications and asthma, and needed regular medical attention. During the blockade, she was allegedly unable to obtain medical aid and died. Similarly, Osani's daughter was injured in a fall, and rushed to a medical center. Because there was no doctor or medication available as a result of the blockade, she also died.[87]

84. See *id.*, ¶ 15.

85. See *id.*, ¶ 16.

86. *Id.*, ¶ 18.

87. See *id.*, ¶ 32.

• Ben Korus is a resident of Bougainville. During the conflict, the PNGDF allegedly beat his father to death.[88]

On January 26, 2001, defendants filed a motion to dismiss, asserting that the court lacks subject matter jurisdiction because plaintiffs fail to state a cognizable claim under the Alien Torts Claim Act. Defendants contend alternatively that the action should be dismissed on *forum non conveniens* grounds, as either Papua New Guinea or Australia is a more appropriate forum. Finally, defendants assert that plaintiffs raise questions that are nonjusticiable under the act of state or political question doctrines, and that the court should abstain under the doctrine of international comity.

## II. DISCUSSION

### A. Motion To Dismiss For Lack Of Subject Matter Jurisdiction

#### 1. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(1)[89]

Defendants first move to dismiss the action under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. Rule 12(b)(1) attacks can be either facial or factual. See *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual"); *Thornhill Publishing Co. v. General Telephone & Electronics*, 594 F.2d 730, 733 (9th Cir. 1979) ("A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or tack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact..."). Plaintiff bears the burden of demonstrating that the court has subject matter jurisdiction to hear the action. See *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir.1989).

There is an important difference between Rule 12(b)(1) motions attacking the complaint on its face and those that rely on extrinsic evidence. In ruling on the former, courts must accept the allegations of the complaint as true. See *Valdez v. United States*, 837 F.Supp. 1065, 1067 (E.D.Cal. 1993), aff'd., 56 F.3d 1177 (9th Cir.1995). In deciding the latter, courts may weigh the evidence presented, and determine the facts in order to evaluate whether they have the power to hear the case. See *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987). The "court may not[, however,] resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'" *Id.* (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983)). See also *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("A district court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are not intertwined with the merits").

Where jurisdiction is intertwined with merits, "the district court [must] assume[ ] the truth of the allegations in a complaint

---

88. See *id.*, ¶ 33.

89. Defendants has moved to dismiss under Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. 28 U.S.C. § 1350 is both a jurisdictional and a substantive statute. Under § 1350, the court may exercise subject matter jurisdiction over the action only if it finds that plaintiffs' complaint adequately alleges a violation or violations of the law of nations. In the context of this statute, therefore, the Rule 12(b)(1) and Rule 12(b)(6) analyses merge.

... unless controverted by undisputed facts in the record" (*Roberts, supra,* 812 F.2d at 1177), or treat the motion as a motion for summary judgment (*Careau Group v. United Farm Workers,* 940 F.2d 1291, 1293 (9th Cir.1991) ("where jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, 'the trial court should employ the standard applicable to a motion for summary judgment' ")). See also *Islands, Inc. v. United States Bureau of Reclamation,* 64 F.Supp.2d 966, 968 (E.D.Cal.1999) ("A court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case"), vacated on other grounds, 2001 WL 503478 (9th Cir. May 11, 2001); *Laurence v. United States,* No. C–93–0381–DLJ, 1993 WL 266657, * 2 (N.D.Cal. July 8, 1993) (same).

In the context of actions arising under the Alien Tort Claims Act, the jurisdictional issue is almost always intertwined with the merits of plaintiffs' claims. As the Second Circuit stated in *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), because the statute requires, as a jurisdictional prerequisite, that plaintiffs allege a violation of the law of nations, "[c]ourts have ... engaged in a more searching preliminary review of the merits than is required, for example, under the more flexible 'arising under' formulation." *Id.* at 887. See also *Bigio v. Coca–Cola Co.,* 239 F.3d 440, 447 (2d Cir.2000) (requiring that a plaintiff proceeding under the Alien Tort Claims Act plead a violation of the law of nations as a jurisdictional prerequisite, and noting that *Filartiga* distinguished the Act, "with its jurisdictional pleading requirement, from general federal question jurisdiction, which is 'not defeated by the possibility that the aver-

ments in the complaint may fail to state a cause of action' "); *Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995) ("Because the Alien Tort Act requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of section 1331 [federal question jurisdiction],' " quoting *Filartiga, supra*), cert. denied, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996),; *Amlon Metals, Inc. v. FMC Corp.,* 775 F.Supp. 668, 671 (S.D.N.Y.1991) ("When considering Alien Tort Statute claims on a 12(b)(1) motion, courts typically engage 'in a more searching preliminary review of the merits than is required, for example[,] under the more flexible arising under formulation,' " quoting *Filartiga, supra*). Accordingly, for purposes of assessing defendants' jurisdictional attack, the court will assume the truth of the allegations set forth in plaintiffs' first amended complaint.

## 2. Whether 28 U.S.C. § 1350 Confers Jurisdiction

The Alien Tort Claims Act ("ATCA") provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.[90] Invoking this statute, plaintiffs plead that defendants are liable for crimes against humanity, war crimes/murder, violation of the rights to life, health, and security of the person, racial discrimination, cruel, inhuman, and degrading treatment, violation of international environmental rights, and a consistent pattern of gross violations of human rights.

The Ninth Circuit has stated that the ATCA both confers federal subject

---

90. The Alien Tort Claims Act is also known as the Alien Tort Statute.

matter jurisdiction and creates an independent cause of action for violations of treaties or the law of nations. See *In re Estate of Ferdinand Marcos, Human Rights Litigation* ("*Hilao II*"), 25 F.3d 1467, 1475–76 (9th Cir.1994). See also *Kadic, supra,* 70 F.3d at 238; *Filartiga, supra,* 630 F.2d at 887; *Alomang v. Freeport–McMoran, Inc.,* Civ. A. No. 96–2139, 1996 WL 601431, *4 (E.D.La. Oct.17, 1996) ("Freeport correctly points out that the Alien Tort Statute provides an independent basis of federal question jurisdiction to redress human rights violations").

Thus, for jurisdiction to lie under § 1350, plaintiffs must allege facts sufficient to establish that (1) they are aliens (2) suing for a tort (3) that was committed in violation of the law of nations or a treaty of the United States. See *Kadic, supra,* 70 F.3d at 238 ("... it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations. There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)"); *Beanal v. Freeport–McMoran, Inc.,* 197 F.3d 161, 164–65 (5th Cir.1999) ("Section 1350 confers subject matter jurisdiction when the following conditions are met; (1) an alien sues, (2) for a tort, (3) that was committed in violation of the 'law of nations' or a treaty of the United States.... Thus, the issue before us is whether Beanal states claims upon which relief can be granted for violations under the 'law of nations,' i.e., international law"); *Alvarez–Machain v. United States,* 107 F.3d 696, 703 (9th Cir.1996) ("we have previously held that the ATCA has a sub-

stantive as well as a jurisdictional component"); *National Coalition Gov't of the Union of Burma v. Unocal, Inc.* ("*Unocal II*"), 176 F.R.D. 329, 344 (C.D.Cal.1997).

In the present case, there is no dispute that the first two elements necessary to establish jurisdiction under § 1350 are present. The only dispute is whether, accepting the allegations of the complaint as true, plaintiffs have adequately pleaded a violation of a treaty of the United States or the law of nations.[91] It is on this basis that defendants urge the court to dismiss the action for lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, or both.[92] Plaintiffs concede that Rio Tinto has not violated a treaty of the United States. They contend, however, that they have sufficiently alleged violations of the law of nations.[93]

To ascertain the content of the law of nations, courts consult the works of jurists on public law, consider the general practice of nations, and refer to court decisions that discuss and enforce international law. See *Beanal, supra,* 197 F.3d at 165; *Kadic, supra,* 70 F.3d at 238; *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714 (9th Cir.1992).

Looking to such sources, the Ninth Circuit has held that the ATCA "creates a cause of action for violations of specific, universal and obligatory international human rights standards which 'confer [ ] fundamental rights upon all people vis-a-vis their own governments.'" *Hilao II, supra,* 25 F.3d at 1475 (quoting *Filartiga, supra,* 630 F.2d at 885). See also *Filartiga, supra,* 630 F.2d at 888 ("It is only where the nations of the world have demonstrated that the wrong is of mutual and not merely several, concern, by means of express in-

**91.** See Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss ("Defs.' Mem.") at 9–25.

**92.** See *id.* at 9–10.

**93.** See Plaintiffs' Memorandum of Point and Authorities in Opposition to Motion to Dismiss ("Pls.' Opp.") at 14–39.

ternational accords, that a wrong generally recognized becomes an international law violation within the meaning of the [ATCA]"); *Beanal, supra,* 197 F.3d at 167 (same); *Xuncax v. Gramajo,* 886 F.Supp. 162, 180 (D.Mass.1995) (same); *Amlon Metals, supra,* 775 F.Supp. at 671 (same). Cf. *Guinto v. Marcos,* 654 F.Supp. 276, 280 (S.D.Cal.1986) ("violation of the First Amendment right of free speech does not rise to the level of such universally recognized rights and so does not constitute a 'law of nations'").

In evaluating plaintiffs' ATCA claims, therefore, the court must consider: (1) whether they identify a specific, universal, and obligatory norm of international law; (2) whether that norm is recognized by the United States; and (3) whether they adequately allege its violation. See *Unocal II, supra,* 176 F.R.D. at 345.

Plaintiffs allege that Rio Tinto's actions in Bougainville—commencing with its construction of the mine in the 1960s and continuing through the end of the civil war in 1999—violated norms of international law that are established in various international declarations and resolutions. The allegations of are four general types—plaintiffs assert that defendants are guilty of war crimes; that they have committed crimes against humanity; that they have

engaged in racial discrimination; and that they have caused environmental harm. Before examining whether each type of claim adequately alleges a violation of the law of nations, it is appropriate to consider defendants' argument that plaintiffs have failed to exhaust local remedies, and that exhaustion is a necessary prerequisite to filing suit under the ACTA.

### a. Exhaustion Of Local Remedies

Defendants' threshold argument is that the action should be dismissed because plaintiffs have failed to exhaust remedies available locally in PNG.[94] They assert that "remedies for violation of human rights obligations may be pursued 'only after the individual claiming to be a victim of a human rights violation has exhausted available remedies under the domestic law of the accused state,' or shown that it would be futile to do so."[95] Defendants contend that PNG law provides adequate remedies and that plaintiffs cannot demonstrate that the exhaustion of such remedies would be futile.

### i. Exhaustion Requirement Under The ATCA/TVPA

■ In support of their assertion that exhaustion is required, defendants cite the Torture Victims Protection Act ("TVPA") enacted by Congress in 1992.[96] The TVPA

---

**94.** See Defs.' Mem. at 12–14.

**95.** *Id.* at 12:16–20 (quoting RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES ("RESTATEMENT"), § 703, cmt. d (1986)).

**96.** Following its passage in 1789 as part of the first Judiciary Act, and prior to the Second Circuit's 1980 decision in *Filartiga, supra,* there were only twenty-one reported decisions under the ATCA. See Kenneth C. Randall, *Federal Jurisdiction over International Law Claims: Inquiries Into the Alien Tort Claims Statute,* 18 N.Y.U.J. INT'L. L. & POL. 1, 4–5, n. 15 (1985). *Filartiga* was thus the seminal case interpreting the Act. It held that two Paraguayans could bring an ATCA claim

against a former Paraguayan police inspector for the torture and death of one of their family members. The TVPA codified the *Filartiga* decision. See *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 105, n. 10 (2d Cir.2000) ("[T]he text of the [ATCA] seems to reach claims for international human rights abuses occurring abroad. We reached the conclusion that such claims are properly brought under the Act in *Filartiga* ...; Congress ratified our conclusion by passing the Torture Victim Protection Act"); *Alvarez–Machain, supra,* 107 F.3d at 702 ("The Torture Victim Protection Act does not impose new duties or liabilities on defendants. Torture has long been condemned and prohibited by international law," citing *Filartiga, supra,* 630

(reprinted in the historical and statutory notes to 28 U.S.C. § 1350) provides in pertinent part:

"(a) Liability.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual or;

(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

(b) Exhaustion of remedies.—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." [97]

Defendants assert that by including subdivision (b) in the TVPA, "Congress has explicitly recognized that exhaustion of national remedies is an element of a cause of action under international law." [98]

Plaintiffs' complaint, however, states claims under the ATCA rather than the TVPA. [99] On its face, the ATCA does not require exhaustion of local remedies; it simply provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. As plaintiffs note, no court has imposed an exhaustion requirement in a case brought exclusively under the ATCA. [100] Rather, all alien tort actions in which exhaustion of remedies has been addressed have involved claims pleaded under the TVPA. See, e.g., *Hilao v. Estate of Ferdinand Marcos ("Hilao III")*, 103 F.3d 767, 778, n. 5 (9th Cir.1996); *Xuncax, supra*, 886 F.Supp. at 178; *Alomang, supra*, 1996 WL 601431 at * 3; *Cabiri v. Assasie–Gyimah*, 921 F.Supp. 1189, 1197, n. 6 (S.D.N.Y. 1996).

The court is not persuaded that Congress' decision to include an exhaustion of remedies provision in the TVPA indicates that a parallel requirement must be read into the ATCA. Indeed, the Second Circuit rejected an analogous argument in *Kadic*. There, defendant asserted that Congress intended that the TVPA's color of law provision apply to claims brought under the ATCA. *Kadic, supra*, 70 F.3d at 241. The court disagreed, stating:

"Congress enacted the Torture Victim Act to codify the cause of action recog-

---

F.2d 876); *Abebe–Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996) ("In enacting the TVPA, Congress endorsed the *Filartiga* line of cases: The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), which permits Federal district courts to hear claims by aliens for torts committed in violation of the law of nations," quoting H.R.Rep. No. 367, 102d Cong., 2d Sess. 3, reprinted in 1992 U.S.C.C.A.N. 84, 86 (internal quotations omitted)); H.R.Rep. No. 367, *supra*, at 4 (noting that codification of *Filartiga* was necessary given the skepticism expressed by Judge Bork in his concurring opinion in *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir.

1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985)).

**97.** Unlike the ATCA, the TVPA is not a jurisdictional statute. Thus, to state a claim under the TVPA, a plaintiff must first establish jurisdiction under the ATCA or properly invoke federal question jurisdiction under 28 U.S.C. § 1331. See *Kadic, supra*, 70 F.3d at 246.

**98.** Defs.' Mem. at 12:23–25.

**99.** See First Amended Complaint, ¶¶ 210–66.

**100.** Pls.' Opp. at 33:20–22 (noting that no court has "interpreted [the] ATCA [to] requir[e] exhaustion of local remedies as a prerequisite to a civilian plaintiff bringing an otherwise valid claim in the U.S.").

nized by this Circuit in *Filartiga,* and to further extend that cause of action to plaintiffs who are U.S. citizens. At the same time, Congress indicated that the Alien Tort Act 'has other important uses and should not be replaced,' because '[c]laims based on torture and summary executions do not exhaust the list of actions that may appropriately be cov-

ered [by the Alien Tort Act]. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.'" *Id.* (quoting H.R.Rep. No. 367, *supra,* at 4, U.S.Code Cong. & Admin.News 1992, pp. 84, 87).[101]

**101.** See also *The Torture Victim Protection Act: Hearing on H.R. 1417 Before the Subcomm. on Human Rights and International Organizations of the Comm. on Foreign Affairs,* 102nd Cong. 1 (Mar. 23, 1998) (statement of Rep. Yatron, Member, House Comm. on Foreign Affairs) ("International human rights violators visiting or residing in the United States have formerly been held liable for money damages under the Alien Tort Claims Act. It is not the intent of Congress to weaken this law, but to strengthen and clarify it. Federal courts should not allow congressional actions with respect to this legislation to prejudice positive developments, but rather to act upon existing law when ruling on the cases presently before them"); *id.* at 19 (statement of Michael H. Posner, Executive Director, The Lawyers Committee for Human Rights) ("The second historical aspect of the bill is that there have been in the last eight years a series of court decisions, starting with the *Filartiga* decision ... which have relied on an old statute, the Alien Tort Claims Act. This bill is intended to reinforce, to support, and to strengthen that longstanding statute, in several respects to expand on it. In particular, by providing a clear remedy, not only to aliens but to U.S. citizens, to make it clear without ambiguity, without doubt, that there is a private right of action available, and that a contemporary expression of the U.S. Congress would suggest that at least two international human rights crimes—torture and extrajudicial killing—are violations that deserve court attention and remedy in the United States"); *id.* at 34, 36 (statement of Alice Henkin, Chair, Committee on International Human Rights, Association of the Bar of the City of New York) ("The Protection Act would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, Section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act) .... Section 1350 has other important uses ..., and should not be replaced .... [C]laims based on torture or sum-

mary executions do not exhaust the list of actions that may appropriately be covered by Section 1350. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law"); *id.* at 71 (statement of A. Henkin) ("The reason for preserving Section 1350, even in the presence of this new legislation is for the future and any emerging international consensus on what is a violation of the law of nations"). While, generally, the statements of individual members of Congress or witnesses testifying before Congressional committees are not entitled to great weight in ascertaining legislative intent, on this point they are consistent with information contained in the committee reports and with other aspects of the legislative history. The court thus considers them further indicators that, in enacting the TVPA, Congress intended to ensure that the ATCA would remain intact to permit suits based on norms of international law that were in existence or that might come into existence in the future. See *Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) ("[S]tatements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' Intent"); *United States v. Shaw,* 936 F.2d 412, 416 (9th Cir.1991) (" 'Such statements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent.' ... In this case, the sponsors' statements are consistent with everything else we can deduce from the legislative history, dictionary definitions, and the Sentencing Commission's interpretation. Indeed, we have seen no statements indicating any different interpretation of the term 'cocaine base,'" quoting *Brock, supra*).

Accordingly, it held that "[t]he scope of the Alien Tort Act remain[ed] undiminished by enactment of the Torture Victim Act," and that the color of law requirement did not apply to ATCA lawsuits outside the scope of the TVPA. See *id.* Adopting a similar rationale, the court concludes that the inclusion of an exhaustion of remedies provision in the TVPA was not intended to impose a similar requirement upon ATCA claims that fall outside the scope of the TVPA statute.

As noted earlier, the TVPA was enacted at least partially in response to Judge Bork's concurrence in *Tel–Oren, supra,* 726 F.2d at 798–823. In his opinion, Judge Bork took issue with the Second Circuit's assumption in *Filartiga* that the ATCA both granted jurisdiction and created a cause of action. *Id.* at 801. He stated: "... [I]t is essential that there be an explicit grant of a cause of action before a private plaintiff be allowed to enforce principles of international law in a federal tribunal." *Id.* The TVPA con-

firmed that individuals subjected to torture and/or extrajudicial killing by state actors had a cognizable claim in federal court. See *Kadic, supra,* 70 F.3d at 241 ("Congress enacted the Torture Victim Act to codify the cause of action recognized by this Circuit in *Filartiga,* and to further extend that cause of action to plaintiffs who are U.S. citizens"). It was to this specific cause of action that Congress attached an exhaustion of local remedies requirement.

Moreover, nothing in the TVPA's legislative history supports defendants' argument that Congress was motivated to include an exhaustion requirement because it believed that exhaustion was a necessary element of a torture/extrajudicial killing claim under international law.[102] Rather, it appears that Congress mandated exhaustion as a means of balancing its desire to provide meaningful remedies to victims of such acts against its wish to avoid overburdening the nation's courts.[103] While at least one speaker at legislative hearings on

**102.** See Reporter's Transcript of July 9, 2001 Proceedings ("RT") at 16:17–20 ("The Senate when it enacted the TVPA added the—specified the exhaustion requirement based on— ... based on a finding that that is a general requirement of international law").

**103.** See H.R. Rep. 367, *supra,* at 4, U.S.Code Cong. & Admin.News 1992, pp. 84, 87 ("Striking a balance between the desirability of providing redress for a victim and the fear of imposing additional burdens on U.S. courts, the bill recognizes as a defense the existence of adequate remedies in the country where the violation allegedly occurred"); *id.* at 5 ("The bill provides that a court shall decline to hear and determine a claim if the defendant establishes that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred. This requirement ensures that U.S. courts will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries"). See also

*March 23 Hearing on H.R. 1417, supra,* at 26 (statement of M. Posner) ("Passage of the legislation will not open the floodgates to litigation in U.S. courts, if for no other reason than that human rights violators rarely are made available to victims or victims' families in this country. In addition, the language of the Act includes several important limitations. For example: ... A court could decline jurisdiction if there was clear and convincing evidence that the party bringing the case had not exhausted 'adequate and available remedies' in the nation where the alleged abuses occurred"); *id.* at 31 (statement of A. Henkin) ("The Act, moreover, would authorize suits in federal court only after the victim or his representative has exhausted any adequate and available legal remedies in the place where the torture of killing occurred. The Protection Act would thereby encourage other nations to develop meaningful domestic remedies, and would provide a remedy in U.S. courts only when no forum is available in the state where the act occurred"); *id.* at 38 (statement of A. Henkin) ("Striking a balance between the desirability of providing redress for a victim and the potential burdens on U.S. courts, the proposed statute recognizes as a

the bill referenced similar exhaustion requirements in both international and domestic law,[104] at no point did anyone testify that an exhaustion provision should be included in the TVPA because it was a necessary element of such a claim under international law. Indeed, the statements of this one speaker—who was not even a member of Congress—are not reliable indicators of Congressional intent, and cannot be given weight in the face of committee reports indicating a contrary purpose. Compare *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation' "); *United States v. Nelson*, 277 F.3d 164, 186 (2d Cir.2002) ("In making this inquiry, we rely principally on the reports of the legislative Committees involved in drafting the statute and in steering it through Congress. The Supreme Court has said that these Reports, 'which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation,' constitute 'the authoritative source for finding the Legislature's intent.' ... We therefore 'eschew [ ] reliance on the passing comments of one Member, and casual statements from the floor debates,' ... and focus on the Reports instead"); *Mills v. United States*, 713 F.2d 1249, 1252 (7th Cir.1983) (committee reports are among the most reliable indicators of congressional intent), cert. denied, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *American Jewish Congress v. Kreps*, 574 F.2d 624, 629, n. 36 (D.C.Cir.1978) (committee reports carry greater weight than other types of legislative history) with *Kelly v. Robinson*, 479 U.S. 36, 51, n. 13, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) ("We acknowledge that a few comments in the hearings and the Bankruptcy Laws Commission Report may suggest that the language bears the interpretation adopted by

defense the existence of adequate remedies in the country where the violation allegedly occurred"); *id.* at 42–43 (statement of A. Henkin) ("The Protection Act provides that a court 'shall decline to hear and determine a claim' under the statute 'if the defendant establishes by clear and convincing evidence that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.' This requirement ensures that U.S. courts will not intrude into cases more appropriately handled by courts in the state where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries").

**104.** See *March 23 Hearing on H.R. 1417, supra,* at 43–45 (statement of A. Henkin) ("The exhaustion requirement contained in the Protection Act tracks similar requirements found in a range of international agreements that establish remedies for individuals claiming violations of their human rights. The common requirement that an individual exhaust domestic remedies before seeking a remedy outside his country has been interpreted by international tribunals and commentators in a manner wholly consistent with the goals of the Protection Act .... The exhaustion requirement in international law strikes a balance between the international community's interest in avoiding unwarranted intrusion in matters properly left to a sovereign nation's domestic system and a human rights victim's right to a judicial remedy"); *id.* at 45, n. 29 (statement of A. Henkin) ("The requirement that a litigant must exhaust other available remedies before seeking judicial intervention is familiar in U.S. law as well. For example, a basic tenet of administrative law requires the plaintiff to pursue all internal administrative remedies before resorting to the court for relief. Not all domestic remedial legislation, of course, imposes an exhaustion requirement. Section 1983 civil rights suits, for example, are not barred by the plaintiff's failure to exhaust state or administrative remedies");

the Second Circuit. But none of those statements was made by a Member of Congress, nor were they included in the official Senate and House Reports. We decline to accord any significance to these statements"); *Turner v. Prod*, 707 F.2d 1109, 1119 (9th Cir.1983) ("... testimony of witnesses before congressional committees prior to passage of legislation generally constitutes only 'weak evidence' of legislative intent"), rev'd. on other grounds sub nom. *Heckler v. Turner*, 470 U.S. 184, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985); *Nish v. Cohen*, 95 F.Supp.2d 497, 500 (E.D.Va. 2000) ("Generally, statements made at committee hearings by non-members of Congress are accorded little to no weight in a legislative history analysis," citing Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION, § 48.10, at p. 343 (5th ed.1992)).

The Ninth Circuit, like the Second Circuit, has explicitly recognized that the ATCA not only confers jurisdiction on the federal courts, but creates a cause of action based on international law. See *Alvarez–Machain, supra*, 107 F.3d at 703 ("First, defendants argue that the ATCA confers jurisdiction on federal courts to hear international law claims, but does not create a substantive, federal right like the TVPA. Defendants err in their description of the ATCA; we have previously held that the ATCA has a substantive as well as a jurisdictional component"); *Hilao II, supra*, 25 F.3d at 1473 ("In *[In re Estate of Ferdinand E. Marcos Human Rights Litigation] Estate I, [*978 F.2d 493 (9th Cir. 1992)]* we agreed that a jurisdictional statute could 'not alone confer jurisdiction on the federal courts, and that the rights of the parties must stand or fall on federal substantive law to pass constitutional mus-

ter.' ... However, we disagreed that there was no federal substantive law governing the dispute[,] ... [and] rejected the Estate's argument that international law does not provide a basis for federal court jurisdiction under § 1350"); *id.* at 1475 ("We thus join the Second Circuit in concluding that the Alien Tort Act, 28 U.S.C. § 1350, creates a cause of action for violations of specific, universal and obligatory international human rights standards which 'confer [ ] fundamental rights upon all people vis-a-vis their own governments' "). It is thus appropriate for this court to adopt the Second Circuit's view that the ATCA continues to provide a cause of action for violations of international law *other than* torture and extrajudicial killing. See *Kadic, supra*, 70 F.3d at 241 ("Claims based on torture and summary executions do not exhaust the list of actions that may appropriately be covered [by the Alien Tort Act]. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.... The scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim Act").

As respects these types of claims, there is no explicit statutory requirement that plaintiffs exhaust local remedies before filing suit in federal court. Nor, as noted, is there any indication in the legislative history that Congress intended to impose any such requirement. Congress could, had it wished to do so, have amended the ATCA to impose such a requirement at the time it enacted the TVPA. It did not do so. As a matter of statutory construction, therefore, the court declines to find that ATCA plaintiffs must exhaust national remedies before filing suit in the United States.[105]

---

**105.** See Eric Gruzen, *The United States as a Forum for Human Rights Litigation: Is This the Best Solution?*, 14 TRANSNAT'L L. 207, 232 (2001) ("A final distinction between the two statutes is that the Torture Victim Protection

Act, unlike the Alien Tort Statute, incorporates a requirement that the claimant exhaust local remedies"); Kathryn L. Pryor, *Does the Torture Victim Protection Act Signal the Immi-*

Cf. *Jama v. U.S. Immigration and Naturalization Service*, 22 F.Supp.2d 353, 364 (D.N.J.1998) (rejecting defendants' contention that plaintiffs could not state ATCA claims for violation of international law because the United States Constitution and statutes afforded adequate relief, the court found "there [was] no absolute preclusion of international law claims" simply because "domestic remedies [were available] for the same alleged harm.... There is nothing in the ATCA which limits its application to situations where there is no relief available under domestic law").[106]

### ii. Exhaustion Requirement Under International Law

■ Defendants argue alternatively that exhaustion of local remedies is a well-established principle of international law, and thus that, in order to plead a "violation of the law of nations," an ATCA plaintiff must plead exhaustion of local remedies. It would appear that exhaustion of local remedies is generally a recognized feature of international law. See *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422–23, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)

("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another. Because of its peculiar nation-to-nation character the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal"); RESTATEMENT, § 703, cmt. d ("A state may pursue formal, bilateral remedies under Subsections (1) and (2) only after the individual claiming to be a victim of a human rights violation has exhausted available remedies under the domestic law of the accused state. International agreements providing remedies to individuals also generally require that the individual first exhaust domestic remedies. That requirement is met if it is shown that none is available or that it would be futile to pursue them. The individual's failure to exhaust remedies is not an obstacle to informal intercession by a state on behalf of an individual, to unilateral 'sanctions' by a state against another for human rights violations, or to multilateral measures

---

*nent Demise of the Alien Tort Claims Act?*, 29 VA. J. INT'L L. 969, 1017 (1989) ("Finally, the TVPA, unlike the ATCA, incorporates an exhaustion of local remedies requirement").

**106.** In further support for their exhaustion argument, defendants cite a treatise written by plaintiffs' expert, Steven Ratner, on human rights violations under international law. Ratner states that, "[a]lthough not explicit in the ATCA, th[e exhaustion] requirement also applies to suits under that statute...." Steven R. Ratner & Jason S. Abrams, *Accountability for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy* at 245 (2d ed.2001). As evidence of this proposition, Ratner cites two cases—*Xuncax, supra*, 886 F.Supp. at 178, and *Mushikiwabo v. Barayagwiza*, No. 94 CIV. 3627(JSM), 1996 WL 164496, *2 (S.D.N.Y. April 9, 1996)—both of which involved claims under the TVPA. The proper interpretation of a statute is a question of law for the court. See, e.g., *Silver Sage*

*Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir.2001); *United States v. Stephens*, 237 F.3d 1031, 1033 (9th Cir.2001). Questions of law are inappropriate subjects for expert testimony. See, e.g., *G.F. Company v. Pan Ocean Shipping Co., Ltd.*, 23 F.3d 1498, 1507, n. 6 (9th Cir.1994) (" '[M]atters of law for the court's determination ... [a]re inappropriate subjects for expert testimony.'... Because the interpretation of legislative history and the application of a statute to a particular case are uniquely questions for the court, we strike the affidavits from the record," quoting *Aguilar v. International Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir.1992)). Consequently, the court declines to defer to the views articulated by Professor Ratner in his treatise, or to the opinions expressed by defendants' expert, Professor Barry Carter, in a declaration filed in support of defendants' motion to dismiss. (See note 107 *infra*.)

against violators by United Nations bodies or international financial institutions").[107]

Nonetheless, the court here must apply the plain language of the ATCA, which does not require such a measure. See *Bates v. United States,* 522 U.S. 23, 30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face"); *Ralph Oldsmobile Inc. v. General Motors Corp.,* No. 99–Civ. 4567(AGS), 2000 WL 1459767, *5 (S.D.N.Y. Sept. 29, 2000) ("It is well established that a court should usually not read into a statute requirements that are not called for by the statutory language").

Stated otherwise, the ATCA does not adopt wholesale all principles of international law. Rather, it creates a domestic cause of action for violations of international law. See *Hilao II, supra,* 25 F.3d at 1475 (" '. . . section 1350 does not require that the action 'arise under' the law of nations, but only mandates a 'violation of the law of nations' in order to create a cause of action.' . . . It is unnecessary that international law provide a *specific* right to sue. International law 'does not require any particular reaction to violations of law. . . . Whether and how the United States wished to react to such violations are domestic questions,' " quoting *Tel–Oren, supra,* 726 F.2d at 779 (Ed-

wards, J., concurring) (emphasis original)). Because it is a creature of domestic law, the ATCA need not impose the same conditions on a plaintiff's right to sue as international law or the domestic law of other nations. Accordingly, the court finds that plaintiffs are not required to demonstrate that they have exhausted local remedies, or that doing so would be futile, in order to state a claim under the ATCA.

### b. Pleading Of Substantive Claims

#### i. War Crimes

Count II of plaintiffs' complaint pleads an ATCA claim for war crimes and murder.[108] It alleges that, acting as Rio Tinto's agents, the PNG government and the PNG Defense Force ("PNGDF") violated the law of war, which constitutes a recognized norm of international law. Specifically, it asserts that by implementing and maintaining a medical blockade, defendants tortured and murdered innocent civilians.[109] It also alleges that the PNGDF bombed civilian targets, engaged in wanton killing and acts of cruelty, burned homes and villages, raped Bougainvillean women, and pillaged the island.[110]

Courts have held that a violation of the law of war may serve as a basis for a claim under the ATCA. See *Kadic, supra,* 70

---

107. See also Declaration of Professor Barry E. Carter in Support of Defendants' Motion to Dismiss ("Carter Decl."), ¶¶ 22–23 ("One requirement consistent with the concern for sovereignty is that a plaintiff exhaust adequate and available remedies in the place in which the conduct giving rise to the claim occurred before seeking the same remedy in another country. This requirement stems from the law of nations' deference to the concepts of territorial integrity and political independence of sovereigns. This principle is articulated in the Torture Victim Protection Act, where Congress has codified some principles of international law. . . . Because exhaustion is also a requirement of customary inter-

national law, . . . a plaintiff seeking to make a claim under the Alien Tort Statute should have to exhaust national remedies. Thus to bring an action in a United States court pursuant to customary international law, a foreign plaintiff should have to show that he or she has exhausted the adequate remedies that might be available in his or her local forum, or that there is a basis for excusing him or her from doing so").

108. See First Amended Complaint, ¶¶ 219–25.

109. See *id.,* ¶ 221.

110. See *id.,* ¶ 203.

F.3d at 242–43 ("Plaintiffs also contend that the acts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities, violate the law of war. Atrocities of the types alleged here have long been recognized in international law as violations of the law of war.... The District Court has jurisdiction pursuant to the Alien Tort Act over appellants' claims of war crimes and other violations of international humanitarian law"); *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 444–45 (D.N.J.1999) (concluding that plaintiff had stated a claim under the ATCA since "deportation of civilian populations to slave labor is a war crime"); *Jane Doe I v. Islamic Salvation Front (FIS)*, 993 F.Supp. 3, 8 (D.D.C.1998) (finding jurisdiction under the ATCA for alleged war crimes because the Geneva Conventions, which apply to "armed conflict[s] not of an international character," require that civilians be "treated humanely" and prohibit "murder of all kinds, mutilation, cruel treatment and torture, kidnapping and summary executions"). See also *Corporate Liability for Violations of International Human Rights Law*, 114 HARV. L. REV.2025, 2037 (2001) ("[I]f a corporation commits piracy, slave trading, genocide, or war crimes, then it may be held liable under the ATCA even absent state action"); RESTATEMENT, § 404 ("A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as ... war crimes, ... even where [no other basis of jurisdiction] is present").

Defendants attack plaintiffs' war crimes allegations on two bases. First, they assert that plaintiffs have not alleged a violation of the law of war.[111] Second, they contend that plaintiffs do not adequately plead that Rio Tinto is a state actor.[112]

**(a) Plaintiffs Have Adequately Alleged A Violation Of The Law Of War**

■ Defendants contend that plaintiffs' allegations regarding the effects of the medical blockade do not state a claim for violation of the law of war because "blockades, a form of non-violent economic pressure, do not run afoul of established international norms."[113] As support for this proposition, defendants proffer the declaration of their expert, Professor Barry Carter. Carter states: "The allegation that a sovereign state's blockade of an island within its recognized territory is illegal runs contrary to customary international law, which recognizes and respects the political independence and territorial sovereignty of a state[,] including the inherent right to police its own territory."[114] Carter cites no authority supporting his opinion.

In fact, his (and defendants') position is contrary to the Geneva Conventions, which "represent the international consensus regarding minimum standards of conduct during wartime." *M.A. A26851062 v. U.S. INS*, 858 F.2d 210, 219 (4th Cir.1988). Following World War II, the Geneva Conventions were ratified by more than 180 nations, including the United States. See *Kadic, supra*, 70 F.3d at 243. They apply to "armed conflict[s] not of an international character," and require that each party to the conflict treat persons taking no active part in the hostilities humanely. See *Kadic, supra*, 70 F.3d at 243; *M.A., supra*, 858 F.2d at 219; *Islamic Salvation Front, supra*, 993 F.Supp. at 8. See also *Marzook v. Christopher*, 924 F.Supp. 565, 577 (S.D.N.Y.1996) ("The indiscriminate bomb-

---

**111.** See *id.* at 19–22.

**112.** See *id.* at 22–25.

**113.** Defs.' Mem. at 20:4–5.

**114.** Carter Decl., ¶ 24.

ing of buses laden with civilians and other such types of attacks targeted at civilians do not advance any political motive other than as terrorist acts. Such attacks have been universally condemned, even when they occur during a declared war, and clearly are less tolerable when committed by terrorists," citing the Geneva Convention).

The Conventions prohibit the following acts: "(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture; (b) taking of hostages; (c) outrages upon personal dignity, in particular humiliating and degrading treatment; [and] (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Kadic, supra,* 70 F.3d at 243; *American Baptist Churches in the U.S.A. v. Meese,* 712 F.Supp. 756, 769 (N.D.Cal.

1989). Additionally, Article 3 of Geneva Convention IV provides that "[t]he wounded and sick shall be collected and cared for." Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949, *entered into force* Oct. 21, 1950, *for the United States* Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287, art. 3(2).

Despite defendants' arguments to the contrary,[115] the court concludes that plaintiffs' allegations regarding the decade-long civil war in Bougainville adequately plead the existence of an "armed conflict not of an international character." Because they were engaged in such a conflict, the parties to the struggle—the PNGDF and the BRA—had an obligation to treat civilians humanely. Alleging that defendants intentionally denied civilians medical treatment and supplies through the imposition of a medical blockade adequately pleads "cruel treatment" and an "outrage[ ] upon personal dignity" within the meaning of the

---

115. See Defs.' Mem. at 20–21. Defendants contend that the civil war in PNG does not qualify as an "armed conflict" because plaintiffs fail to allege that "dissident armed forces or other organized armed groups ... under responsible command, exercise[d] such control over ... territory as to enable them to carry out sustained military operations and implement" the Geneva Conventions. (*Id.* at 20:21–24 (citing the Protocol Additional to the Geneva Conventions of 12 August 1949, Relating to the Protection of Victims of Non–International Armed Conflicts ("Protocol"), 1125 U.N.T.S. 609, Part I, Art. 3, § 1).) Rather, they contend, the complaint alleges only that there were " 'internal disturbances and tensions' and 'sporadic acts of violence' which the Protocol excludes from the definition of armed conflict." (*Id.* at 20:28–21:2.) First, it is not clear that the Protocols "have ripened into universally accepted norms of international law." See *Kadic, supra,* 70 F.3d at 243, n. 8. Second, the court cannot accept defendants' characterization of plaintiffs' allegations. The complaint asserts that with the support of Australia, the PNGDF waged a civil war against the BRA for almost ten

years. (See, e.g., First Amended Complaint, ¶¶ 183, 200, 203, 206.) Plaintiffs describe several incidents in which members of the BRA and civilians were killed by the PNGDF. (See, e.g., *id.,* ¶¶ 183, 200, 203, 204.) Moreover, plaintiffs allege that for approximately seven years, the PNG maintained and enforced a medical blockade, which prevented Bougainville civilians from receiving medical supplies and treatment, and which led ultimately to the death of approximately 10,000 persons. (See *id.,* ¶ 196.) These allegations suffice to plead the existence of an "armed conflict" within the meaning of the Geneva Conventions. See *Kadic, supra,* 70 F.3d at 243, n. 8 ("The offenses alleged by the appellants, if proved, would violate the most fundamental norms of the law of war embodied in common article 3, which binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents"). Whether plaintiffs' proof will demonstrate the existence of an "armed conflict" or some other level of disturbance is a matter that is not appropriately resolved at the pleadings stage.

treaty. It also adequately pleads a violation of the requirement that "[t]he wounded and sick ... be collected and cared for."[116]

In addition to their allegations regarding the medical blockade, plaintiffs also allege that PNG troops bombed civilian targets, engaged in wanton killing and acts of cruelty, burned houses and villages, raped women, and pillaged.[117] Defendants do not dispute that such acts are prohibited by the Geneva Conventions. Because the Conventions codify the law of war (see *Kadic, supra,* 70 F.3d at 243), and because the complaint sufficiently alleges a violation of the Conventions, plaintiffs have adequately pled war crimes under the ATCA.

### (b) Plaintiffs Have Adequately Alleged Rio Tinto's Liability For War Crimes

■ Defendants next contend that plaintiffs have not adequately alleged that Rio Tinto proximately caused the war crimes purportedly committed by the PNGDF.[118] They assert that, in order to hold a private defendant liable for a state's violation of international law, a plaintiff must plead and prove that the private party "controlled" the state's conduct. Defendants argue that plaintiffs have failed to allege such control.[119]

Plaintiffs do not dispute that their war crimes allegations involve actions taken by the PNGDF rather than Rio Tinto. They maintain, however, that defendants may be held vicariously liable for international law violations under the ATCA "if [they] take[ ] steps to aid and encourage another's commission of such violations, with knowledge that the violations will oc-

cur."[120] Plaintiffs rely primarily on *Hilao III* and the *Unocal* cases.

In *Hilao III,* plaintiffs sued the Estate of Ferdinand Marcos under the TVPA. They alleged that Philippine military and paramilitary forces under Marcos' command had tortured, summarily executed, and caused the disappearance of plaintiffs and/or their family members during Marcos' nearly 14–year rule. See *Hilao III, supra,* 103 F.3d at 771. The district court instructed the jury, *inter alia,* that the Estate was liable if Marcos "directed, ordered, conspired with, or aided" the military, or if he "knew of such conduct... and failed to use his power to prevent it." *Id.* at 776. On appeal, the Estate argued that the court should have instructed that it could be held liable only for Marcos' conduct, and not for acts within his knowledge that he failed to prevent. See *id.* at 778–79.

Rejecting this argument, the Ninth Circuit noted that the legislative history of the TVPA endorsed the concept of "command responsibility," long recognized in the law of war, and beginning to gain acceptance in the context of liability for peacetime acts of torture. *Id.* at 777, 778–79 (quoting S.Rep. No. 249, 102nd Cong., 1st Sess., at 9 (1991) (" '[A] higher official need not have personally performed or ordered the abuses in order to be held liable. [R]esponsibility for torture, summary execution, or disappearances extends beyond the person who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them' ")). Since Marcos was a "higher official," the

---

116. The Geneva Convention also prohibits the targeting, destruction or rendering useless of objects essential to a civilian population's survival (i.e., foodstuffs, crops, drinking water, and other indispensable items). See Geneva Convention, Art. 54, Protocol I.

117. See First Amended Complaint, ¶ 203.

118. See Defs.' Mem. at 23–24.

119. See *id.* at 23–24.

120. Pls.' Opp. at 21–22.

court concluded that he could be held liable for knowing about acts of torture and execution, and failing to take steps to prevent them. *Id.*

The court also addressed the Estate's challenge to an additional instruction, which stated that the Estate could be held liable if plaintiffs' injuries were "caused by reason of a person being taken into custody by an order of Ferdinand Marcos or under his authority." *Id.* at 779. The Estate argued that the instruction erroneously allowed the jury to hold it liable for injuries suffered by a plaintiff taken into custody on Marcos' orders and later injured due to "intervening causes." *Id.* Noting that jury instructions must be considered as a whole, the court found no error. It stated:

> "The challenged instruction came directly after the district court's main instruction on liability, which required the jury to find either that Marcos had 'directed, ordered, conspired with, or aided' in torture, summary execution, and disappearance, or that he had knowledge of that conduct and failed to use his power to prevent it. Thus, it is clear that the jury was required to find not merely that the plaintiffs were taken into custody under Marcos' authority but that once in custody the plaintiffs were tortured, executed, or disappeared on Marcos' orders or with his knowledge. The district court did not abuse its discretion in giving the challenged instruction." *Id.*

As this excerpt makes clear, the Ninth Circuit upheld the instructions because it concluded that, in enacting the TVPA, Congress intended to extend the concept of "command responsibility" to peacetime acts of torture and extrajudicial killing. The court did not focus on, or discuss, the instruction's use of the phrase "directed, ordered, conspired with or aided," most

probably because the Estate did not challenge it on appeal. See *id.* at 776.

As plaintiffs cannot invoke the concept of "command responsibility" to demonstrate that Rio Tinto is liable for PNG's alleged violations of international law, the court finds *Hilao III* inapposite in determining what facts must be alleged to state a war crimes claim. The *Unocal* cases, by contrast, are directly relevant.

Plaintiffs contend the decisions stand for the proposition that a private entity may be held vicariously liable under the ATCA if it participates or cooperates in, approves of, or accepts the economic benefits of a state's international law violations.[121] In *Unocal,* plaintiffs sued Unocal Corporation under the ATCA for injuries suffered as a consequence of international human rights violations committed by the government of Burma in connection with the Yadana Natural Gas Project. See *Doe v. Unocal Corp. (Unocal V),* 110 F.Supp.2d 1294 (C.D.Cal.2000); *Unocal II, supra,* 176 F.R.D. 329; *Doe I v. Unocal Corp. ("Unocal I"),* 963 F.Supp. 880 (C.D.Cal.1997). Plaintiffs argued that Unocal was liable for the violations because it had entered into a joint venture or implied partnership with the Burmese government to exploit the natural gas resources in the Yadana field. *Unocal II, supra,* 176 F.R.D. at 335–36. They alleged that Unocal participated in the Project by paying its share of Project expenses; shipping equipment to the region; assigning personnel to work on the Project; providing technology and expertise for gas exploration and transportation; and monitoring and advising its partners' performance of their obligations. *Id.* at 336. Plaintiffs contended Unocal had been placed on notice that the Burmese government would use forced labor and commit other human rights violations in implementing the Project, but took no action to ensure that this did not occur. *Id.*

**121.** See *id.*

1144

To evaluate whether the corporation could be held liable for the acts of the Burmese government, the *Unocal I/Unocal II* court followed the lead of the Second Circuit in *Kadic* and looked to case law addressing the "color of law" requirement imposed by 42 U.S.C. § 1983.[122] See *Unocal II, supra,* 176 F.R.D. at 345; *Unocal I, supra,* 963 F.Supp. at 890 (citing *Kadic, supra,* 70 F.3d at 245). In *Kadic,* the Second Circuit described the standard as follows: "A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Kadic, supra,* 70 F.3d at 245. Citing this language, and the Ninth Circuit's jurisprudence regarding state action under § 1983, the *Unocal I* court concluded that "private actors can be state actors if they are 'willful participant[s] in joint action with the state or its agents.'" An agreement between a government and a private party, it found, can constitute joint action. See *Unocal I, supra,* 963 F.Supp. at 890–91 (quoting *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)). Applying this standard, the court held that allegations that the Burmese government was Unocal's agent, that the two were joint venturers working in concert, and that they conspired to commit international law violations were sufficient to plead state action. *Unocal I, supra,* 963 F.Supp. at 890–91 (complaint adequately alleged that Unocal was "jointly engaged with the state officials in the challenged activity,

namely forced labor and other human rights violations in furtherance of the pipeline project"). See also *Unocal II, supra,* 176 F.R.D. at 345–47, 348 (using the " 'willful participant in joint action with the state or its agents' " standard of *Dennis* and *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989), the court held that allegations of a joint venture and/or partnership between Unocal and the Burmese government were sufficient to state an ATCA claim because they suggested that Unocal's activities were inextricably intertwined with those of the Burmese government).

In *Unocal V,* the court addressed the adequacy of plaintiffs' proof of state action on summary judgment. While acknowledging that state action can be shown if a private party is a "willful participant in joint action with the State" (*Unocal V, supra,* 110 F.Supp.2d at 1305), the court noted that this standard contemplates a situation in which a private party has engaged in the challenged conduct while acting in concert with the government. By contrast, it stated, the plaintiffs in *Unocal* sought to hold the corporation liable for acts committed by the Burmese government. See *id.* at 1307. See also *National Collegiate Athletic Ass'n. v. Tarkanian,* 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) ("In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state ac-

**122.** Unlike this action, the *Unocal* cases did not involve allegations of war crimes. War crimes are actionable under the ATCA without regard to state action. See *Bigio, supra,* 239 F.3d at 448 ("We held in *Kadic* that war crimes and acts of genocide are actionable under the Alien Tort Claims Act without regard to state action, but that 'torture and summary execution—when not perpetrated in the course of genocide or war crimes—are proscribed by international law only when committed by state officials or under color of law' "); *Kadic, supra,* 70 F.3d at 243. Because the conduct in question here was clearly committed by state actors, however, the court must perform a "reverse state action" analysis to determine whether defendants, as private parties, can be held liable for that conduct.

tion.... Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.... This case uniquely mirrors the traditional state action case. Here the final act challenged by Tarkanian—his suspension—was committed by UNLV").

Because the acts in question had been committed by a governmental entity, the *Unocal V* court applied both a "joint action" and "proximate cause" test. As respects "joint action," it concluded that the fact that Unocal and the Burmese government shared an interest in ensuring the profitability of the Project was not sufficient to prove that Unocal was a state actor. Because there was no evidence that Unocal "participated in or influenced" the unlawful conduct, or that it conspired with the government of Burma, the court found no proof of "joint action." *Id.* at 1306–07.

The court next analyzed the situation under a "proximate cause" test, which it defined as follows: "In order for a private individual to be liable for a section 1983 violation when the state actor commits the challenged conduct, the plaintiff must establish that the private individual was the proximate cause of the violation. In order to establish proximate cause, a plaintiff must prove that the private individual[ ] exercised control over the government official's decision to commit the section 1983 violation." *Id.* at 1307. (citing *Brower v. Inyo County*, 817 F.2d 540, 547 (9th Cir. 1987), rev'd. on other grounds, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir.1986); *Arnold v. International Bus. Machines Corp.*, 637 F.2d 1350, 1356 (9th Cir.1981)).[123] Because plaintiffs presented no evidence that Unocal "controlled" the Burmese government's decision to commit violations of international law, the court found that they had failed to satisfy the "state action" requirement of the ATCA. *Id.*

123. See *Brower, supra*, 817 F.2d at 547 ("For a complaint to allege a valid claim against private parties for a deprivation of protected rights under section 1983, it must allege that specific conduct by a party was a proximate cause of the section 1983 injury"); *Massarweh, supra*, 782 F.2d at 829 ("Under similar circumstances, this court has determined that, absent some showing that a private party had some control over state officials' decision to arrest a person or search his residence, the private party did not proximately cause the injuries stemming from the arrest and search"); *Arnold, supra*, 637 F.2d at 1356 ("If Arnold could point to any fact that would tend to show that defendants had some control or power over the Task Force, and that defendants directed the Task Force to take action against Arnold, there would certainly be a dispute of material fact on the issue of proximate cause sufficient to reverse the summary judgment"). See also *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1546 (9th Cir.1989) ("Here, [as in *Arnold*], there is abundant evidence of cooperative involvement between Phelps Dodge and law enforcement agencies. The question is, is there more? We believe there is. Here, the conspiracy is admitted for purposes of this appeal. This conspiracy is the 'smoking gun.' The issue is whether the Steelworkers presented enough evidence for a reasonable jury to decide that Phelps Dodge helped pull the trigger. [¶] At the August 11 meeting, Phelps Dodge did not merely agree to cooperate in an investigation. It did not merely provide the police with useful information. It did not merely ask that its gates be opened and its property and workers be protected. If that were all Phelps Dodge requested, this case would be like *Arnold*. Phelps Dodge, in contrast, wanted the police to arrest strikers and 'keep them off the streets.' A reasonable jury could infer that this was not a request to keep strikers off the street in front of the plant, but off 'the streets'—all streets.... It reflects an intent to punish the strikers. Nor is this all. Phelps Dodge further suggested that the police keep the strikers off the streets by setting high bail. A reasonable jury could infer that this reflects an intent to punish the strikers.... Based on this direct evidence, a jury could infer that Phelps Dodge was a participant in the conspiracy").

Given the alternative approaches utilized by the court in *Unocal V,* it is appropriate to consider which test is properly utilized in assessing whether plaintiffs' war crimes claim adequately pleads defendants' liability for the alleged acts of PNG and the PNGDF. The Ninth Circuit's decision in *Arnold* offers some guidance, as it contains a useful discussion of the relationship between the state action and proximate cause requirements of § 1983. In *Arnold,* certain proprietary documents were stolen from IBM, which commenced an internal investigation. Company officials then met with representatives of the California Attorney General's Office and Santa Clara District Attorney's Office, and a criminal investigation was commenced that led ultimately to Arnold's arrest. *Arnold, supra,* 637 F.2d at 1352–53.

Noting that, in the case before it, "the determination of proximate cause [was] different from the determination of state action" (*id.* at 1355), the court first discussed *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), in which the Supreme Court held that a paroled prisoner's killing of a young girl could not be deemed state action because "the death was 'too remote a consequence of the parole officers' action [in releasing the prisoner] to hold them responsible under the federal civil rights law.'" *Arnold, supra,* 637 F.2d at 1356 (quoting *Martinez, supra,* 444 U.S. at 285, 100 S.Ct. 553). The Ninth Circuit observed:

"Although the Court saw no need to decide the proximate cause issue, it appears to have employed elements of proximate cause analysis in determining state action. This can occur when the defendants are state officers. If the actions of the state officers are not the proximate cause of the plaintiff's injuries, then there is no state action.... [¶] The similarity between proximate cause and state action often disappears when the defendants are private parties, rather than state officials. In most cases involving private defendants, there is no proximate cause issue at all. Usually, it is clear that the defendants caused the plaintiff's injury. The issue is whether the particular conduct is purely private, and thus immune from section 1983 liability, or is state action.... The case before us presents a different problem. Here, Arnold's injuries were the result of state action. State officials performed the acts of arresting, searching, and indicting about which Arnold complains. Some circuits have examined the liability of private parties involved in police arrests in terms of state action.... In this case, however, the question before us is whether there is any evidence that the private defendants, IBM and its employees, caused those acts to occur within the meaning of sections 1983 or 1985." *Id.* at 1356.

More recently, the Ninth Circuit observed that "[r]egardless of the label, the inquiry is the same: There must be some nexus between the wrongful act and the private entity." *Sutton v. Providence St. Joseph Medical Center,* 192 F.3d 826, 838 & n. 5 (9th Cir.1999) (citing *Tarkanian's* statement that "[i]n the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action," the court concluded that a private defendant that acts under compulsion of a state regulation does not engage in state action unless there is "some other nexus between the private entity and the government"). *Sutton* suggests that, however the test is denominated, the court must determine that the conduct of the state is "fairly attributable" to the private party before state action can be found. See *id.* ("... the mere fact that the government

compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant ... without some other nexus").

This is consistent with the Supreme Court's analysis in *Tarkanian*. The University of Nevada at Las Vegas ("UNLV") suspended Tarkanian as its basketball coach after the NCAA threatened to impose sanctions against the school if it did not. See *Tarkanian, supra*, 488 U.S. at 186, 109 S.Ct. 454. Tarkanian sued the NCAA under 42 U.S.C. § 1983. Examining Tarkanian's contention that the association was a state actor, the Court considered a number of possibilities—whether UNLV's participation in NCAA rulemaking made those rules the product of state action; whether UNLV's adoption of and compliance with the rules transformed the NCAA into a state actor; whether the NCAA's investigation and enforcement activities were the result of a delegation of power by UNLV; whether UNLV's promise to cooperate in enforcement proceedings was tantamount to a partnership between the entities; and

whether the "power" that the NCAA exercised over the collegiate athletics was so great that UNLV had no alternative but to comply with its demands. *Id.* at 192–99, 109 S.Ct. 454. The Supreme Court found none of these suggestions persuasive. Noting that "[i]n [the] final analysis the question is whether 'the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State,'" it concluded that the NCAA's conduct could not fairly be attributed to the State of Nevada, as UNLV had opposed the imposition of sanctions and Tarkanian's suspension throughout lengthy disciplinary proceedings. *Id.* at 199, 109 S.Ct. 454. See also *id.* at 196, 109 S.Ct. 454. Because the parties' interests did not coincide, it held that there was no "joint action," as that term had been used in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and that there could be no proof of conspiracy, as there had been in *Dennis, supra*, 449 U.S. at 28–29, 101 S.Ct. 183. *Tarkanian, supra*, 488 U.S. at 196, 198, n. 17, 109 S.Ct. 454.[124]

**124.** The Court also held that the NCAA's rules could not be considered the product of state action, since they were formulated by the association's "collective membership" (*id.* at 193, 109 S.Ct. 454); that UNLV's decision to adopt the regulations as its own did not render the NCAA a state actor because the university "retained plenary power to reexamine [the] standards, and, if necessary, to reject them and promulgate its own" (*id.* at 194, 109 S.Ct. 454); that UNLV did not delegate power to the NCAA to discipline its employees, as the association had no power to discipline Tarkanian and all of its actions were directed to the university itself (*id.* at 195–96, 198, 109 S.Ct. 454); and finally that the NCAA did not "impose its will" on UNLV because the university at all times had available the option of non-compliance (*id.* at 198–99, 109 S.Ct. 454). Defendants cite this last rationale as evidence that there can be no state action here as a matter of law. Specifically, they contend that plaintiffs' allegation

that Rio Tinto controlled the PNG government by threatening to withdraw investment from the region insufficiently pleads proximate cause. (See Defendants' Reply in Support of Motion to Dismiss ("Defs.' Reply") at 24–25.) The *Tarkanian* Court recognized that the NCAA rules influenced UNLV to take the action it did, but nonetheless concluded that the ultimate power to suspend rested with the university and not with the NCAA. *Id.* at 198, 109 S.Ct. 454. It questioned whether "the power of the NCAA [was] so great that the UNLV had no practical alternative to compliance with its demands" (*id.*), but noted that, even if true, this would not transform the NCAA into a state actor. The Court reasoned: "The university's desire to remain a powerhouse among the Nation's college basketball teams is understandable, and nonmembership in the NCAA obviously would thwart that goal. But that UNLV's options were unpalatable does not mean that they were nonexistent." *Id.* at 199, n. 19, 109 S.Ct. 454. In the

As can be seen, the Supreme Court invoked multiple formulations of the state action test in analyzing whether the NCAA could be deemed a state actor. Here, in similar vein, whether examined in terms of "joint action," or the "control" necessary to support a finding of "proximate cause," plaintiffs have adequately alleged that PNG's actions are "fairly attributable" to Rio Tinto. Specifically they have alleged that PNG acted as Rio Tinto's agent, that Rio Tinto "controlled" its actions, and that Rio Tinto was a "willful participant"/"conspirator" in them. The complaint asserts:

- "BCL chief Don Carruthers flew into Port Moresby. He warned there that, 'Rio would 'seriously reconsider' future investment in PNG in light of what he described as the 'acts of terrorism' on Bougainville resulting from the 'unrealistic expectations' on the part of landowners.' At the time Rio was investing heavily in PNG, in exploration, reinvestments in Panguna, the planned 'Hidden Valley' project and the enormous gold mine on Lihir Island. Given the economic importance to [PNG], *Rio knew that its wishes were taken as commands by the PNG government and Rio intended that its comments would spur the PNG forces into action.*" [125]

- "To induce PNG military action, Rio issued an ultimatum to the PNG government that the failure to displace plaintiffs and members of the Class and reopen the mine through military action would result in Rio quitting the mine entirely and abandoning all other investment in PNG.... Rio understood and intended that this ultimatum was likely to result in military action by PNG and intended such action to take place even if it meant the death and/or injury of residents. *Rio further understood that it had a great deal of the control over the situation. If Rio did not direct and/or encourage a military response, Rio understood that none would have been initiated. Rio also understood that it could have discouraged or insisted that no military response take place and that none would have been taken.*" [126]

- "On information and belief, the Rio officials ...encouraged and suggested that all efforts be made to displace by any means plaintiffs and members of the class. Rio officials knew such means already in place were resulting in injury and death." [127]

- "With respect to the initiation and maintenance of the blockade, Rio *conspired* with the PNG government and ratified the blockade, informing PNG that its actions were enough to prevent Rio from withdrawing from the region."

- "At meetings with Rio and PNG officials, Rio's on-site employees encouraged continuation of the blockade. At one meeting in 1990 between PNG officials and two top Rio executives, one top Rio manager encouraged continuation of the blockade to 'starve the bastards out, some more and they will come around.' This comment was made after a discussion of the devas-

---

present case, plaintiffs allege not only that Rio Tinto "imposed its will" on the PNG government, but that PNG was the agent of, and controlled by, Rio Tinto. (See *infra* at 46.) Thus, defendants' suggestion that the complaint alleges they controlled PNG through economic coercion alone is inconsistent with the allegations found in the pleading. For this reason, the court does not find the cited language in *Tarkanian* dispositive.

125. First Amended Complaint, ¶ 185 (emphasis added).

126. *Id.,* ¶ 186 (emphasis added).

127. *Id.,* ¶ 188.

tating effects of the blockade. The Rio officials understood that given the economic importance of Rio's operations, *their comments would be considered by PNG as an order to continue military action.*" [128]

● "Rio always understood that *its statements* to PNG officials concerning military action, due to the importance of Rio to the PNG economy, *were taken as directives by the PNG government.*" [129]

● "Rio's threats to withdraw from PNG if the fighting did not continue, and its agreement to stay as long as PNG kept waging the war and the medical blockade, shows that *Rio had a degree of control over PNG's commission of tortuous acts*, and that *Rio's actions were a proximate cause of plaintiffs and Class members' injuries.*" [130]

● "*The PNG government and its soldiers acted as the agent of Rio and with Rio's tacit or implicit direction, encouragement and solicitation.*" [131]

Additionally, the complaint alleges that the mine was a joint venture between Rio Tinto and PNG,[132] that waging war against the BRA was necessary to reopen the mine,[133] and that Rio Tinto supplied helicopters and other vehicles for use by the PNGDF.[134] The court concludes that, if proved, these facts in combination are sufficient to permit a jury to find that the acts of PNG are "fairly attributable" to Rio Tinto, that it was "willful participant" in those acts, and/or that it exercised "control" over them. The allegations of the war crimes claim are thus sufficient to state a claim and confer jurisdiction under the ATCA.

#### ii. Crimes Against Humanity [135]

In addition to asserting that the imposition and continuation of the medical blockade constituted a war crime, plaintiffs charge that it constituted a crime against humanity cognizable under the ATCA.[136] Specifically, they allege that the "medical blockade constitute[d] genocide because it foreseeably resulted in the killing of natives, caused serious bodily harm, was deliberately calculated to destroy plaintiffs and their way of life," [137] and constituted an "act[ ] of official torture." [138] They assert that "Rio [Tinto] ... acted jointly and willfully with PNG and the government of Australia to institute [the] blockade," and that even "[w]hen it became apparent that death and injury was being inflicted, ...

---

128. *Id.,* ¶ 193 (emphasis added).

129. *Id.,* ¶ 215 (emphasis added).

130. *Id.,* ¶ 216 (emphasis added).

131. *Id.,* ¶ 223 (emphasis added).

132. *Id.,* ¶ 4.

133. See *id.,* ¶¶ 185–87, 191–94.

134. *Id.,* ¶ 183, 193.

135. Under applicable Ninth Circuit precedent, crimes against humanity are distinct from war crimes. See *Quinn v. Robinson,* 783 F.2d 776, 799 (9th Cir.1986) ("In *Artukovic* we erroneously assumed that 'crimes against humanity' was synonymous with 'war crimes.' ... The offenses with which Artuko-

vic was charged were crimes against humanity; it matters not whether or not they were also war crimes.... While some of the same offenses that violate the laws and customs of war are also crimes against humanity, crimes of the latter sort most notably include murder, extermination, enslavement, ... or persecutions on political, racial or religious grounds of entire racial, ethnic, national or religious groups. Various inhumane acts committed after the beginning of [World War II] did not constitute war crimes, but constituted crimes against humanity" (internal quotations and citations omitted)).

136. See First Amended Complaint, ¶¶ 210–18.

137. *Id.,* ¶ 213.

138. *Id.,* ¶ 214.

Rio nonetheless encouraged PNG military action."[139]

■ It well-settled that a party who commits a crime against humanity violates international law and may be held liable under the ATCA. See *Kadic, supra,* 70 F.3d at 236 (holding that subject-matter jurisdiction exists under the ATCA for genocide, war crimes, and crimes against humanity); *Quinn, supra,* 783 F.2d at 799 ("Crimes against humanity, such as genocide, violate international law"); *Tel–Oren, supra,* 726 F.2d at 791 (Edwards, J., concurring) (stating that certain war crimes, crimes against humanity, genocide, apartheid and, increasingly, torture are recognized international crimes); *United States v. Schiffer,* 831 F.Supp. 1166, 1180 (E.D.Pa.1993) ("After World War II, the United States Army prosecuted war crimes in accordance with established principles of international law. Because of the atrocities that had occurred in the concentration camps, a new category, 'crimes against humanity,' was added to international law").[140] Defendants do not dispute this.

What constitutes a "crime against humanity" is less clear, and the subject of disagreement between the parties. Plaintiffs' expert, Steven Ratner, states that, generally, crimes against humanity "are a set of acts against human life, liberty, physical welfare, health, or dignity, undertaken as part of a widespread or systematic attack against a civilian population."[141] See also *Handel v. Artukovic,* 601 F.Supp. 1421, 1426 (C.D.Cal.1985) ("crimes against humanity include 'murder, extermination, enslavement, deportation, and other inhu-

mane acts committed against any civilian population' "). Professor Ratner opines that crimes against humanity can occur in peacetime as well during times of war.[142] In his treatise, Ratner identifies the following as crimes against humanity: (1) murder and extermination; (2) enslavement and forced labor; (3) deportation; (4) imprisonment; (5) torture; (6) rape; (7) other inhumane or inhuman acts; (8) persecutions; (9) property crimes; and (10) disappearances. See Steven R. Ratner & Jason S. Abrams, *Accountability for Human Rights Atrocities in International Law, supra,* at 69–77.

It appears that crimes against humanity target a particular group of people for political, racial, or religious reasons. See *Quinn, supra,* 783 F.2d at 799 ("While some of the same offenses that violate the laws and customs of war are also crimes against humanity, crimes of the latter sort most notably include 'murder, extermination, enslavement, ... or persecutions on political, racial or religious grounds ...' of entire racial, ethnic, national or religious groups," quoting *The Nurnberg (Nuremberg) Trial,* 6 F.R.D. 69, 130 (Int'l Military Tribunal 1946)); *Ofosu v. McElroy,* 933 F.Supp. 237, 245 (S.D.N.Y.1995) (stating that the definition of "crimes against humanity" includes "persecutions on political, racial or religious grounds").

■ As noted earlier, plaintiffs allege that the medical blockade was a crime against humanity because it amounted to genocide.[143] Genocide is a recognized crime against humanity. The question, therefore, is whether the facts plaintiffs allege regarding the medical blockade fair-

**139.** *Id.,* ¶ 211.

**140.** See also Declaration of Professor Steven Ratner in Opposition to Motion to Dismiss ("Ratner Decl."), ¶ 9 ("Crimes against humanity are particularly serious violations of the law of nations for which individuals may be held individually responsible").

**141.** *Id.,* ¶ 10.

**142.** See *id.*

**143.** First Amended Complaint, ¶ 213.

ly state a claim for genocide. *Kadic,* which held that plaintiffs could state a claim under the ATCA for genocide (*Kadic, supra,* 70 F.3d at 236), defined the term as " 'any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent births with the group; (e) Forcibly transferring children of the group to another group.' " *Id.* at 241 (quoting the Convention on the Prevention and Punishment of the Crime of Genocide, which has been ratified by more than 120 nations, including the United States).

Plaintiffs allege that the "medical blockade constitute[d] genocide because it foreseeably resulted in the killing of natives, caused serious bodily harm, [and] was deliberately calculated to destroy plaintiffs and their way of life . . . ." [144] As discussed *infra,* plaintiffs also allege that defendants' actions were motivated by racial discrimination.[145] Construing the complaint in the light most favorable to plaintiffs as required on a motion to dismiss, the court concludes that plaintiffs have stated a claim for crimes against humanity under the ATCA.[146]

### iii. Racial Discrimination

Count IV purports to state an ATCA claim against Rio Tinto for racial discrimination. It alleges:

"Rio viewed the people of Bougainville as inferior due to their color and culture and, therefore, intentionally violated their rights. This is a policy and intent that Rio has manifested and directed toward indigenous people in many areas of the world where they have located mines. In this instance, this policy was, in part, the reason Rio destroyed villages, the environment, sacred sites and local culture, and is one of the reasons behind Rio's support of the blockade." "Discrimination was a motivating factor in Rio's actions in Bougainville and around the world. In South Africa, Rio paid a black migrant labor force an average wage below the minimum set by the South African Institute of Race Relations. At another mine, mine laborers were housed in 'appalling temporary camps' in slave-like conditions. Furthermore, Rio has not hesitated to displace indigenous communities to implement various projects, forcing the relocation of villages and the extinction of culture. All of the above practices were instituted by Rio on Bougainville." [147]

Plaintiffs contend that, given PNG's substantial financial interest in the Panguna

---

144. *Id.*

145. The people of Bougainville are of a different race than the people of Papua New Guinea. See Janine Roberts, *Bougainville—The Forgotten War in the South Pacific,* found at http://www.gn.apc.org/inquirer/boug.html; *World's Armed Conflict: Papua New Guinea,* found at http://ww w.jmk.su.se/global99/conflicts/oceania/papuang.htm.

146. Defendants argue that Count I should be dismissed because plaintiffs fail to allege sufficient facts demonstrating that Rio Tinto may

be held liable for the actions of the PNGDF. (See Defs.' Mem. at 22–24.) As noted above in its discussion of the war crimes claim, the court concludes that, were plaintiffs able to prove the facts alleged in the complaint, a reasonable jury could find that the actions of PNG and the PNGDF were "fairly attributable" to Rio Tinto, because it was a "willful participant" in them, "controlled" them, and/or "conspired" with PNG to commit them. Consequently, the court declines to dismiss Count I on this basis.

147. First Amended Complaint, ¶¶ 239, 244.

Mine, defendants acted under color of state authority in discriminating against the people of Bougainville.[148]

■ While defendants argue that plaintiffs' racial discrimination claim "has no support in the law of nations,"[149] their primary attack on the claim is that plaintiffs have failed adequately to allege state action.[150] This focus is not surprising, as it is well-settled that racial discrimination is a violation of the law of nations. Many courts, indeed, have held that practicing racial discrimination violates a *jus cogens* norm.[151] See *Kadic, supra,* 70 F.3d at 240 (" 'A state violates international law if, as a matter of state policy, it practices, encourages, or condones ... systematic racial discrimination,' " quoting RESTATE-MENT, § 702); *Siderman de Blake, supra,* 965 F.2d at 717 (noting that the Restatement "identif[ies] *jus cogens* norms prohibiting genocide, slavery, murder or causing disappearance of individuals, pro-

longed arbitrary detention, and systematic racial discrimination"); *Beanal v. Free-port–McMoRan, Inc.,* 969 F.Supp. 362, 371 (E.D.La.1997) (recognizing that systematic racial discrimination is "actionable as violative of the law of nations"), aff'd., 197 F.3d 161 (5th Cir.1999); *Hirsh, supra,* 962 F.Supp. at 381 ("A foreign state violates *jus cogens* when it participates in such blatant violations of fundamental human rights as 'genocide, slavery, murder, torture, prolonged arbitrary detention, and racial discrimination,' " quoting *Committee of U.S. Citizens in Nicaragua v. Reagan,* 859 F.2d 929, 941 (D.C.Cir.1988)); *Denegri v. Republic of Chile,* Civ. A. No. 86–3085, 1992 WL 91914, *4 (D.D.C. Apr.6, 1992) ("*jus cogens* comprises the fundamental human rights law that prohibits genocide, slavery, murder, torture, prolonged arbitrary detention, and racial discrimination"); *Guinto, supra,* 654 F.Supp. at 280 (recognizing systematic racial discrimination as a representative violation of international law).[152] Clearly, a

---

**148.** See *id.,* ¶ 238.

**149.** Defs.' Reply at 20:8.

**150.** See Defs.' Mem. at 17, n. 15; Defs.' Reply at 20.

**151.** *Jus cogens* norms "proscribe a limited set of activities so universally condemned by the international community that they cannot be undertaken under any circumstances." *Hirsh v. State of Israel,* 962 F.Supp. 377, 381 (S.D.N.Y.1997) (internal quotations omitted).

**152.** See also Declaration of Professor Lakshman Guruswamy in Opposition to Motion to Dismiss ("Guruswamy Decl."), ¶¶ 3–4 ("The prohibition against racial discrimination is established by numerous international treaties and conventions ... including the Charter of the United Nations, 26 June 1945; the Universal Declaration of Human Rights, 10 Dec. 1948; the International Covenant on Civil and Political Rights, 16 Dec. 1966; the International Convention on the Elimination of All Forms of Racial Discrimination, 7 Mar. 1966; The Stockholm Declaration of the United Nations Conference on the Human Environ-

ment, 16 June 1972; the International Covenant on Economic, Social, and Cultural Rights, 16 Dec. 1966; and the Convention on the Prevention and Punishment of the Crime of Genocide, 9 Dec. 1948 .... The well-established treaty norms prohibiting racial discrimination have been accepted by the international community and institutionalized, through state practice and *opinio juris,* as international customary law" (internal citations omitted)); Ratner Decl., ¶¶ 27–28 ("Racial discrimination is a violation [of] treaties to which the United States is party, namely the Convention on the Elimination of All Forms of Racial Discrimination ... which entered into force for the United States on November 20, 1994. Racial discrimination is also a violation of the law of nations, as evidenced by the large numbers of ratifications of the Racial Discrimination Convention (157 parties as of 2001) ..." (internal citations omitted)). But see *Mendonca v. Tidewater, Inc.,* 159 F.Supp.2d 299, 301 (E.D.La. 2001) (concluding that allegations "of a threat to [plaintiff's] car and subsequent damage, two alleged statements indicating work-related discrimination of Indians, an allegation

claim under the ATCA may be based on the violation of a *jus cogens* norm such as racial discrimination. See *Hilao II, supra,* 25 F.3d at 1475; *Unocal I, supra,* 963 F.Supp. at 890.

■ Defendants are correct, however, that to state an ATCA claim for racial discrimination, plaintiffs must allege state action. See RESTATEMENT, § 702 (providing that "[a] *state* violates international law if, as a matter of state policy, it practices, encourages, or condones . . . systematic racial discrimination" (emphasis added)). See also *Kadic, supra,* 70 F.3d at 240 ("The Restatement is careful to identify those violations that are actionable when committed by a state, Restatement (Third) § 702"); *Iwanowa, supra,* 67 F.Supp.2d at 444 ("The *Kadic* Court further noted that section 702 [of the Restatement] . . . identifies violations that are actionable when committed by a state, whereas section 404 of the Restatement lists a more limited category of violations of universal concern"). Plaintiffs do not dispute this point.[153] Thus, the question is whether, in connection with their racial discrimination claim, plaintiffs have alleged facts sufficient to hold Rio Tinto liable as a state actor.

■ As noted earlier, courts look to the "[t]he color of law jurisprudence of 42 U.S.C. § 1983" in assessing whether a private defendant is a state actor for purposes of jurisdiction under the ATCA. *Kadic, supra,* 70 F.3d at 245; *Unocal V, supra,* 110 F.Supp.2d at 1305; *Unocal II, supra,* 176 F.R.D. at 345; *Unocal I, supra,* 963 F.Supp. at 890. Unlike their claim that Rio Tinto is liable for war crimes committed by PNG and its Defense Force,

plaintiffs' racial discrimination claim concerns the purported actions of Rio Tinto itself. Consequently, the "mirror image" analysis utilized in assessing whether plaintiffs' war crimes claim adequately plead state action or proximate cause is not required here. See *Tarkanian, supra,* 488 U.S. at 193, 109 S.Ct. 454.

In § 1983 cases where a private defendant has allegedly harmed the plaintiff, courts use one of four approaches to determine whether the state was sufficiently involved that the conduct may be treated as state action. These are: (1) whether the private entity was performing a traditional public function; (2) whether the entity acted under state compulsion; (3) whether there was a sufficiently close nexus between the government and the challenged action; and (4) whether the private entity and the state were joint participants in the act. See *George v. Pacific–CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996), cert. denied, 519 U.S. 1081, 117 S.Ct. 746, 136 L.Ed.2d 684 (1997); *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1447 (10th Cir.1995). See also *Jensen v. Lane County,* 222 F.3d 570, 574 (9th Cir.2000); *Sutton, supra,* 192 F.3d 826, 835–36 (9th Cir.1999). It is unclear whether these approaches are different in operation or merely alternative ways of characterizing the fact intensive decision as to whether state action is present. See *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). See also *id.* ("The Court suggested that that 'something more' which would convert the private party into a state actor might vary with the circumstances of the case"); *Burton, supra,* 365 U.S. at 722, 81

---

that the defendant withheld the plaintiff and his family's passport for two months and an allegation that the plaintiff was compelled to submit false submissions and/or bribes regarding Indian taxes" did not state a claim for a violation of the law of nations).

**153.** See Pls.' Opp. at 23:20–21 ("The remaining Counts allege violations of international law that require state action and some participation by Rio").

S.Ct. 856, ("[T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an impossible task which [t]his Court has never attempted" (citation and internal quotation marks omitted)); *Howerton v. Gabica,* 708 F.2d 380, 383 (9th Cir.1983) ("While these factors are helpful in determining the significance of state involvement, there is no specific formula for defining state action"); *Ouzts v. Maryland Nat'l Ins. Co.,* 505 F.2d 547, 550 (9th Cir.1974) ("It is also a truism by now that there is no rigid formula for measuring state action for purposes of section 1983 liability").

Plaintiffs here invoke the joint action and/or governmental nexus approaches. In order to prove state action under these tests, "the court must find a sufficiently close nexus between the state and the private actor 'so that the action of the latter may be fairly treated as that of the State itself.'" *Jensen, supra,* 222 F.3d at 575 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). The government's regulation of, or provision of substantial funding to, a private party is not sufficient to constitute state action. See *Blum v. Yaretsky,* 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534(1982); *Jensen, supra,* 222 F.3d at 575. Rather, the "State [must be] so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jackson, supra,* 419 U.S. at 357–58, 95 S.Ct. 449. See also *Burton, supra,* 365 U.S. at 725, 81 S.Ct. 856 (the private party and the state must be "joint participant[s] in the challenged activity").

Plaintiffs' racial discrimination claim asserts that defendants' decision to build the mine, take their land, destroy their environment, and encourage military action was, at least in part, motivated by racial discrimination. Additionally, it alleges that Rio Tinto paid native Bougainvilleans lower wages than workers of other races. In support of their assertion that this conduct constitutes state action, plaintiffs allege, *inter alia,* that "the financial stake of the PNG government [in the Panguna Mine] effectively turned the copper mine into a joint venture between PNG and Rio and allowed Rio to operate under color of state law." [154] More specifically, plaintiffs allege that: "(a) PNG conferred a mining concession [on] Rio; (b) Rio · and PNG were co-owners of the mine; (c) PNG profited by virtue of the mining operation; (d) PNG allowed Rio to exercise the power of eminent domain and to dispossess the native people of Bougainville whenever and wherever Rio decided to do so; (e) Rio encouraged and assisted in the PNG military effort to suppress the revolution ...; (f) Rio's actions were done with the concurrence and authority of the PNG government; and (g) the PNG military acted as Rio's agent in attacking and blockading the people of Bougainville." [155]

Taken together, these facts allege "something more" than that the PNG government regulated and/or funded the Panguna Mine. See *Sutton, supra,* 192 F.3d at 835 ("When addressing whether a private party acted under color of law, we therefore start with the presumption that private conduct does not constitute governmental action. In order for private conduct to constitute governmental action, 'something more' must be present"). Plaintiffs assert, in essence, that PNG made its governmental power of eminent domain available to Rio Tinto so that it could build the mine, and that, because of its profit participation in the mine, PNG took no steps to control or minimize the negative impact of Rio Tinto's mining op-

---

**154.** First Amended Complaint, ¶ 4.

**155.** *Id.,* ¶ 111.

erations. In connection with this motion, defendants have requested that the court take judicial notice of the Copper Act, which codified the agreement between Rio Tinto's subsidiary, BCL, and PNG regarding the mine. The Act arguably gives rise to an inference that PNG in fact affirmatively endorsed Rio Tinto's actions with respect to the mine, and lends support to plaintiffs' allegations that Rio Tinto and PNG were engaged in a joint venture, and hence joint action, as respects its operation.

For this reason, the court finds that the factual allegations supporting plaintiffs' claim that Rio Tinto and PNG operated the mine as joint venture partners sufficiently plead state action to confer jurisdiction over the ATCA racial discrimination claim. Cf. *Iwanowa, supra,* 67 F.Supp.2d at 445–46 ("... the Complaint pleads sufficient facts to support a claim that from 1942–1945, Defendants were acting as *de facto* state actors. The Complaint alleges that the Nazi army abducted adolescents in occupied territories, including Iwanowa, and transported them to Germany to work as slave laborers. The Complaint also asserts that Sauckel, the Nazi Plenipotentiary General for the Allocation of Labor, encouraged German industries to bid for forced laborers in order to meet production quotas and to increase their profits. The Complaint further alleges that as a result of Sauckel's solicitation, Ford Werke purchased forced laborers, including Iwanowa, from the Nazis. Hence, the Complaint alleges that Defendants acted in close cooperation with Nazi officials in compelling civilians to perform forced labor"); *Unocal II, supra,* 176 F.R.D. at 348 (finding allegations "that Unocal (1) conspired with its subsidiaries, affiliates and others to cause injury to plaintiffs, ... by entering into the Project with SLORC; (2) similarly conspired to allow SLORC to use the Project to launder money in violation of 18 U.S.C. § 1956; and (3) made efforts to conceal SLORC's repressive activities" sufficient "to support subject-matter jurisdiction under the ATCA because, when construed in the light most favorable to plaintiffs, they suggest that Unocal may have been 'a willful participant in joint action with the State or its agents.' In other words, defendants' challenged actions are allegedly inextricably intertwined with those of the SLORC government," quoting *Collins, supra,* 878 F.2d at 1154); *Unocal I, supra,* 963 F.Supp. at 891 ("Here, plaintiffs allege that SLORC and MOGE are agents of the private defendants; that the defendants are joint venturers, working in concert with one another; and that the defendants have conspired to commit the violations of international law alleged in the complaint in order to further the interests of the Yadana gas pipeline project.... Plaintiffs have alleged that the private [defendants] were and are jointly engaged with the state officials in the challenged activity, namely forced labor and other human rights violations in furtherance of the pipeline project. These allegations are sufficient to support subject-matter jurisdiction under the ATCA").

### iv. Environmental Harms

■ The majority of the allegations in the first amended complaint concern harm to the environment and health of the Bougainvillean people allegedly caused by Rio Tinto's mining operations. In their motion to dismiss, defendants assert that the court lacks subject matter jurisdiction over these environmental claims because they do not allege a violation of the law of nations. They contend that international law prohibits only activities that "cause damage to the environment of other States or of areas beyond the limits of national jurisdiction."[156] Plaintiffs do not assert

---

**156.** Defs.' Mem. at 16:17–19.

that Rio Tinto's and/or PNG's conduct harmed the environment beyond PNG (or Bougainville, for that matter). Consequently, defendants maintain, no claim under international law can be stated.[157]

Plaintiffs counter that they do not simply allege harm to the environment. Rather, they assert, the complaint pleads that defendants' acts of environmental contamination have deprived Bougainvilleans of their right to life, health, and security of the person.[158] Plaintiffs assert that the first amended complaint "alleges that Rio's extraordinary pollution of the island of Bougainville caused widespread death[ ] and serious illness...," and that "international law cases... support a finding that massive environmental destruction resulting in loss of life violates the rights to life and health."[159] They contend their allegations regarding environmental damage state a cognizable claim for violation of international law because the principle of "sustainable development" imposes a duty on state actors to avoid " 'serious and irreversible' environmental or human health effects from development activities," and because the complaint alleges a violation of the United Nations Convention on the Law of the Sea ("UNCLOS"), which prohibits certain types of pollution of the marine environment.[160] The court will consider these points in turn.

### (a) Rights To Life And Health

The parties' experts dispute whether the rights to life and health are recognized principles of international law. Plaintiffs' expert, Professor Gunther Handl, contends "...that the human right to life, including the right to enjoy life, is a fundamental right under international law."[161] As evidence of this, he cites the International Covenant on Civil and Political Rights ("ICCPR"), the Universal Declaration of Human Rights, the American Declaration of the Rights and Duties of Man, the American Convention on Human Rights, the African Charter of Human and Peoples' Rights, the European Convention for the Protection of Human Rights and Fundamental Freedoms, and the Charter of Fundamental Rights of the European Union.[162] Handl asserts that the right to life can be violated by "serious environmental degradation,"[163] noting a report prepared by the Inter-American Commission, which states that

" 'respect for the inherent dignity of the person is the principle which underlies the fundamental protections of the right to life and to preservation of physical well-being. Conditions of severe environmental pollution, which may cause serious physical illness, impairment and suffering on the part of the local populace, are inconsistent with the right to be respected as a human being.... The realization of the right to life, and to physical security and integrity is necessarily related to and in some ways dependent upon one's physical environment. Accordingly, where environmental contamination and degradation pose a persistent threat to human life and health, the foregoing rights are implicated.' "[164]

Handl also cites the *Case Concerning The Gabcikovo–Nagymaros Project (Hungary*

---

157. See *id.* at 17.

158. See Pls.' Opp. at 29–31.

159. *Id.* at 30:22–24.

160. See *id.* at 31:26–32:3, 32:13–33:16.

161. Declaration of Gunther Handl in Opposition to Motion to Dismiss ("Handl Decl."), ¶ 23.

162. See *id.*

163. See *id.,* ¶ 24.

164. *Id.*

*v. Slovakia),*[165] decided by the International Court of Justice, which held that

> " '[t]he protection of the environment is ... a vital part of contemporary human rights doctrine, for it is a *sine qua non* for numerous human rights such as the right to health and the right to life itself. It is scarcely necessary to elaborate on this, as damage to the environment can impair and undermine all the human rights spoken of in the Universal Declaration and other human rights instruments.' "[166]

Like the right to life, Handl asserts that the right to health is an established principle of international law, and that, "in relation to environmentally injurious activities that threaten human health and well-being[,] there is general recognition of the fact that such activities also may abridge basic human rights of the victims concerned."[167] In support of this proposition, he cites several treaties and resolutions, including the Stockholm Declaration on the Human Environment, a report of the World Commission on Environment and Development, and the Additional Protocol to the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights.[168] Notably, he concludes his discussion with the following statement: "While these documents do not provide sufficient evidence of international practice to support a claim to the existence in present-day international law of a separate human right to environmental protection, they underline the general acceptance among states of a 'right to health' as an established international human right."[169]

Defendants acknowledge that some of the treaties and/or agreements Handl cites recognize a right to life and/or a right to health. Nonetheless, they contend that plaintiffs have not demonstrated that violation of these rights via environmental harm is "a specific, universal, and obligatory" norm outlawed by international law. See *Hilao II, supra,* 25 F.3d at 1475. See also *Hilao III, supra,* 103 F.3d at 794 ("Actionable violations of international law [under § 1350] must be of a norm that is specific, universal, and obligatory"). Defendants challenge, for example, Handl's reliance on the report of the Inter–American Commission. Their expert, Professor Barry Carter, notes pointedly that the Commission's work was ultimately documented in the American Convention on Human Rights, which does *not* address issues of environmental harm.[170] Furthermore, defendants contend, "the United States has refused to sign or ratify [the American Convention on Human Rights for] ... [more than] 32 years, because the Convention's definition of 'right to life' is so broad that it expressly conflicts with U.S. state and federal law on matters including abortion and capital punishment."[171]

Having reviewed the American Convention on Human Rights, the court agrees that it does not specifically address human rights deprivations caused by environmental degradation.[172] The court also considers relevant the fact that the United States has refused to ratify the Convention for more than three decades.[173] See *Stan-*

---

**165.** See *id.*, ¶¶ 24–25.

**166.** *Id.*, ¶ 25.

**167.** *Id.*, ¶ 30.

**168.** See *id.*, ¶ 31.

**169.** *Id.*, ¶ 32.

**170.** See *id.*, ¶¶ 34, 46–47.

**171.** Defs.' Reply at 17. See also Supp. Carter Decl., ¶ 34.

**172.** See Plaintiffs' Request for Judicial Notice ("Pls.' RJN"), Ex. T.

**173.** The case law cited contradicts Carter's contention that the United States has refused to sign or ratify the Convention.

*ford v. Kentucky,* 492 U.S. 361, 390, n. 10, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (noting that Article 4(5) of the American Convention on Human Rights has been signed, but not ratified, by the United States); *Garza v. Lappin,* 253 F.3d 918, 925 (7th Cir.2001) ("More recently, the [Charter of the Organization of American States] has developed an American Convention on Human Rights, which creates an Inter–American Court of Human Rights. Under the American Convention, the Inter–American Court's decisions are potentially binding on member nations. The rub is this: *although the United States has signed the American Convention, it has not ratified it,* and so that document does not yet qualify as one of the 'treaties' of the United States that creates binding obligations" (emphasis added)).

While Professor Handl identifies several multinational agreements and/or treaties,

he does not describe the parameters of the rights to life and health mentioned therein, nor detail what type of conduct violates those rights.[174] Consequently, the court cannot conclude that the rights are sufficiently "specific" that their alleged violation states a claim under the ATCA, or that nations universally recognize they can be violated by perpetrating environmental harm.[175] See *Aguinda v. Texaco, Inc.,* No. 93–Civ.7527, 1994 WL 142006, *7 (S.D.N.Y. Apr. 11, 1994) ("Not all conduct which may be harmful to the environment, and not all violations of environmental laws, constitute violations of the law of nations").

Additionally, Handl provides no information concerning the number of nations that have signed these agreements and/or treaties, or, more specifically, whether the United States and/or Papua New Guinea are parties to them. Because plaintiffs base their ATCA claims on the law of nations, rather than treaties, they must

---

**174.** Indeed, the case authority on which plaintiffs rely—*Xuncax, supra,* 886 F.Supp. at 184–85, and *Forti v. Suarez–Mason,* 694 F.Supp. 707, 709–10 (N.D.Cal.1988)—discusses the right to life in the context of claims for torture, summary execution, and disappearance. See *Xuncax, supra,* 886 F.Supp. at 185 ("As with official torture, the practices of summary execution, 'disappearance,' and arbitrary detention also have been met with universal condemnation and opprobrium.... By international consensus, such practices have been adjudged to be inconsistent with the 'inherent dignity and of the equal and inalienable rights of all members of the human family.' ... An affidavit signed by twenty-seven widely respected scholars of international law attests that every instrument or agreement that has attempted to define the scope of international human rights has 'recognized a right to life coupled with a right to due process to protect that right.' ... And again, not only are the proscriptions of these acts universal and obligatory, they are adequately defined to encompass the instant allegations. Consequently, this Court clearly has jurisdiction under § 1350 to hear the plaintiffs' claims for recovery in tort in connection

with injuries suffered as a result of the acts of torture, summary execution, disappearance and arbitrary detention perpetrated or commanded by the defendant" (internal citations omitted)); *Forti, supra,* 694 F.Supp. at 710 ("Plaintiffs cite numerous international legal authorities which support the assertion that 'disappearance' is a universally recognized wrong under the law of nations. For example, United Nations General Assembly Resolution 33/173 recognizes 'disappearance' as violative of many of the rights recognized in the Universal Declaration of Human Rights.... These rights include: (1) the right to life; (2) the right to liberty and security of the person; (3) the right to freedom from torture; (4) the right to freedom from arbitrary arrest and detention; and (5) the right to a fair and public trial..." (internal citations omitted)).

**175.** Plaintiffs' other expert, Steven Ratner, states that the right to life may be violated by either intentional or reckless killing. (See Ratner Decl., ¶¶ 24–25.) This general statement, however, does not adequately define the scope of the rights to life and health, nor the type of conduct that constitutes a violation of them.

demonstrate that defendants' conduct breached a "universal" norm of international law. See *Beanal, supra,* 197 F.3d at 167 ("... the ATS 'applies only to shockingly egregious violations of universally recognized principles of international law....' Beanal fails to show that these treaties and agreements enjoy universal acceptance in the international community"); *Filartiga, supra,* 630 F.2d at 888 ("It is only where the nations of the world have demonstrated that the wrong is of mutual and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute"). Plaintiffs have failed to make such a showing here.

Indeed, some of the authorities upon which plaintiffs rely—i.e., the Rio Declaration and the Stockholm Declaration—undermine their claim that defendants' conduct violates recognized international law. As the court explained in *Beanal, supra:*

> "Principle 2 on the first page of the Rio Declaration asserts that states have the 'sovereign right to exploit their own resources pursuant to their own environmental and developmental policies,' but also have 'the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment or other States or areas beyond the limits of national jurisdiction.'"

*Beanal, supra,* 197 F.3d at 167, n. 6. Similarly, the Stockholm Declaration does "not set forth ... specific proscriptions," but references "in a general sense ... the responsibility of nations to insure that activities within their jurisdiction do not cause damage to the environment beyond their borders." *Amlon Metals, supra,* 775 F.Supp. at 671. Plaintiffs do not allege that Rio Tinto's mining activities on Bougainville have affected environmental conditions beyond the island. Under the Rio and Stockholm Declarations, therefore, it is possible that defendants' conduct may not violate international law.

Plaintiffs have the burden of proving that the court has subject matter jurisdiction under 28 U.S.C. § 1350. After reviewing the complaint, the case law, and the expert declarations and authorities cited therein, the court finds that plaintiffs have failed to meet their burden in this regard. Courts addressing the issue have consistently determined that allegations of environmental harm do not state a claim under the law of nations. See *Beanal, supra,* 197 F.3d at 167 ("The sources of international law cited by Beanal and the amici merely refer to a general sense of environmental responsibility and state abstract rights and liberties devoid of articulable or discernable standards and regulations to identify practices that constitute international environmental abuses or torts.... Therefore, the district court did not err when it concluded that Beanal failed to show in his pleadings that Freeport's mining activities constitute environmental torts or abuses under international law"); *Amlon Metals, supra,* 775 F.Supp. at 671 (dismissing claims regarding environmental harm under Rule 12(b)(1) "[b]ecause the complaint contains no clear allegation of a violation of the law of nations"). See also *Jota v. Texaco, Inc.,* 157 F.3d 153, 159 (2d Cir.1998) ("We express no view on whether the plaintiffs have alleged conduct by Texaco that violates the law of nations, whether an ATA suit for environmental misconduct, alleged to violate the law of nations, may be brought against a nongovernmental entity under the ATA, or how the *forum non conveniens* balance for ATA claims is to be struck when alien plaintiffs select a United States forum for a suit against a domestic corporation"); *Aguinda II, supra,* 142 F.Supp.2d at 552 ("First, the specific claim plaintiffs purport to bring under the ATCA—that the Consortium's oil extraction activities violated

evolving environmental norms of customary international law—lacks any meaningful precedential support and appears extremely unlikely to survive a motion to dismiss").

The court finds these authorities persuasive despite the fact that none involved a claim based on the "right to life" or "right to health." The relevant inquiry in assessing jurisdiction is not how plaintiffs characterize the conduct alleged in the complaint (i.e., environmental harm or deprivation of the rights to life and health), but whether "a specific, universal, and obligatory" norm prohibits the activity. See *Hilao II, supra*, 25 F.3d at 1475. The complaints considered in *Beanal* and *Amlon Metals* alleged the same type of injury plaintiffs claim here. See *Beanal, supra*, 969 F.Supp. at 382–83 ("As set forth in the complaint, Plaintiff alleges that Freeport's mining operations and drainage practices have resulted in environmental destruction *with human costs to the indigenous people*. The mine itself has hollowed several mountains, re-routed rivers, stripped forest and increased toxic and non-toxic materials and metals in the river system. Another culprit is discharged water containing tailings from Freeport's mining operations, for it is from this discharge that a stream of environmental and human problems flow, including: 1) pollution, disruption and alteration of natural waterways leading to deforestation, 2) *health safety hazards and starvation*, 3) degradation of surface and ground water from tailings and solid hazardous waste" (internal citations omitted) (emphasis added)); *Amlon Metals, supra*, 775 F.Supp. at 670 ("The Complaint also alleges that the material may present imminent and substantial danger to human health and to the environment"). As in *Beanal* and *Amlon,* the court concludes that plaintiffs here have failed to demonstrate that Rio Tinto's alleged environmental torts violated a "specific, universal, and obligatory" norm of international law. Accordingly, it finds that it lacks jurisdiction to adjudicate Count III of the complaint, and grants defendants' motion to dismiss the claim as a result.

**(b) Sustainable Development And The United Nations Convention On The Law Of The Sea**

Plaintiffs additionally assert that their allegations of environmental harm state an ATCA claim under the principle of "sustainable development" and the United Nations Convention on The Law of the Sea ("UNCLOS").[176] Professor Handl explains that the principle of sustainable development "is generally understood to mean 'development that meets the needs of the present without compromising the ability of the future generations to meet their own needs.'"[177] He asserts that it "implies specific substantive duties, such as the obligation to avoid 'serious and irreversible' environmental or human health effects from development activities and the obligation to manage of toxic or hazardous chemicals and wastes in an 'environmentally sound' manner."[178] While Handl's discussion of the principle spans six pages, he nonetheless fails to articulate a "specific, universal, and obligatory" norm of the type that will support a claim for violation of the law of nations. Indeed, as defendants note,[179] Handl concedes that the principle may be "too broad a concept to be legally meaningful."[180] Because the court cannot identify the parameters of the right created by the principle of sustainable develop-

---

176. See Pls.' Opp. at 31–33.

177. Handl Decl., ¶ 33.

178. *Id.,* ¶ 36.

179. See Defs.' Reply at 18.

180. Handl Decl., ¶ 36.

ment, it concludes that it cannot form the basis for a claim under the ATCA. See *Hilao III, supra,* 103 F.3d at 794; *Hilao II, supra,* 25 F.3d at 1475; *Beanal, supra,* 969 F.Supp. at 370 ("To be recognized as an international tort under § 1350, the alleged violation must be definable, obligatory (rather than hortatory), and universally condemned").

As respects UNCLOS, plaintiffs contend that, if proved, the facts alleged in Count VI would establish a violation of the convention, and thus that the claim should survive a motion to dismiss.[181] UNCLOS—an international treaty that prohibits certain acts of pollution in the marine environment—has been ratified by 166 nations, including PNG. The United States has not ratified the treaty.[182] Plaintiffs assert that Rio Tinto's operation of the mine violated two treaty provisions: (1) one requiring that "states take 'all measures ... that are necessary to prevent, reduce and control pollution of the marine environment' that involves 'hazards to human health, living resources and marine life through the introduction of substances into the marine environment;'" and (2) another mandating that states "adopt laws and regulations to prevent, reduce, and control pollution of the marine environment caused by land-based sources." [183]

Although the United States has not ratified UNCLOS, it has signed the treaty. Moreover, the document has been ratified by 166 nations and thus appears to represent the law of nations. See *United States v. State of Alaska,* 503 U.S. 569, 588, n. 10, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) ("The United States has not ratified [the United Nations Convention on the Law of the Sea], but has recognized that its baseline provisions reflect customary international law"); *Mayaguezanos por la Salud*

*y el Ambiente v. United States,* 198 F.3d 297, 305, n. 14 (1st Cir.1999) ("Mayaguezanos refers to the 1982 United Nations Convention on the Law of the Sea (UNCLOS). The Convention has been signed by the President, but it has not yet been ratified by the Senate. Consequently, we refer to UNCLOS only to the extent that it incorporates customary international law, though we also note that the United States 'is obliged to refrain from acts that would defeat the object and purpose of the agreement,'" quoting RESTATEMENT, § 312(3)); *R.M.S. Titanic, Inc. v. Haver,* 171 F.3d 943, 965, n. 3 (4th Cir.1999) ("Within this economic zone, a nation may exercise exclusive control over economic matters involving fishing, the seabed, and the subsoil, but not over navigation. See United Nations Convention on the Law of the Sea, Dec. 10, 1982. Even though the United States has not yet ratified this treaty, it generally recognizes this 200–mile economic zone"); *Mayaguezanos por la Salud y el Ambiente v. United States,* 38 F.Supp.2d 168, 175, n. 3 (D.P.R.1999) ("The Senate has yet to ratify UNCLOS III. However, pending ratification or rejection by the Senate, 'the United States is bound to uphold the purpose and principles of the agreement to which the executive branch has tentatively made the United States a party.' ... Furthermore, there is a consensus among commentators that the provisions of UNCLOS III reflect customary international law, and are thus binding on all other nations, signatory or non-signatory," citing *United States of America v. Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d 155, 159 (D.P.R.1997) and Carol Elizabeth Remy, *Note: U.S. Territorial Sea Extensions: Jurisdiction and International Environmental Protection,* 16 FORDHAM INT'L L.J. 1208, 1211–12 (1993)),

---

181. See Pls.' Opp. at 32–33.

182. See Guruswamy Decl., ¶ 11.

183. Pls.' Opp. at 32–33.

aff'd. on other grounds, 198 F.3d 297 (1st Cir.1999).

Because UNCLOS reflects customary international law, plaintiffs may base an ATCA claim upon it. Defendants argue that the court should nevertheless dismiss the claim because UNCLOS does not cover the activities alleged, and because plaintiffs have not exhausted national and international remedies. Citing plaintiffs' allegation that waste from the mine extends "several kilometers" into Empress Bay, defendants contend that UNCLOS governs only pollution of the "open sea," i.e., international waters beyond the twelve mile limit of sovereign territorial jurisdiction. Additionally, defendants assert, UNCLOS requires the exhaustion of national remedies, and provides that disputes arising under it will be adjudicated by an international tribunal in Hamburg, Germany.[184]

It is true that plaintiffs allege that "[t]ailing accumulated at the mouth of the river, creating an artificial cape covering 1000 hectares and stretching several kilometers into the Empress Augusta Bay."[185] The complaint contains several additional allegations regarding pollution of the Bay, however, and specifically alleges that Rio Tinto polluted the Pacific Ocean:

- "To build the mine, Rio chemically defoliated, bulldozed and sluiced off an entire mountainside of pristine rain forest. During the years of the mine's operations, billions of tons of toxic mine waste was generated and dumped onto the land and into pristine waters, filling major rivers with tailings, *polluting a major bay dozens of miles away, and the Pacific Ocean as well.*"[186]
- "The tailings that did not remain on the Jaba River were deposited in Empress Augusta Bay. The fish in the Bay, which were a major food source, soon disappeared and died."[187]
- "It is estimated that one-half of the tailings have remained in the valley, while finer portions have been carried into the Empress Augusta Bay."[188]
- "By the mid–1980s, some 8000 hectares of the Empress Augusta Bay were covered with tailings to a copper concentration greater than 500ppm (parts per million)."[189]

Given these allegations, and the lack of any proof at this stage of the proceedings regarding the extent of the pollution in Empress Augusta Bay and/or the Pacific Ocean, the court concludes that plaintiffs have adequately stated a claim for violation of the customary international law reflected in UNCLOS. As discussed in section II.A.2.a., *supra*, it is irrelevant that UNCLOS may require the exhaustion of national remedies, and/or require that plaintiffs bring suit in Germany, because plaintiffs sue here under the ATCA, and the ATCA does *not* require the exhaustion of national remedies or compliance with the terms of the treaty. For these reasons, the court denies defendants' motion to dismiss plaintiffs' claim based on the violation of international law as reflected in UNCLOS.[190]

---

184. See Defs.' Reply at 18–19; Supp. Carter Decl., ¶¶ 60–63.

185. First Amended Complaint, ¶·141.

186. *Id.,* ¶ 8 (emphasis added).

187. *Id.,* ¶ 142.

188. *Id.,* ¶ 145.

189. *Id.,* ¶ 146.

190. Defendants proffer no arguments as to why Counts V and VII—"Cruel Inhuman and Degrading Treatment" and "Consistent Pattern of Gross Violations of Human Rights"—should be dismissed. Because subject matter jurisdiction is a threshold issue that must be examined *sua sponte,* however, the court considers whether it has jurisdiction to hear

these claims. See *Dittman v. State of California*, 191 F.3d 1020, 1025 (9th Cir.1999) ("Although Defendants did not assert that their possession of the social security number rendered this case moot, we have an independent obligation to address *sua sponte* whether this court has subject-matter jurisdiction"). Having carefully reviewed the complaint and sources cited therein, and conducted independent research, the court concludes that plaintiffs have not demonstrated that prohibitions against cruel, inhuman, and degrading treatment (other than torture) and gross violations of human rights constitute established norms of customary international law. Indeed, two courts in this circuit have held that a claim for cruel, inhuman, and degrading treatment cannot serve as a basis for an ATCA claim. In *Forti v. Suarez–Mason*, 672 F.Supp. 1531 (N.D.Cal.1987), the district court stated:

> "Plaintiffs do not cite, and the Court is not aware of, such evidence of universal consensus regarding the right to be free from 'cruel, inhuman and degrading treatment as exists, for example, with respect to official torture.' Further, any such right poses problems of definability. The difficulties for a district court in adjudicating such a claim are manifest. Because this right lacks readily ascertainable parameters, it is unclear what behavior falls within the proscription—beyond such obvious torts as are already encompassed by the proscriptions of torture, summary execution and prolonged arbitrary detention. Lacking the requisite elements of universality and definability, this proposed tort cannot qualify as a violation of the law of nations. Accordingly, the Court dismisses Count Five of the Complaint for failure to state a claim upon which relief may be granted." *Id.* at 1543.

On motion for reconsideration, the *Forti* court reinstated a claim that defendants had violated international law by causing the disappearance of plaintiffs' family members, but declined to reverse its dismissal of the "cruel and inhuman and degrading treatment" claim. Rather, it reaffirmed that there was no consensus within the international community as to what conduct constitutes cruel, inhuman and degrading treatment. See *Forti, supra*, 694 F.Supp. at 712 ("While [the Restatement, the Universal Declaration of Human Rights] and other materials establish a recognized proscription of 'cruel, inhuman or degrading treatment,' they offer no guidance as to what constitutes such treatment. The Restatement does not define the term. The cited statute (22 U.S.C. § 2304) and the Universal Declaration of Human Rights also both fail to offer a definition. The scholars whose declarations have been submitted likewise decline to offer any definition of the proposed tort. In fact, one of the declarations appears to concede the lack of a universally recognized definition").

Similarly, the district court in *Hilao* concluded that "cruel, inhuman and degrading treatment" was not a sufficiently definite norm upon which to ground an ATCA claim. See *Hilao III, supra*, 103 F.3d at 794 ("The district court refused to instruct the jury on Sison's and Piopongco's claims for cruel, inhuman, or degrading treatment because it said that [the] standard for such a claim was 'too vague.' ... [A]lthough it is not entirely clear as a formal, procedural matter what the district court did, it appears to have dismissed the claim for lack of subject-matter jurisdiction. The Alien Tort Claims Act grants jurisdiction over torts in violation of international law, and this court has held, in a prior decision in this litigation, that '[a]ctionable violations of international law [under § 1350] must be of a norm that is specific, universal, and obligatory.' The district court's refusal to instruct the jury on this claim appears to have been a decision that the international-law norm against cruel, inhuman, and degrading treatment is not sufficiently specific such that violations of that norm are actionable under § 1350"). The Ninth Circuit itself did not decide the question, as it concluded that defendants' conduct constituted torture, which did violate clearly established international law. *Id.* at 795 ("we need not decide whether the proscription against 'cruel, inhuman, or degrading' treatment is sufficiently specific to allow a suit for its violation under § 1350 or what, apart from torture and arbitrary detention, which are recognized as actionable violations of international law, it might consist of").

Plaintiffs here have stated a claim for cruel, inhuman, and degrading treatment, but *not* for torture. Like the district courts in *Forti* and *Hilao*, the court finds that plaintiffs have not articulated a specific, universal and obligatory norm underlying this claim. Similarly, plaintiffs' claim for gross violations of human rights is not based on any specific provision of international law that is universally recognized. Consequently, Count V and VII are dismissed. Because plaintiffs may claim that they and/or their family members were subjected to acts of torture, which are clearly prohibited by international law, the court would allow plaintiffs to amend these claims

## B. Motion To Dismiss On *Forum Non Conveniens* Grounds

In addition to asserting that the court lacks subject matter jurisdiction to hear the action, defendants argue that plaintiffs' complaint should be dismissed on *forum non conveniens* grounds.[191] They contend that Papua New Guinea is an adequate alternative forum, and that the balance of public and private interests weighs in favor of having the action heard in the courts of that nation. Defendants assert, alternatively, that either Australia or Britain is a more appropriate forum than the United States in which to have the action tried, and urge the court to dismiss in favor of one of these countries in the event it determines that PNG is inadequate for *forum non conveniens* purposes. Plaintiffs assert that the court should deny this aspect of defendants' motion because they have failed to demonstrate that any of PNG, Australia or Britain is an adequate alternative forum.[192]

### 1. Legal Standard Governing *Forum Non Conveniens* Dismissals

"[T]he standard to be applied [to a motion for dismissal on the ground of *forum non conveniens*] is whether ... defendants have made a clear showing of facts which ... establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent...." *Cheng v. Boeing Co.*, 708 F.2d 1406, 1410 (9th Cir.1983). Applying this standard, the court should treat *"forum non conveniens* as an exceptional tool to be employed sparingly," and should not "perceive it as a doctrine that compels plaintiffs to choose the optimal forum for their claim." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir.2000).

To obtain dismissal on *forum non conveniens* grounds, defendants must demonstrate that an adequate alternative forum exists, and that private and public interests favor trial in the alternative forum. See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir.2001); *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499, n. 22 (9th Cir.2000); *Cheng v. Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir.1983).

Relevant "private interests" include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for unwilling witnesses; (3) the comparative cost of obtaining willing witnesses; (4) the possibility of a view of any affected premises; (5) the ability to enforce any judgment eventually obtained; (6) and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), superseded by statute on other grounds as recognized in *Hartford Fire Ins. Co. v. Westinghouse Elec. Corp.*, 725 F.Supp. 317 (S.D.Miss.1989). See also *Rosa, supra,* 211 F.3d at 512; *Nebenzahl v. Credit Suisse,* 705 F.2d 1139, 1140 (9th Cir.1983). "Public interest factors," by contrast, include: (1) court congestion; (2) the unfairness of burdening citizens in an unrelated forum with jury duty; (3) the interest in having localized controversies decided at home; (4) the interest in trying the case in a forum familiar with the applicable law; and (5) the interest in avoiding unnecessary conflicts of laws. *Gulf Oil, supra,* 330 U.S. at 508–09, 67 S.Ct. 839; *Rosa, supra,* 211 F.3d at 512. The defendant bears the burden of showing that, in light of these factors, "exceptional circumstances" warrant dis-

---

to state a cause of action for official torture under the TVPA were it not for the issues of non-justiciability discussed *infra.*

**191.** See Defs.' Mem. at 30–40.

**192.** Pls.' Opp. at 44–50.

missal on *forum non conveniens* grounds. See *Ioannidis/Riga v. M/V Sea Concert,* 132 F.Supp.2d 847, 861 (D.Or.2001); *Magellan Real Estate Investment Trust v. Losch,* 109 F.Supp.2d 1144, 1148 (D.Ariz. 2000). Ultimately, the determination is committed to the sound discretion of the district court. *Lueck, supra,* 236 F.3d at 1143.

## 2. Papua New Guinea

### a. Whether It Is An Adequate Forum

■ To demonstrate that PNG is an adequate forum, defendants must show that "(1) they are amenable to process [there], and (2) the subject matter of the lawsuit is cognizable [there] so as to provide plaintiff[s] appropriate redress." *Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 132 (E.D.N.Y.2000). See also *Piper, supra,* 454 U.S. at 254, n. 22, 102 S.Ct. 252; *AAR Intern, Inc. v. Nimelias Enter. S.A.,* 250 F.3d 510, 524 (7th Cir.2001) ("The court must first determine that an adequate alternative forum is available to hear the case, meaning that all parties are within the jurisdiction of the alternative forum and amenable to process there, and that the parties would not be treated unfairly or deprived of all remedies if the case were litigated in the alternative forum"); *Aguinda II, supra,* 142 F.Supp.2d at 539 ("The requirement of an adequate alternative forum 'ordinarily ... will be satisfied when the defendant is "amenable to process" in the other jurisdiction' ").

### i. Amenability To Process

Defendants' agreement to subject themselves to service of process in the foreign jurisdiction is sufficient to satisfy the first prong of the test. See *Aguinda II, supra,* 142 F.Supp.2d at 539. Because defendants in the present case have indicated that they will consent to jurisdiction in PNG, the first element is met.[193]

### ii. Whether Plaintiffs' Claims Are Cognizable In PNG

To demonstrate that plaintiffs' claims are cognizable in PNG's courts such that they can obtain appropriate redress, defendants must establish that PNG permits litigation of the subject matter of the dispute, that it provides adequate procedural safeguards, and that the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all. See *Piper, supra,* 454 U.S. at 255, n. 22, 102 S.Ct. 252 ("dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute"); *Lueck, supra,* 236 F.3d at 1143 ("The foreign forum must provide the plaintiff with some remedy for his wrong in order for the alternative forum to be adequate.... However, it is only in 'rare circumstances ... where the remedy provided by the alternative forum ... is so clearly inadequate or unsatisfactory, that it is no remedy at all,' that this requirement is not met," quoting *Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991)); *Ceramic Corp. of Am. v. Inka Maritime Corp.,* 1 F.3d 947, 949 (9th Cir.1993) ("Even where the defendant is amenable to process in the alternative forum, however, there may be 'rare circumstances' in which the 'remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all,' " quoting *Piper, supra,* 454 U.S. at 254 & n. 10, 102 S.Ct. 252).

### (a) PNG Permits Litigation Of The Subject Matter Of The Claims

To satisfy this aspect of the test, defendants proffer expert declarations stating that plaintiffs can pursue their claims in PNG. See *Mercier v. Sheraton Intern.,*

---

**193.** See Defs.' Mem. at 34:1–2.

*Inc.,* 981 F.2d 1345, 1352 (1st Cir.1992) (citing *Lockman Foundation, supra,* 930 F.2d at 768, for the proposition that "moving party may demonstrate [the] adequacy of [the] alternative forum's law through [the] affidavits and declarations of experts"). Defendants' expert, Teresa Anne Doherty, a former Justice of the National and Supreme Courts of PNG, for example, states that she has reviewed the complaint, and that she believes "the rights claimed by plaintiffs ... are recognized and protected by the Constitution of the Independent State of Papua New Guinea." [194] Plaintiffs counter with the declaration of Brian Danesbury Brunton, also a former justice of PNG's National and Supreme Courts.[195] Addressing whether plaintiffs' claims are cognizable under PNG law, Brunton agrees that "[m]any of the human rights claims ... would be, in theory, actionable in PNG." [196] He asserts, however, that "similar complaints arising out of the Bougainville conflict, properly before the courts, were not adjudicated, ... indicat[ing] that the relief available in PNG is more theoretical than real." [197] Additionally, Brunton contends that plaintiffs' "claims ... for violations of international environmental rights [and] the medical monitoring claim currently are not recognized under PNG law. They might be [in the future], but the issue is open to debate and interpretation." [198]

Having considered the experts' declarations, the court concludes that defendants have demonstrated that PNG permits litigation of the subject matter of the dispute. The court bases this conclusion on (1) Brunton's admission that PNG recognizes the majority of plaintiffs' claims for human rights violations, (2) his failure to explain why similar complaints were not adjudicated in PNG, and (3) the fact that the claims he asserts are not recognized under PNG law—i.e., for environmental harm—are also not cognizable under international law.

### (b) Whether PNG Provides Adequate Procedural Safeguards And An Adequate Remedy

To establish that PNG is an adequate forum, however, defendants must also show that it provides procedural safeguards, and that the remedies it affords are "not so inadequate as to amount to no remedy at all." With respect to procedural safeguards, defendants' experts opine that PNG's judicial system is independent and unbiased,[199] that it provides for class (or representative) actions,[200] that PNG law permits contingency fee arrangements,[201] and that discovery is liberal.[202]

**194.** Declaration of Teresa Anne Doherty in Support of Motion to Dismiss ("Doherty Decl."), ¶ 3.

**195.** See Declaration of Brian Danesbury Brunton in Opposition to Motion to Dismiss ("Brunton Decl."), ¶ 10.

**196.** *Id.*

**197.** *Id.*

**198.** *Id.,* ¶ 11.

**199.** See Doherty Decl., ¶¶ 3, 9; Declaration of Anthony Paul Wano Deklin in Support of Motion to Dismiss ("Deklin Decl."), ¶¶ 20–27; Declaration of Ian Robert Molloy in Support of Motion to Dismiss ("Molloy Decl."), ¶¶ 12–14.

**200.** See Doherty Decl., ¶ 12; Supplemental Declaration of Teresa Anne Doherty in Support of Motion to Dismiss ("Supp. Doherty Decl."), ¶¶ 10–18; Supplemental Declaration of Anthony Paul Wano Deklin in Support of Motion to Dismiss ("Supp. Deklin Decl."), ¶¶ 19–21; Supplemental Declaration of Florian Gubon in Support of Motion to Dismiss ("Supp. Gubon Decl."), ¶¶ 41–43; Molloy Decl., ¶¶ 17–23.

**201.** See Supp. Deklin Decl., ¶ 22; Molloy Decl., ¶¶ 34–36.

**202.** See Doherty Decl., ¶¶ 3, 12; Supp. Doherty Decl., ¶¶ 26–28; Molloy Decl., ¶¶ 30–33.

While plaintiffs do not dispute that PNG's judiciary is independent and honest,[203] they do take issue with defendants' remaining assertions.[204] Basically, the parties present a "battle of the experts" regarding the availability of contingency fee arrangements, liberal discovery, and class actions.

### (i) Class Actions

Plaintiffs' experts assert, for example, that PNG has no form of action comparable to the class action mechanism, while defendants' experts contend that PNG's representative action is akin to a Rule 23 class action. In addition to their experts' declarations, defendants rely on *Carnie v. Esanda Finance Corp.* an opinion from the High Court of Australia interpreting that nation's rule regarding representative actions. The rule is, apparently, identical to and interpreted the same as PNG's court rule concerning representative actions.[205] Defendants cite the following language from *Carnie:*

> "It would be unprofitable and difficult to make a precise comparison between a representative action under r. 13 and a class action under r. 23 but we see no reason to doubt that the two rules could cover much common ground. The elaborate set of provisions contained in r. 23 would create some differences. But this

does not seem to be of much moment for present purposes." [206]

This court is not persuaded that this excerpt from *Carnie* proves that representative actions in PNG (or Australia) are, for purposes of *forum non conveniens* analysis, analogous to Rule 23 class actions. Consequently, the record contains contradictory evidence respecting the similarities between the procedural rules.

### (ii) Contingency Fee Contracts

Similarly, the experts disagree as to whether contingency fee arrangements are permitted under PNG law. Defendants' experts assert that PNG authorizes such agreements, citing section 66 of the Lawyer Act titled "Remuneration by Agreement." [207] Section 66 provides:

> "(1) A lawyer may make a written agreement with his client as to his remuneration in respect of contentious or non-contentious business done or to be done by him.
>
> (2) An agreement referred to in Subsection (1)—
>
> (a) May provide for the remuneration of the lawyer by a gross sum, or by commission or percentage or other wise, and at a greater or lesser rate than at which he would otherwise have been entitled to be remunerated; and

203. See Brunton Decl., ¶ 7 ("The court system in [PNG] is independent, impartial, honest, and has integrity. Generally speaking, the [PNG] court system delivers justice, within the context of limited human and fiscal resources"); Declaration of John Anthony Griffin in Opposition to Motion to Dismiss ("Griffin Decl."), ¶ 8.1 ("There is no doubt about the independence of the Papua New Guinea judiciary"); Declaration of Mark Findlay in Opposition to Motion to Dismiss ("Findlay Decl."), ¶ 19 ("Certainly, the judiciary in Papua New Guinea does have an extensive and often distinguished history in the processing of their laws").

204. See generally Brunton Decl.; Declaration of Andrew John Rogers in Opposition to Motion to Dismiss ("Rogers Decl."); Findlay Decl.; Griffin Decl.

205. See Defendants' Supplement Request for Judicial Notice, Ex. 21.

206. *Id.* at 404.

207. See Supp. Deklin Decl., ¶ 22; Molloy Decl., ¶¶ 34–36.

(b) may be made on the terms that the amount of the agreed remuneration either shall or shall not include all or any disbursements made by the lawyer. (3) If on motion by the client it appears to a Judge that the agreement is unfair or unreasonable, he may—

(a) reduce the amount agreed to be payable under the agreement; or

(b) direct that the costs of the business done by the lawyers be ascertained by taxation...." [208]

Defendants also cite a 1998 case decided by the Papua New Guinea National Court of Justice. In *Yapao Lawyers v. Yaliman Pawe & Others and Porgera River Alluvial Miners Ass'n.*, the court held that "[i]t is clear from § 66(2)(a) [of the Lawyers Act] that it is permissible to enter into a contingency fee arrangement in an agreement." [209] In that case, the Yapao Lawyers entered into an agreement with plaintiffs Yaliman Pawe & Others and Porgera River Alluvial Miners Association, which provided as follows: "I agree that, unless the legal fees for Messrs. Yapao Lawyers are further negotiated they will be paid 10% of once only compensation package, at settlement which shall be calculated from backdated payment including, the initial lump sum payments as agreed by the Porgera River Alluvial Miners Association." [210] Apparently, plaintiffs won a default judgment and thereafter were granted a total compensation package of 15,243,415 kinos—an amount determined by the Minister for Environment & Conservation. Thereafter, the attorneys attempted to collect 10% of this sum pursuant to their remuneration agreement.

The court ultimately determined that the amount of compensation that would be due the lawyers under the agreement was unreasonable, and exercised its authority pursuant to section 66(e) to review the value of the work performed. Nonetheless, the court's statement regarding the availability of contingency fee contracts corroborates the clear language of section 66, and leads the court to conclude that such arrangements are permissible under PNG law.

█ The fact that the PNG court retains authority to review and reduce the compensation payable to an attorney under such a contract does not alter this conclusion, as federal courts have inherent power to conduct such a review as well. See, e.g., *United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1047 (6th Cir.1994) (" As we said in *Krause v. Rhodes*, 640 F.2d 214, 218 (6th Cir.), cert. denied, 454 U.S. 836[, 102 S.Ct. 140, 70 L.Ed.2d 117] ... (1981), 'an attorney's right to contract for a contingent fee is not completely beyond judicial control.' A lawyer is first an officer of the court, and as such his commercial contractual rights must yield to his duty. The district judge has broad equity power to supervise the collection of attorney's fees under contingency fee contracts"); *In re Agent Orange Product Liability Litigation*, 818 F.2d 226, 240 (2d Cir.1987) ("It is well established that a district court, pursuant to its rulemaking authority or on an ad hoc basis, may review a contingency fee agreement"); *Novinger v. E.I. DuPont de Nemours & Co., Inc.*, 809 F.2d 212, 217 (3d Cir.) ("In *Dunn v. H.K. Porter Co.*, 602 F.2d 1105, 1108 (3d Cir.1979), ... we recognized that federal courts have the power to monitor contingent fee arrangements"), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462,

**208.** Defendants' Exhibits for Use During Hearing on Motion to Dismiss ("Defs.' Hearing Exs."), Ex. 19.

**209.** Defs.' Hearing Exs., Ex. 19 at 32–4.

**210.** *Id.*, Ex. 19 at 32–2 to 32–3.

95 L.Ed.2d 871 (1987); *Rosquist v. Soo Line R.R.,* 692 F.2d 1107, 1111 (7th Cir. 1982) ("The district court's appraisal of the amount of the fee is ... justified by the court's inherent right to supervise members of its bar"); *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1277 (8th Cir.) ("The court has the power and the responsibility to monitor contingency fee agreements for reasonableness"), cert. denied, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Allen v. United States,* 606 F.2d 432, 435 (4th Cir. 1979) ("The district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established"); *Schlesinger v. Teitelbaum,* 475 F.2d 137, 141 (3d Cir.) ("The district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established"), cert. denied, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973).[211]

Neither Brunton nor Rogers addresses section 66 or the *Yapao Lawyers* case. Rather, they assert in conclusory fashion that contingency fee contracts are illegal in PNG.[212] As they provide no basis for this opinion, and cite no authority, the court cannot credit this testimony in the face of the evidence to the contrary proffered by defendants.

Brunton and Rogers also assert that any advance against costs by attorneys representing plaintiffs would be problematic under PNG law. Brunton states:

"Theoretically, a lawyer can enter into an agreement with a client to lend the client a sum of money to cover the costs of an action. But this type of agreement runs the risk of attracting an action in maintenance or champerty. In a case involving the Mount Kare Mine, the Supreme Court has held that the common law actions of maintenance and champerty are available in Papua New Guinea. One of the three judges in that case was of the view that these actions would not be appropriate in cases involving legal aid. But there are still substantial risks involved because that was a minority view."[213]

Section 66 provides that a retainer agreement between lawyer and client "may be made on the terms that the amount of the agreed remuneration either shall or shall not include all or any disbursements made by the lawyer." This appears to permit the lawyer to advance costs on the client's behalf and to recover those costs, if at all, from the recovery obtained by the client at the conclusion of the litigation. Alternatively, it appears to permit the lawyer to require the client to reimburse costs regardless of the outcome of the case. Brunton does not dispute that lawyers are permitted to advance costs for their clients in PNG. He merely states that it is potentially problematic for them to do so.[214] Accordingly, on the record presently available, the court concludes that defendants have demonstrated that contingency fee contracts are available in PNG, and that lawyers are able to advance costs.

---

**211.** Courts, in fact, have power to review contingent fee agreements *sua sponte* when justice so requires. See *Rosquist, supra,* 692 F.2d at 1111 ("Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics,"

citing *Elder v. Metropolitan Freight Carriers, Inc.,* 543 F.2d 513, 518 (3d Cir.1976)).

**212.** See Brunton Decl., ¶ 21; Rogers Decl., ¶ 10.

**213.** Brunton Decl., ¶ 20.

**214.** Rogers declaration is once again conclusory. (See Rogers Decl., ¶ 10.)

### (iii) Discovery

As respects discovery procedures, plaintiffs' experts declare that PNG courts cannot compel (1) testimony from anyone located outside the jurisdiction, (2) the production of documents by non-parties located outside the country, or (3) testimony from recalcitrant government witnesses. Defendants' experts dispute these points.[215] Additionally, they assert that if this suit proceeds in the United States, "a Papua New Guinea Court [will] be unwilling, and probably jurisdictionally unable, to provide any assistance in any manner whatsoever, to any person or Court so as to further proceedings conducted in contravention of the [Compensation] Act."[216] Stated otherwise, defendants contend that, because Papua New Guinea is not a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, the decision whether to provide discovery will rest with the PNG court, and it will likely choose not to provide assistance since this action was brought in violation of PNG's Compensation Act.[217]

### iii. Conclusion Regarding Adequate Forum

Based on the current record, it is disputed whether PNG's legal system provides for class action lawsuits and what type of discovery would be available to plaintiffs if they were required to litigate there. While it appears there would be no legal impediment to plaintiffs' retention of contingency fee counsel, there is no evidence that there are lawyers who would be willing to undertake plaintiffs' representation in PNG on that basis.[218] Nonetheless, the court finds that the unavailability of class actions and contingency fee counsel (if indeed such counsel are unavailable), as well as constraints on discovery, do not render Papua New Guinea an inadequate forum for *forum non conveniens* purposes. See *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir.2001) ("The plaintiffs' concerns about Argentine filing fees, the lack of discovery in Argentine courts, and their fear of delays in the Argentine courts do not render Argentina an inadequate forum. '[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate,'" quoting *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir.1990)); *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1430 (11th Cir.1996) ("Magnin also points out, almost in passing, that if the case is tried in France he will not receive a jury trial, nor will he be able to obtain counsel through a contingency fee arrangement, because such fee arrangements are not permitted in France. As cherished as trial by jury is in our law, and as cherished as contingency fee arrangements have become to some plaintiffs and their attorneys, Magnin has not cited us to any Supreme Court or court of appeals decision giving such considerations substantial weight in *forum non conveniens* analysis. The argument is particularly weak in regard to contingency fees. In

**215.** See Deklin Decl., ¶ 27 ("The legal process is regulated by Court Rules and also by legislation and can be served internally as well as outside PNG").

**216.** Molloy Decl., ¶ 38.

**217.** See Defs.' Mem. at 37:16–27; Molloy Decl., ¶¶ 38–39.

**218.** While it is true that plaintiffs have retained local counsel in PNG and Australia, there is no evidence that any of these individuals are willing (or able) to take over for Hagens Berman as lead counsel, and to do so on a contingency fee basis.

*Coakes v. Arabian American Oil Co.*, 831 F.2d 572, 576 (5th Cir.1987), the Fifth Circuit held that the ban against contingency fees in England should not significantly influence the *forum non conveniens* determination"); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984,* 809 F.2d 195, 199 (2d Cir.1987) (dismissing a United States class action in favor of a representative suit brought by the Indian government in India); *Aguinda II, supra,* 142 F.Supp.2d at 540–41 ("Plaintiffs' second objection to the adequacy of an Ecuadorian forum is that 'Ecuador is Not an Adequate Forum For This Litigation Because Ecuador Does Not Recognize Class Actions and Has No Comparable Procedure to Grant Plaintiffs the Equitable Remedy They Are Principally Seeking.' This, again, is unpersuasive. The class action mechanism, added to the Federal Rules of Civil Procedure in 1937, is ultimately nothing more than a 'convenient procedural device,' which most of the world's nations have chosen not to adopt and the merits of which continue to be debated even in the United States. Its absence does not ordinarily render a foreign forum 'inadequate' for purposes of *forum non conveniens* analysis" (internal citations omitted)); *Pavlov v. Bank of New York Co., Inc.,* 135 F.Supp.2d 426, 434 (S.D.N.Y.2001) ("[P]laintiffs complain that there is no class action or comparable mechanism available under Russian law and that the filing of a claim requires payment of a state duty of 6 percent of the amount of damages sought. But the lack of a class action device is not a basis for concluding that a foreign forum is inadequate for *forum non conveniens* purposes"); *Stewart v. Adidas A.G.,* No. 96 Civ. 6670(DLC), 1997 WL 218431, \*8 (S.D.N.Y. Apr.30, 1997) ("the Second Circuit has specifically noted that the unavailability of contingency fee arrangements in an alternative forum may not be sufficient to preclude dismissal on *forum non conve-*

*niens* grounds"); *Kristoff v. Otis Elevator Co.,* No. CIV. A. 96–4123, 1997 WL 67797, \*2 (E.D.Pa. Feb.14, 1997) ("The majority of courts reviewing plaintiff's ability to litigate in the foreign forum consider the absence of a contingency fee arrangement one of the balancing factors in a *forum non conveniens* analysis, not an argument against availability of an alternative forum"). The court thus finds that defendants have met their burden of demonstrating that PNG is an adequate forum.

Nonetheless, as discussed below, the possibility that plaintiffs would be unable to find lawyers willing to represent them on a contingent fee basis, and the inadequacy of discovery procedures, are relevant to the second aspect of the *forum non conveniens* test—i.e., assessing whether public and private interests favor dismissal. See *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 292 (2d Cir.1996) ("There is a division of authority on whether financial hardships facing a plaintiff in an alternative forum as a result of the absence of contingent fee arrangements may cause a forum to be deemed unavailable. The majority of courts deem a plaintiff's financial hardships resulting from the absence of contingent fee arrangements to be only one factor to be weighed in determining the balance of convenience after the court determines that an alternative forum is available. We agree with the majority rule" (internal citations omitted)); *Reid–Walen v. Hansen,* 933 F.2d 1390, 1398 (8th Cir.1991) ("As part of the *Gilbert* private interest analysis, courts must be sensitive to the practical problems likely to be encountered by plaintiffs in litigating their claim, especially when the alternative forum is in a foreign country. The district court must be alert to the realities of the plaintiff's position, financial and otherwise, and his or her ability as a practical matter to bring suit in the alternative forum. The district court failed to even consider this

factor" (internal citations and quotations omitted)); *Doe v. Sun International Hotels, Ltd.,* 20 F.Supp.2d 1328, 1330 (S.D.Fla.1998) ("The Court finds that there are significant practical reasons for trying the case in the United States. In the Bahamas the plaintiff would not be entitled to a jury trial and she would be unable to obtain a lawyer on a contingency fee basis. It is undisputed that the eighteen-year old plaintiff does not have the financial ability to bring a lawsuit in the Bahamas. Thus for all practical purposes the plaintiff would be unable to maintain a lawsuit in the Bahamas. Under the circumstances, the practicality factors weigh heavily in favor of a United States forum"); *MTS Securities, Inc. v. Creditanstalt–Bankverein,* No. 96–CV–0567E, 1997 WL 251482, *5 (W.D.N.Y. May 1, 1997) ("The plaintiffs concede that the defendants are amenable to process in Austria but contend that 'rare circumstances' are present here because (1) the Austrian courts would require them to post a substantial bond before they could assert their claims in Austria, (2) Austrian law prohibits contingency fee arrangements, so the plaintiffs would be forced to pay significant attorney's fees just to bring their claims in Austria, (3) litigation proceeds slowly in Austria and (4) the plaintiffs would not be entitled to recover punitive damages under Austrian law. The first two arguments relate to whether the plaintiffs could afford to bring their claims in Austria. In *Murray* the United States Court of Appeals for the Second Circuit held that whether the plaintiff has the financial resources to bring his claim in the alternative forum 'may not be considered in determining the availability of an alternative forum but must be deferred to the balancing of interests relating to the forum's convenience.' Accordingly, the first two arguments will be examined when this Court weighs the relevant public and private interest factors," quoting *Murray, supra,* 81 F.3d at 292–93); *Lugones v. Sandals Resorts, Inc.,* 875 F.Supp. 821, 824 (S.D.Fla.1995) (denying a motion to dismiss on *forum non conveniens* grounds where a United States plaintiff injured on vacation in Jamaica lacked access to a jury trial or a contingent fee attorney in Jamaica). Accordingly, the court turns next to this aspect of the test.

### b. "Exceptional Circumstances" Do Not Justify Dismissal

Since defendants have demonstrated the adequacy of the PNG forum, the court must consider whether "exceptional circumstances" warrant dismissal of the action. See *Piper, supra,* 454 U.S. at 254, 102 S.Ct. 252. In this regard, it is important to note, as an initial matter, that one of the named plaintiffs is a resident of the United States. "[T]he Supreme Court has clearly and unambiguously established that courts should offer greater deference to the selection of a U.S. forum by U.S. resident plaintiffs when evaluating a motion to dismiss for *forum non conveniens.*" *Wiwa, supra,* 226 F.3d at 102. See also *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 62 (2d Cir.2000) ("We recently reaffirmed this holding, by noting that *Guidi* illustrates that a plaintiff's U.S. citizenship and residence is entitled to consideration in favor of retaining jurisdiction" (internal citations omitted)). Moreover, the Ninth Circuit recently cautioned that "*forum non conveniens* is an exceptional tool to be employed sparingly." *Rosa, supra,* 211 F.3d at 514. Hence, the court must consider whether defendants have " 'demonstrate[d] that the ordinarily strong presumption favoring the plaintiffs' chosen forum is countered by the private and public interest factors set out in [*Gulf Oil Corp. v.*] *Gilbert,* [330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947),] which weigh

so heavily in favor of the foreign forum that they overcome the presumption for plaintiffs' choice of forum.'" *Aguinda II, supra,* 142 F.Supp.2d at 547 (quoting *DiRienzo, supra,* 232 F.3d at 56–57).

### i. Private Interest Factors

Defendants argue that the private interest factors identified by the Supreme Court in *Gilbert* weigh in favor of dismissing the action so that it may be litigated in PNG. They assert that "[a]ll of the events which are alleged to form the basis for liability in this matter occurred overseas, primarily in Australia and Papua New Guinea. Virtually all witnesses and documentary evidence are also overseas, primarily in Australia and Papua New Guinea." [219] In this regard, defendants identify the following "key witnesses" who are located either in PNG or Australia: the people of Bougainville; military and civilian employees of the governments of PNG and Australia; journalists and academics from PNG and Australia; and unnamed executives of CRA who were in charge of day-to-day operations at the mine. [220]

Plaintiffs counter that defendants' assertions regarding the location of witnesses do not satisfy the standard set forth in *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325 (9th Cir.1984). [221] There, the Ninth Circuit reversed a *forum non conveniens* dismissal because, *inter alia,* the "district court improperly focused on the number of witnesses in each location" rather than "examin[ing] the materiality and importance of the anticipated witnesses' testimony and then determin[ing] their accessibility and convenience to the forum." *Id.* at 1335–36. Here, defendants simply identify broad categories of potential witnesses. They do not specify specific individuals or explain the subjects concerning which they might testify. Accordingly, they have failed to meet their burden under *Gates Learjet.*

Plaintiffs also assert that, despite the fact that a majority of the putative class members who might serve as witnesses reside in PNG, "many ... would not travel to Port Moresby for fear of their lives." [222] For this reason, plaintiffs contend, it would not be more convenient for the class to litigate the action in that forum. By way of example, plaintiff Poposan states: "I fear grave harm would result to my family, my village, and me if this case were brought in [PNG].... I do not feel that I would be safe if I had to go to PNG to prosecute this case." [223] Plaintiff Miriori reports: "I do not feel I would be safe if I had to go to PNG to prosecute this case along with many of those in my village." [224] Many other plaintiffs describe similar feelings of fear for their own and their family members' life and safety.

Citing *Shields v. Mi Ryung Construction Co.,* 508 F.Supp. 891 (S.D.N.Y.1981), defendants urge the court to disregard these declarations on the basis that they do not constitute "the necessary proof of an actual threat to [plaintiffs'] safety." [225] In *Shields,* plaintiff opposed a motion to dismiss on *forum non conveniens* grounds in part because "his personal safety would be endangered if he pursued litigation in Saudi Arabia involving a dispute with Saudi Arabians, especially since his claims

219. Defs.' Mem. at 37:9–13.

220. See Defs.' Reply at 39, n. 37.

221. See Pls.' Opp. at 48–49; RT at 38–39.

222. Pls.' Opp. at 49:9–10.

223. Declaration of Michael Poposan, ¶ 3.

224. Declaration of Philip Miriori, ¶ 3.

225. Defs.' Reply at 10:9–10. See also RT at 12.

[concerned] allegations of wrongdoing on the part of a member of the royal family." *Id.* at 895. The court rejected this assertion as "entirely unsubstantiated speculation." *Id.* at 896.

The present case is distinguishable from *Shields.* Plaintiffs and other Bougainvilleans have been engaged in a civil war with the PNG government for the past ten years. Plaintiffs have adduced detailed declarations as to why they believe they would be in danger if they were forced to travel to Port Moresby. Thomas Tapuri and Francis Bom, for instance, state that they fear traveling to Port Moresby because they are close to Francis Ona, the leader of the Bougainville Republican Army, on whose head the PNG government has placed a bounty.[226] Given that PNG was plaintiffs' wartime adversary for more than a decade, and that defendants were allegedly aligned with PNG in prosecuting the war, the court finds that the relevant "private interests" favor retention of jurisdiction in this forum. See *Jane Doe I v. Karadzic,* 866 F.Supp. 734, 735 (S.D.N.Y.1994) ("the courts of the former Yugoslavia, either in Serbia or war-torn Bosnia, are not now available to entertain plaintiffs' claims"), rev'd. on other grounds, 70 F.3d 232 (2d Cir.1995); *Rasoulzadeh v. Associated Press,* 574 F.Supp. 854, 860 (S.D.N.Y.1983) ("In the case at bar, I have no confidence whatsoever in the plaintiffs' ability to obtain justice at the hands of the courts administered by Iranian mullahs. On the contrary, I consider that if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot. There is, in these circumstances, no substance to AP's motion based upon *forum non conveniens*"); *Cabiri, supra,* 921 F.Supp. at 1199 ("[P]laintiff is highly unlikely to obtain justice in the Ghanaian courts, and ... to force plaintiff to bring this action in Ghana would unnecessarily put him in harm's way, or, also unacceptable, would mean an end to the action altogether. Accordingly, defendant's motion to dismiss on the ground of *forum non conveniens* is denied").

Additionally, as discussed above, it is unclear whether plaintiffs will be able to identify counsel who will be willing to represent them on a contingency fee basis in PNG. Moreover, it appears that they will not be able to compel the production of critical witnesses and documents. Taken together with the fact that plaintiffs will be able to attach Rio Tinto's substantial American assets if a judgment is obtained, private interests factors weigh in favor of denying defendants' motion to dismiss on *forum non conveniens* grounds.

### ii. Public Interest Factors

As respects public interests, defendants contend that

> "[t]he same strong sovereign interests that support dismissal on grounds of comity and act of state also compel the conclusion that Papua New Guinea is the appropriate forum for this dispute. Its residents compose the putative class of plaintiffs. Its sovereign choices regarding economic development of natural resources, and actions necessary to maintain territorial integrity and prevent secession of Bougainville Island, are at the center of the dispute." [227]

It is clear that two of the four public interest factors—local interest in the controversy and avoidance of imposing jury duty on residents of a jurisdiction having little relationship to the controversy—weigh in favor of dismissing this action so that it may proceed in PNG. As for the remaining two—court congestion and ap-

---

**226.** See Tapuri Decl., ¶ 3; Bom Decl., ¶ 3.

**227.** Defs.' Mem. at 36–37.

plication of foreign law—the issue is closer.

There is evidence in the record that PNG's courts are congested, and that it has taken them several years to resolve complex cases similar to this one.[228] While defendants have submitted declarations stating that the delay was occasioned by plaintiffs' delay,[229] they have not proffered evidence that PNG's court system is any less congested than that in this country. Moreover, while it is true that the court will have to interpret and apply PNG law as respects some of plaintiffs' claims, many of the causes of action are brought under the ATCA, and require that the court interpret international, not PNG, law. On balance, therefore, the court concludes that the public interests at issue do not tip sharply in favor of the alternate forum.

### iii. Conclusion

Because the court finds that the private interests favor retaining jurisdiction, and the public interests are neutral, it denies defendants' motion to dismiss the action in favor of a PNG forum. The court believes such a result is particularly appropriate given that the case is brought under the ATCA and alleges violations of international law. See *Wiwa, supra,* 226 F.3d at 108 (holding that "the policy expressed in the TVPA favoring adjudication of claims in violation of international prohibitions on torture" weighed against dismissing the action on *forum on conveniens* grounds).

### 3. Australia

Alternatively, defendants contend that the court should dismiss the action in favor of an Australian forum. As noted earlier, to obtain dismissal on *forum non conve-*

*niens* grounds, defendants must demonstrate that they are amenable to process in the alternative forum, and that the subject matter of the lawsuit is cognizable there. See *Piper, supra,* 454 U.S. at 254, n. 22, 102 S.Ct. 252; *Aguinda II, supra,* 142 F.Supp.2d at 538. While defendant Rio Tinto Limited is an Australian corporation, and thus presumably amenable to process in that country, defendant Rio Tinto plc "is a company incorporated under the laws of England and Wales with its registered office at 6 St. James's Square, London."[230] Given its citizenship, it is unclear whether Rio Tinto plc can be served with process in Australia. "In order to grant a motion to dismiss for *forum non conveniens,* a court must satisfy itself[, *inter alia,*] that the litigation may be conducted elsewhere *against all defendants.*" *Jota, supra,* 157 F.3d at 159. See also *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998) (same); *Ikospentakis v. Thalassic Steamship Agency,* 915 F.2d 176, 179 (5th Cir.1990) ("A threshold inquiry in a motion that urges *forum non conveniens* dismissal is whether an adequate alternative forum exists as to all defendants"); *McMurtrie v. Iolab Corp.,* Civ. A. Nos. 94–3683 to 94–3688, 1995 WL 133338, *1 (E.D.La. Mar.24, 1995) ("IOLAB Corporation contends that an adequate alternative forum exists in Australia based on the plaintiffs' citizenship and its willingness to stipulate to Australian jurisdiction. However, dismissal predicated on *forum non conveniens* requires that all defendants consent or be subject to the alternative forum's jurisdiction. While the Court has already ruled that defendants Dr. Azar and his insurers were improperly joined, IOLAB Corporation's motion fails to ad-

---

**228.** See Brunton Decl., ¶ 42; Findlay Decl., ¶¶ 10, 14, 49.

**229.** See Parkop Decl., ¶ 24; Supp. Doherty Decl., ¶¶ 8–9.

**230.** Amended Answer, ¶ 40.

dress whether Johnson & Johnson, Inc. is subject to Australian court jurisdiction. Nor has Johnson & Johnson, Inc. consented to the jurisdiction of the Australian courts. IOLAB has thus failed to overcome the threshold requirement of demonstrating the existence of an alternative, available forum").

Here, defendants have proffered no evidence demonstrating that Rio Tinto plc would be amenable to process in Australia. While defendants explicitly state that they would consent to jurisdiction in PNG,[231] they make no similar statement regarding Australia. Indeed, defendants state that "Papua New Guinea is . . . by far the most appropriate forum in terms of comity as well as convenience, and defendants do not waive their right to raise their comity, act of state, and *forum non conveniens* defenses in either the U.K. or Australia."[232] Nonetheless, defendants did indicate in their proposed order that they would consent in writing to personal jurisdiction in Australia, and defense counsel reaffirmed this position at the July 9, 2001 hearing. Consequently, the court concludes that defendants have met their burden of showing that all defendants are amenable to process in Australia.

Turning to the second prong of the "adequate forum" test, defendants must demonstrate that plaintiffs' claims are cognizable in Australia, that Australia provides appropriate procedural safeguards, and that plaintiffs may obtain appropriate redress in that country. To this end, defendants assert that "[a] number of courts already have determined that Australia is an adequate forum."[233] While it may be true that courts have held that Australia is an adequate alternate forum, there is no evidence that the suits in which such a finding was made involved claims of the type at issue here. The fact that Australia has been deemed adequate in some types of cases is not sufficient to demonstrate adequacy here. See *McLellan v. American Eurocopter, Inc.*, 26 F.Supp.2d 947, 950 (S.D.Tex.1998) ("[W]hile it is not irrelevant that some federal courts have found Canada to be an adequate, alternative forum, it is also not controlling given the fact specific nature of a *forum non conveniens* inquiry").

As they did with respect to the adequacy of the PNG forum, defendants proffer expert declarations addressing the adequacy of an Australian forum.[234] Donald Denoon, an Australian history professor, opines that "[i]f the claims for some reason cannot be dealt with in PNG then . . . the courts of Australia would be the most appropriate alternative forum."[235] While he

---

**231.** See Defs.' Mem. at 34:1–2.

**232.** *Id.* at 39 n. 24.

**233.** Defs.' Reply at 39: 10–11.

**234.** Shortly before the hearing on this matter, plaintiffs filed an *ex parte* application seeking leave to file a motion to strike the expert testimony defendants had proffered regarding the adequacy of an Australian forum. The court grants the *ex parte* application, but denies the motion to strike. Plaintiffs argue that the court should strike the declarations of Donald Denoon and Robert James Ellicott, which defendants submitted with their reply brief, because they raise "new" issues not responsive to plaintiffs' opposition. (See Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Strike at 7–11.) While the declarations do not respond directly to arguments set forth in the opposition or to evidence presented in support thereof, defendants clearly raised the notion of dismissing the case in favor of an Australian forum in their opening brief. (See Defs.' Mem. at 38–40.). Plaintiffs thus had notice of the argument, and could have addressed it in their opposition and/or submitted evidence to prove that Australia was an inadequate forum.

**235.** Declaration of Donald Denoon ("Denoon Decl."), ¶ 5.

sets forth in some detail the historical relationship between Papua New Guinea and Australia, Australia's involvement with the mine, and the peace process in Bougainville, Denoon says nothing about plaintiffs' claims or whether they are actionable under Australian law. Accordingly, his declaration does not assist in analyzing the "adequate forum" prong of the *forum non conveniens* test.

Robert James Ellicott, an Australian barrister and former judge, offers opinions on a variety of topics, including: (1) the causes of action available under Australian law; (2) class actions; (3) the general competence of Australian lawyers in PNG law; (4) the general competence and impartiality of the Australian courts; (5) human rights; (6) customary law; (7) hostile environment; (8) contingency fees; (9) jury trial; (10) delays in court proceedings; (11) discovery; (12) the taking of evidence from persons outside of Australia; (13) the enforcement of judgments; and (14) the availability of costs.[236] Despite the length of his declaration, Ellicott says little as to whether the subject matter of plaintiffs' lawsuit is cognizable in Australia. The only statements he offers in this regard are as follows:

> "5. Some causes of action relied upon in this proceeding are based upon the Alien Tort Claims Act. No similar act is in force in Australia. In paragraph 92 of the Complaint, there are set out what are termed predominating common law questions and fact which are allegedly relevant to the plaintiffs' claims. They include as issues what are potential causes of action, namely:
>
> (a) negligence;

> (b) intentional malfeasance;
>
> (c) nuisance; and
>
> (d) conspiracy to injury.

Each of these would involve claims for damages and exemplary damages.

> 6. My opinion is that under the laws in force in the State of Victoria, the Supreme Court of that State could entertain claims for damages based on the alleged negligence, conspiracy and trespass of the defendants (to whom I will collectively refer to as 'Rio Tinto') of the broad nature alleged against them in the Complaint. These torts are, I understand, actionable as such in Papua New Guinea and, under conflict of law principles, could be the subject of proceedings here. . . .

> 15. I am not aware of any cause of action which would enable the plaintiffs to prosecute, in Australia, the claims made in the Complaint involving the infraction, as such, of treaties and general human rights violations. However, the Complaint makes allegations about these matters which could well be relevant to claims under national law based on negligence, conspiracy or trespass, even though international law would not be recognized as the source of authority."[237]

Based on a review of Ellicott's declaration, it is clear that, as alleged in this action, plaintiffs' claims are not cognizable in Australia. It is unclear, moreover, whether the subject matter of the claims would be cognizable in some other form. Ellicott says only that plaintiffs' allegations "could well be relevant" to negligence, conspiracy or trespass claims under

---

**236.** See generally Declaration of Robert James Ellicott ("Ellicott Decl.").

**237.** *Id.,* ¶¶ 5–6, 15.

Australian national law. This is not sufficient to support a finding that Australia would provide an adequate alternative forum. Accordingly, to the extent defendants seek dismissal in favor of an Australian forum, their motion is denied.

## C. Motion To Dismiss On The Basis Of Nonjusticiability

Defendants next challenge the complaint on the basis that raises only nonjusticiable questions. They rely on three separate principles: the act of state, comity of nations, and political question doctrines. To assist it in evaluating the applicability of these doctrines, the court solicited the opinion of the Department of State as to the effect, if any, adjudication of this litigation might have on the nation's foreign relations.

### 1. Statement Of Interest Of The United States

 In support of their nonjusticiability arguments, defendants initially proffered a press release that quoted a statement by former Secretary of State Madeline Albright following a 1998 visit to Papua New Guinea:[238]

"[W]e discussed a number of other issues today, among the most important was Bougainville. Papua New Guinea has an historic opportunity to end permanently a conflict that claimed thousands of innocent lives. I want to commend Prime Minister Skate's government for its initiative in seeking a negotiated peace and for sticking to the process until a cease fire agreement was reached. It's up to the people of this country to make sure the agreement sticks, that America will do all it can to help. I am happy to announce that we will provide $450,000 to support U.N. projects for reconstruction in Bougainville. We also plan to support training for the Papua New Guinea electoral commission so that it can ensure free and fair election of a reconciliation Government in Bougainville."[239]

In response to a question concerning independence for Bougainville, Albright reportedly said: "[W]e are pleased with the process that has taken place and salute the Prime Minister for what he has done. We believe in the territorial integrity of Papua New Guinea."[240] The final question and answer reported regarding Bougainville was as follows:

"**Question:** In 1996, the State department vetoed an attempt by the Papua New Guinea Defense Force to buy ten surplus U.S. Army Iroquois helicopters because of concerns about human rights abuses on Bougainville .... [G]iven the progress on Bougainville would a similar request be treated the same way?

**Secretary Albright:** We would have to consider it. I think that clearly the

---

**238.** See Defs.' RJN, Ex. CC. Plaintiffs object that the court should not take judicial notice of this exhibit, arguing that Albright's statements are hearsay because "defendants do not simply ask the Court to take notice that the press release was issued or that Ms. Albright made the statements ... [but instead] ask the Court to take notice that it expresses the 'official position of the United States'" regarding the situation in PNG. (Plaintiffs' Opposition in Part to Defendants' Request for Judicial Notice at 7.) Because the court does not rely on the press release for the reasons stated *infra*, it need not decide whether it is a proper subject of judicial notice.

**239.** *Id.* at 3.

**240.** *Id.* at 4.

changes in the way that the Bougainville problem was handled [were] quite remarkable and the Prime Minister and I spoke at some length about his efforts and what has happened there to end one of the more difficult situations, not only in the region but in the world and if a request were made we would consider it." [241]

Based on these comments, defendants argued that the United States' official policy "is to support 'the territorial integrity of Papua New Guinea,' and the peace process for resolving the Bougainville crisis." [242] If the court were to adjudicate plaintiffs' claims, defendants asserted, it would "interfere" in PNG's internal affairs, and have a strong negative impact on relations between the United States and PNG. Consequently, they urged, the act of state doctrine should apply to bar the claims.

The court was hesitant to base conclusions regarding United States foreign policy on general comments made by the Secretary of State during an informal press conference. In similar cases, courts have solicited the opinion of the Department of State as to whether adjudication of an action would negatively impact the nation's foreign policy. See *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 403, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (stating that the district court "requested and received a letter expressing the views of the legal adviser to the United States Department of State as to the applicability of the act of state doctrine"); *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 696–97, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) ("It is the position of the United States, stated in an Amicus brief filed by

the Solicitor General, that such a line should be drawn in defining the outer limits of the act of state concept and that repudiations by a foreign sovereign of its commercial debts should not be considered to be acts of state beyond legal question in our courts. Attached to the brief of the United States and to this opinion as Appendix 1 is the letter of November 26, 1975, in which the Department of State, speaking through its Legal Adviser agrees with the brief filed by the Solicitor General and, more specifically, declares that 'we do not believe that the *Dunhill* case raises an act of state question because the case involves an act which is commercial, and not public, in nature' "); *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 761–62, 92 S.Ct. 1808 (1972) ("On appeal, the Court of Appeals for the Second Circuit held that the congressional enactments relied upon by the District Court did not govern this case, and that our decision in *Sabbatino* barred the assertion of petitioner's counterclaim. We granted certiorari and vacated the judgment of the Court of Appeals *for consideration of the views of the Department of State which had been furnished to us following the filing of the petition for certiorari...*" (emphasis added)); *Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 342 (1st Cir.2000) ("[T]he district court commendably invited comment from the U.S. Department of State"); *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1370 (9th Cir.1988) ("This en banc court requested the amicus views of the Department of State on the act of state issues"); *Millen Industries, Inc. v. Coordination Council for North American Affairs,* 855 F.2d 879, 881 (C.A.D.C.1988) ("the courts recognize the value of obtaining views of

**241.** *Id.* at 5.

**242.** Defs.' Mem. at 29.

the Executive Branch in matters relating to the application of the act of state doctrine and giving appropriate weight to those views").[243]

Notably, in both *Kadic* and *Unocal,* the court considered the views of the Department of State before rendering a decision. See *Kadic, supra,* 70 F.3d at 250 ("In the pending appeal, we need have no concern that interference with important governmental interests warrants rejection of appellants' claims. After commencing their action against Karadzic, attorneys for the plaintiffs in *Doe* wrote to the Secretary of State to oppose reported attempts by Karadzic to be granted immunity from suit in the United States; a copy of plaintiffs' complaint was attached to the letter. Far from intervening in the case to urge rejection of the suit on the ground that it presented political questions, the Department responded with a letter indicating that Karadzic was not immune from suit as an invitee of the United Nations.... After oral argument in the pending appeals, this Court wrote to the Attorney General to inquire whether the United States wished to offer any further views concerning any of the issues raised. In a 'Statement of Interest,' signed by the Solicitor General and the State Department's Legal Adviser, the United States has expressly disclaimed any concern that the political question doc-

trine should be invoked to prevent the litigation of these lawsuits .... Though even an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication, the Government's reply to our inquiry reinforces our view that adjudication may properly proceed"); *Unocal II, supra,* 176 F.R.D. at 335 ("[T]he Court invited the Department of State to express its views concerning the potential ramifications of this litigation on the foreign policy of the United States").

At the hearing on the motion to dismiss, therefore, the court issued a tentative ruling which, *inter alia,* advised the parties of its view that the State Department should be contacted. Subsequently, the court requested supplemental briefing and held a status conference to afford the parties an opportunity to express their views on the subject.[244] Although the parties disagreed regarding the specific content of the letter to be sent to the Department, neither objected as a general matter to the court soliciting the State Department's views.[245] On August 30, 2001, therefore, the court sent a letter to the Honorable William Howard Taft IV, Legal Adviser to the U.S. Department of State, together with a copy of the first amended complaint. The court asked Mr. Taft to communicate the State

**243.** See also *Interpamil GMBH v. Collectibles, Inc.,* No. 97 Civ. 9076(WHP), 1999 WL 1043960, *1 (S.D.N.Y. Nov.16, 1999) ("On May 27, 1999, Interpamil asked the U.S. Department of State whether the United States recognizes or has diplomatic relations with the Federal Republic of Yugoslavia. In a letter to this Court dated June 25, 1999, the U.S. Department of Justice responded on behalf of the Department of State ..."); *Republic of Liberia v. Bickford,* 787 F.Supp. 397, 400 (S.D.N.Y.1992) ("On December 31, at the parties' request, the Court sent a letter to the Honorable Edwin D. Williamson, the legal

advisor of the United States Department of State. The letter requested the Department of State to 'submit a statement to this Court setting forth its views on the standing issues raised by the enclosed transcript' of the pre-motion conference held on November 20, 1991").

**244.** See Aug. 3 RT at 4–5.

**245.** See *id.*

Department's position regarding the potential effect adjudication of this lawsuit might have on the United States' foreign relations.[246]

On November 5, 2001, the Attorney General, acting on behalf of the Department of State, filed a Statement of Interest of the United States pursuant to 28 U.S.C. §§ 516 and 517. The Statement of Interest attached an October 31, 2001 letter from Mr. Taft to the Attorney General's Office that "explain[ed] the Department of State's views on the effects that continued adjudication of the action may have on the conduct of U.S. foreign relations."[247] Specifically, Mr. Taft stated that continued adjudication of this lawsuit "would risk a potentially serious adverse impact on the [Bougainville] peace process, and hence on the conduct of [United States] foreign relations."[248]

Subsequently, the parties filed a joint *ex parte* application for leave to submit responses to the Statement of Interest. On November 16, 2001, the court granted the application, and directed the parties to file supplemental briefs addressing the applicability of the act of state, political question, and international comity doctrines in light of the United States' Statement of Interest.

Together with their supplemental briefs, plaintiffs filed two offers of proof pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.[249] Plaintiffs ask that the court consider declarations proffered by negotiators of the Bougainville Peace Agreement, which contradict the State Department's assessment that the action may have a negative impact on the peace process. Specifically, the negotiators assert that the litigation has not affected, and will not disturb, the peace negotiations. Plaintiffs contend the declarations respond to certain representations the PNG government made to the State Department that caused the Department to take the position it did in the recently filed Statement of Interest.[250]

Plaintiffs misapprehend the nature of the court's inquiry to the Department of State, and the relevance of the Department's response. As discussed in detail below, in determining whether to invoke the act of state, political question or comity of nations doctrines, the court must first ascertain the relevant foreign policy of the executive branch, and then assess whether adjudication of the claims before it will unduly interfere with that policy. In conducting this analysis, the court must accept the statement of foreign policy provided by the executive branch as conclu-

---

246. A copy of the letter is attached hereto as Appendix A. Contrary to plaintiffs' assertion (see Pls.' Supp. Brief at 10:20–22), the court did not decline to refer the racial discrimination claim to the State Department. The court referred all of the claims, by sending the Department a copy of the first amended complaint in addition to summarizing certain of the pertinent allegations.

247. Statement of Interest at 2: 1–3.

248. Statement of Interest of the United States ("Statement of Interest"), Ex. A at 5.

249. In its order granting the parties' joint *ex parte* application to file briefs in response to the Statement of Interest, the court specifically stated that it would *not* consider further factual submissions. Plaintiffs filed the offers of proof in direct contravention of the court's order.

250. See Declaration of Steve W. Berman pursuant to Rule 56(f) and Offer of Proof ("Berman Decl.") at 1; Second Declaration of Steve W. Berman pursuant to Rule 56(f) and Offer of Proof ("Supp. Berman Decl.") at 1.

sive of its view of that subject; [251] it may not assess whether the policy articulated is wise or unwise, or whether it is based on misinformation or faulty reasoning. See *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political' departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision"). See also *Banco Nacional de Cuba, supra*, 406 U.S. at 766, 92 S.Ct. 1808 (citing *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), as a "case that emphasized the exclusive competence of the Executive Branch in the field of foreign affairs," and stating that the Court "has recognized the primacy of the Executive in the conduct of foreign relations"). This, however, is precisely what plaintiffs would have the court do. They propose to litigate whether, prompted by Rio Tinto, the PNG government transmitted erroneous information to the State Department that caused it to conclude that continued litigation of this action would have deleterious consequences for the peace process in Bougainville. The court simply cannot delve into such matters without violating settled separation of powers principles.

Plaintiffs also incorrectly assert that consideration of the Statement of Interest converts this aspect of the motion into a Rule 56 motion for summary judgment.

While the court may not take judicial notice of the facts that underlie the position of the United States regarding this litigation, it may take notice of the government's official policy and opinion. See *United States v. Penn Foundry & Mfg. Co.*, 337 U.S. 198, 215, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949) (Douglas, J., concurring) ("The policy of the Navy, revealed as it was in official communications to Congress, is a matter of which we can take judicial notice"); *American–Arab Anti–Discrimination Committee v. Reno*, 70 F.3d 1045, 1069–70 (9th Cir.1995) ("The Government seeks to use undisclosed information to achieve its desired outcome of prohibiting these individuals whom it perceives to be threats to national security from remaining in the United States while protecting its confidential sources involved in the investigation of terrorist organizations. Yet the Government has offered no evidence to demonstrate that these particular aliens threaten the national security of this country. In fact, the Government claims that it need not. It relies on general pronouncements in two State Department publications about the PFLP's involvement in global terrorism and on the President's recent broad Executive Order prohibiting 'any United States persons' from transacting business with the PFLP. See Exec. Order No. 12947 (January 23, 1995) (finding 'that grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and

---

**251.** Plaintiffs argue that, under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, Congress has deprived the executive branch of any role in determining whether foreign states are entitled to immunity under the act. See also *Chuidian v. Philippine National Bank*, 912 F.2d 1095, 1100 (9th Cir.1990) ("The principal change envisioned by the stat-ute was to remove the role of the State Department in determining immunity"). This has no bearing on the question before the court, however, as the issue is whether the executive branch is empowered to speak authoritatively and conclusively to *its own* position on a matter of foreign relations policy. There can be no doubt that it is.

economy of the United States'). We take judicial notice of these government documents on appeal for the limited purpose of assessing the strength of the Government's interest"); *Unocal II, supra,* 176 F.R.D. at 352 ("In light of the foregoing evidence proffered by Unocal, and particularly the Statement of Interest submitted by the United States, the Court takes judicial notice of the fact that the United States conducts diplomatic relations with SLORC as the current government of Burma"); *United States v. State of Alaska,* 236 F.Supp. 388, 394 (D.Alaska 1964) ("A statement by a duly authorized official of the State Department as to the policy of the Executive Branch of the Government, either at the present time or in the past, in claiming internal waters for the United States as against other countries in its international dealings, is subject to judicial notice, and is binding upon this Court"), rev'd. on other grounds, 353 F.2d 210 (9th Cir.1965). See also *Kadic, supra,* 70 F.3d at 250 (considering Statement of Interest

submitted by State Department in the context of the appeal of a facial Rule 12(b)(1) challenge).[252] Consequently, consideration of these documents does not convert defendants' motion to dismiss into a motion for summary judgment.[253]

### 2. Act Of State Doctrine

#### a. Legal Standard Governing Act Of State Doctrine

██ The act of state doctrine precludes a United States court from adjudicating claims if doing so would require that the court invalidate a foreign sovereign's official acts within its own territory. See *Credit Suisse v. United States Dist. Court for the Central Dist. of Cal.,* 130 F.3d 1342, 1346 (9th Cir.1997) (" 'Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on these acts of the government of another done within its own territory. Redress of grievances by reason of such acts

252. *Environmental Tectonics Corp., Internat'l. v. W.S. Kirkpatrick & Co.,* 659 F.Supp. 1381 (D.N.J.1987), aff'd. in part, rev'd. in part, 847 F.2d 1052 (3d Cir.1988), aff'd., 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990), is not to the contrary. There, the district court converted a motion to dismiss premised in part on the act of state doctrine into a motion for summary judgment after directing the parties to provide answers to certain specific questions it had posed, considering exhibits attached to plaintiff's opposition brief, and soliciting a Statement of Interest from the Department of State. See *id.* at 1385. See also *Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1056 (3d Cir.1988). The extent of extrinsic evidence considered by the court thus warranted conversion. Here, by contrast, the submission of the Statement of Interest, standing alone, does not.

253. Moreover, when the court informed the parties of its intention to solicit the opinion of the Department of State, plaintiffs did not

object or state that they believed doing so would convert the motion to dismiss into a motion for summary judgment. (See Reporter's Transcript of August 3, 2001 Proceedings ("Aug. 3 RT") at 4–5 ("COURT: We scheduled this telephone status conference to discuss the issue of communicating with the Department of State regarding this action and specifically, the applicability of the Act of State and Political Question Doctrines to the action. The Court invited counsel to submit, in effect, position papers regarding that matter, which counsel have done. And in addition, they have provided us with replies regarding the other party's submission. And the Court has had an opportunity to review that information. As an initial matter, it appears that no party objects to the Court making such a communication, and the Court believes it will be a benefit in evaluating the Act of State and Political Question Doctrine issues that have been raised as part of the defendants' motion to dismiss the case.'"))

must be obtained through the means open to be availed of by sovereign powers as between themselves,'" quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897)); *Liu v. Republic of China*, 892 F.2d 1419, 1431–32 (9th Cir. 1989) (same); *Tchacosh Co., Ltd. v. Rockwell Int'l Corp.*, 766 F.2d 1333, 1336 (9th Cir.1985) (same).

The doctrine reflects a concern that judicial determinations regarding the conduct of a foreign nation not interfere with executive branch foreign policy decisions. See *Bodner, supra*, 114 F.Supp.2d at 130 (citing *Sabbatino, supra*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804); *Unocal II, supra*, 176 F.R.D. at 349–50 ("[T]he act of state doctrine embodies the purely prudential concern that judicial inquiry into the validity of a foreign nation's sovereign acts may interfere with Executive and Congressional foreign policy efforts"). Thus, the act of state doctrine is "viewed as a 'consequence of domestic separation of powers, reflecting "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder" the conduct of foreign affairs.'" *Credit Suisse, supra*, 130 F.3d at 1346 (quoting *Environmental Tectonics Corp., supra*, 493 U.S. at 404, 110 S.Ct. 701, and *Sabbatino, supra*, 376 U.S. at 423, 84 S.Ct. 923).

 The doctrine is not one of abstention; rather, it is a "'*principle of decision* binding on federal and state courts alike.'" *Environmental Tectonics, supra*, 493 U.S. at 406, 110 S.Ct. 701 (quoting *Sabbatino, supra*, 376 U.S. at 427, 84 S.Ct. 923 (emphasis original)). Stated otherwise, "'the act within its own boundaries of one sover-

eign State ... becomes ... a rule of decision for the courts of this country.'" *Id.* (quoting *Ricaud v. American Metal Co.*, 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918)). The act of state doctrine comes into play only when the outcome of a case turns on the effect of official action by a foreign sovereign. See *id.*

 Thus, courts find that a claim is barred by the act of state doctrine only if it involves (1) an official act of a foreign sovereign, (2) performed within its own territory, and (3) seeks relief that would require the court to declare the foreign sovereign's act invalid. See *Environmental Tectonics, supra*, 493 U.S. at 405, 110 S.Ct. 701; *Credit Suisse, supra*, 130 F.3d at 1346; *Roe III v. Unocal Corp.*, 70 F.Supp.2d 1073, 1076 (C.D.Cal.1999).

### b. Plaintiffs' Environmental Tort And Racial Discrimination Claims Are Barred By The Act Of State Doctrine

 Defendants assert that the act of state doctrine bars the environmental claims set forth in Counts III and VI of the complaint.[254] Specifically, they contend that because the Copper Agreement, which regulated the relationship between Rio Tinto and PNG, is codified as PNG law, "plaintiffs cannot prevail on their environmental claims without establishing that [PNG's] official conduct over more than 30 years in licensing and regulating mining operations on Bougainville violated the law of nations."[255] Defendants do not argue that plaintiffs' war crimes, crimes against humanity, and racial discrimination claims are similarly barred. Given the potential effect adjudication of this case could have on the people of Bougainville generally,

---

**254.** See Defs.' Mem. at 17–19.

**255.** *Id.* at 18:4–8.

and on relations between the governments of the United States and Papua New Guinea, however, the court considers the applicability of the doctrine to all claims.[256]

In *Sabbatino, supra,* the Supreme Court delineated a test to assist courts in determining whether the act of state doctrine bars consideration of a particular claim. It later described the test as "a sort of balancing approach" (*Environmental Tectonics, supra,* 493 U.S. at 409, 110 S.Ct. 701), which considers that

> "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the court can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, ... for the political interest of this country may, as a result, be measurably altered." *Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. 923.

Because it is defendants who invoke the act of state doctrine, it is they who have the burden of proving that the predicates to its application are met. See *Liu, supra,* 892 F.2d at 1432 ("The burden of proving acts of state rests on the party asserting the applicability of the doctrine"); *Roe III, supra,* 70 F.Supp.2d at 1077 ("When applying the *Sabbatino* test, the party asserting the applicability of the act of state doctrine bears the burden of proof"); *Unocal II, supra,* 176 F.R.D. at 350 (same). " 'At a minimum, this burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest.' " *Unocal II, supra,* 176 F.R.D. at 350 (quoting *Liu, supra,* 892 F.2d at 1432). If defendants meet this burden, the court must then determine whether the factors set forth in *Sabbatino*—international consensus; impact on foreign relations; and the continued existence of the government—support or undermine application of the act of state doctrine to bar plaintiffs' claims. See *Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. 923; *Roe III, supra,* 70 F.Supp.2d at 1080–82; *Unocal II, supra,* 176 F.R.D. at 351–54. See also *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1546, n. 9 (N.D.Cal.1987) ("Defendant's failure to meet his threshold burden of establishing the applicability of the act of state doctrine makes it unnecessary to proceed to an analysis of the *Sabbatino* factors").

**i. PNG's Alleged Involvement In The Construction And Operation Of The Mine Was Public, Governmental And Official**

Plaintiffs assert that defendants have not made the threshold showing necessary

---

**256.** Given the sensitive nature of the subjects the act of state doctrine addresses, it is appropriate for the court to consider the matter as it relates to all claims. See, e.g., *Liu, supra,* 892 F.2d at 1432 ("First, we address whether Liu's suit against the ROC for damages for the assassination of her husband is barred by the [act of state] doctrine. Although the ROC did not raise this argument, we are concerned with the potential for embarrassing the Executive Branch, and raise the issue *sua sponte*"). See also *Siderman de Blake, supra,* 965 F.2d at 704 (noting that the district court dismissed plaintiffs' expropriation claims *sua sponte* on the basis of the act of state doctrine).

to justify application of the act of state doctrine, as they have not demonstrated either that the case involves the official acts of a foreign sovereign, or that the court will be required to invalidate such acts in order to grant relief.[257] As respects the first prong of the showing, plaintiffs contend that defendants have failed to establish that the conduct alleged in the complaint constitutes "official acts taken in pursuit of a public purpose, as opposed to profit-making activities engaged in by a private company."[258] It is true that, in applying the act of state doctrine, the Supreme Court has distinguished between the "public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other." *Alfred Dunhill, supra,* 425 U.S. at 695, 96 S.Ct. 1854. See also *Kalamazoo Spice Extraction Co. v. The Provisional Military Gov't. of Socialist Ethiopia,* 729 F.2d 422, 425 (6th Cir.1984) ("[I]n order for there to be act of state immunity, the act in question must be public and not commercial in nature"). A close reading of plaintiffs' allegations reveals, however, that PNG's purported conduct was "public and governmental" in nature.

As respects their claims for environmental harm and racial discrimination, plaintiffs assert that no official action was involved since the allegedly wrongful conduct was committed by Rio Tinto, not PNG. This argument is unavailing, as Rio Tinto conducted its mining activity pursuant to an agreement between its subsidiary, BCL, and the PNG government, which was ultimately codified as the Copper Act. Because PNG entered into the agreement, and codified it as the Copper Act, in order to exploit its natural resources, it is clear that it was engaged in a "public and governmental," as opposed to a "private and commercial," function. See *Rush–Presbyterian St. Luke's Med. Ctr. v. Hellenic Republic,* 877 F.2d 574, 578 (7th Cir.1989) ("[A] contract whereby a foreign state grants a private party a license to exploit the state's natural resources is not a commercial activity, since natural resources, to the extent they are 'affected with a public interest,' are goods in which only the sovereign may deal"); *Clayco Petroleum Corp. v. Occidental Petroleum Corp.,* 712 F.2d 404, 408 (9th Cir.1983) ("We now turn to appellants' efforts to invoke exceptions to the act of state doctrine. Appellants first contend that an exception for purely commercial acts should apply in this case. A plurality of the Supreme Court recognized an exception for purely commercial activity in *Alfred Dunhill* ..., but only four Justices concurred in that section of the opinion. The *Dunhill* plurality emphasized that a commercial exception is appropriate in situations where governments are not exercising powers peculiar to sovereigns. Unlike the context *Dunhill* envisioned, the governmental action here could not have been taken by a private citizen. Granting a concession to exploit natural resources entails an exercise of powers peculiar to a sovereign"); *United States v. Mitchell,* 553 F.2d 996, 1002 (5th Cir.1977) ("The nature of such a bill is based on the con-

---

257. See Pls.' Opp. at 43–44.

258. *Id.* See also Plaintiffs' Response to U.S. Statement of Interest and in Opposition to Rio's Motion to Dismiss ("Pls.' Supp. Brief") at 4:8–13 ("Rio has not provided any competent evidence that the Court will adjudicate the legality of sovereign *official* acts taken in pursuit of a *public* purpose, as opposed to profit-making activities engaged in by the government in its *private capacity,* which is what plaintiffs allege" (emphasis original)).

trol that a sovereign such as the United States has over the natural resources within its territory. It can exploit them or preserve them or establish a balance between exploitation and preservation. The nature of such control is not limited to the sovereignty of the United States. Other sovereign states enjoy similar authority" (internal citations omitted)); *Liberian Eastern Timber Corp. v. Government of Republic of Liberia,* 650 F.Supp. 73, 75–76 (S.D.N.Y.1986) ("The granting of a concession to exploit that natural resource [the Liberian forest] and the subsequent revocation of that concession were regulations of Liberia's natural resources and entailed an exercise of powers peculiar to a sovereign. Indeed, LETCO does not dispute that such activities were a governmental function").

Furthermore, before Rio Tinto can be held liable under the ATCA for environmental torts—i.e., for violations of the international law reflected in UNCLOS—or for racial discrimination, plaintiffs must establish that it was a state actor. To this end, plaintiffs have alleged, *inter alia,* that Rio Tinto and PNG "were joint venture partners, [and that they] worked in concert with each other and conspired to com-

mit the violations of customary international law set forth" in the complaint.[259] As these allegations make clear, plaintiffs seek to prove that PNG played an integral role in building and operating the mine, and in the racial discrimination and environmental harm that was purportedly caused thereby.[260] Given the allegations of joint action and international law violations, and given the codification of PNG's relationship with Rio Tinto in the Copper Act, there is a strong likelihood that the court will be required to assess the legality of PNG's official conduct. Cf. *Patrickson v. Dole Food Co.,* 251 F.3d 795, 800 (9th Cir.2001) ("This is as far as *Sabbatino* goes, and it's not far enough, because nothing in plaintiffs' complaint turns on the validity or invalidity of any act of a foreign state. Plaintiffs seek compensation for injuries sustained from the defendants' manufacture, sale and use of DBCP. Plaintiffs don't claim that any foreign government participated in such activities or that the defendants acted under the color of foreign law. The case—at least as framed by plaintiffs—does not require us to evaluate any act of state or apply any principle of international law").

Plaintiffs dispute this, arguing that the court need only adjudicate Rio Tinto's lia-

---

**259.** First Amended Complaint, ¶ 109.

**260.** Plaintiffs concede they allege that PNG was a joint actor in "establishing the mine, expropriating property, constructing and making the mine operational, sharing in the profits, and codif[ying] the mining agreement . . . ." They assert, however, that the act of state doctrine does not bar their environmental claims because they "do not allege that PNG played an active role in the environmental devastation perpetrated by Rio." (Pls.' Supp. Brief at 9:9–14.) To find state action under a joint action and/or governmental nexus approach, however, "the court must find a sufficiently close nexus between the state and the private actor 'so that the action of the latter may be fairly treated as that of the State itself.'" *Jensen, supra,* 222 F.3d at 575 (quot-

ing *Jackson, supra,* 419 U.S. at 350, 95 S.Ct. 449). While plaintiffs may not allege that PNG officials dumped mine tailings in Bougainville's rivers and lakes, this is irrelevant, since they clearly allege that PNG was Rio Tinto's joint venture partner with respect to the mine, and, more importantly, that pursuant to its agreement with Rio Tinto (codified as the Copper Act), the PNG government had the power to control and monitor pollution generated by the mine. It is simply inconsistent for plaintiffs to argue that Rio Tinto was a state actor when it polluted Bougainville's environment, while at the same time arguing that the state (i.e., PNG) was in no way responsible for the pollution.

bility, as the PNG government is not a defendant in the case.[261] Other courts have rejected such a contention. In *Unocal II* and *Roe III*, for example, the court noted that the acts of officials of the Burmese government were clearly at issue in the litigation, as Unocal's liability was premised on the existence of an alleged joint venture between it and the Burmese government. *Unocal II, supra,* 176 F.R.D. at 352;[262] *Roe III, supra,* 70 F.Supp.2d at 1078 ("Unocal correctly identifies that an SPDC military officer's act is at issue in this litigation. As Unocal's liability is premised on the acts of its alleged joint venturer or implied partner, plaintiff Roe IX may only assert claims against Unocal on the basis of official actions for which SPDC could conceivably be liable were it not protected by the Foreign Sovereign Immunities Act. Unocal establishes the official nature of the officer's order by relying on Burma law, case authority and public policy").

Here, Rio Tinto's liability is premised on its alleged joint venture with the PNG government, as codified in the Copper Act, and on the purported actions the two took jointly to construct, operate, and reopen the mine on Bougainville. Certain of those alleged activities clearly involved official acts of the PNG government—e.g., conferring a mining concession on Rio Tinto and allowing Rio Tinto to exercise eminent domain powers to dispossess the native people of Bougainville.[263] Were the court to conclude that Rio Tinto was a state actor, and that its conduct violated the law of

nations, it would, *a fortiori*, have to conclude that PNG's official acts were invalid as well. For this reason, the court cannot accept plaintiffs' argument that defendants have failed to demonstrate that the act of state doctrine applies to their racial discrimination and environmental claims.

### ii. PNG's Alleged Acts Of Torture, Pillage And Illegitimate Warfare Were Not Official Acts Of State

As for plaintiffs' claims based on the conduct of PNG's military during the war—i.e., the imposition of a medical blockade, and acts of torture, killing, bombing, rape, and pillage—the question is different. Unlike the environmental and racial discrimination claims, which challenge actions taken by Rio Tinto, the claims asserting war crimes and crimes against humanity involve allegedly illegal acts committed by the PNGDF during the civil uprising on Bougainville. Orders given by military commanders during wartime are commonly viewed as official sovereign acts. See *Roe III, supra,* 70 F.Supp.2d at 1079 (". . . an order given by a military officer has traditionally been viewed as an official act of a sovereign for purposes of the act of state doctrine. . . . [T]he[ ] cases establish that if a court determines the military officer acted on behalf of a recognized government and if the lawsuit turns on a challenge to the officer's order, then the act of state doctrine bars adjudication of the matter," citing *Ricaud v. American Metal Co.,* 246 U.S. 304, 306, 38 S.Ct. 312, 62 L.Ed. 733 (1918); *Oetjen,*

---

**261.** See Pls.' Supp. Brief at 5:3–6:12.

**262.** In *Unocal II*, the court ultimately determined that defendants had not made the threshold showing necessary to invoke the act of state doctrine because they had not demonstrated that the acts were "official." Additionally, it concluded that *Sabbatino* balancing did not favor application of the doctrine to bar the claims. *Unocal II, supra,* 176 F.R.D. at 352–54.

**263.** First Amended Complaint, ¶ 111. See also *id.,* ¶ 244.

*supra,* 246 U.S. at 303, 38 S.Ct. 309; and *Underhill, supra,* 168 U.S. at 254, 18 S.Ct. 83).

Where the commands do not involve acts of *legitimate* warfare, however, the outcome changes. See *Linder v. Portocarrero,* 963 F.2d 332, 337 (11th Cir.1992) (holding that "there is no foreign civil war exception to the right to sue for tortious conduct that violates the fundamental norms of the customary laws of war," and that *Underhill* exempts only "acts of legitimate warfare" from liability). While it is open to question whether the blockade will ultimately be shown to be a legitimate act of warfare or, as alleged, a form of genocide, the court must, at this stage of the proceedings, accept plaintiffs' allegations as true, and consider it the latter. So considered, neither it nor the purported acts of torture, rape and pillage can be deemed official acts of state. See, e.g., *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 24 (D.D.C., 1998) (after finding that suicide bus bombings were acts of extrajudicial killing, the court "conclude[d] that bus bombings and other acts of international terrorism are not valid acts of state of the type which bar consideration of this case"); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 552 (S.D.N.Y.1984) ("A claim arising out of an alleged violation of human rights—for instance a claim by the victim of torture or genocide—would (if otherwise sustainable) probably not be defeated by the act of state defense since the accepted international law of human rights contemplates external scrutiny of such acts," quoting RESTATEMENT (REVISED) OF FOREIGN RELATIONS LAW, § 428, comment 4, at 8 (Tent. Draft No. 4, 1983)), and citing *Sabbatino, supra,* 376 U.S. at 430, n. 34, 84 S.Ct. 923 ("There are, of course, areas of international law in which consensus as to standards is greater and which do not

represent a battleground for conflicting ideologies. This decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international law"). See also *Unocal I, supra,* 963 F.Supp. at 894–95 ("Because nations do not, and cannot under international law, claim a right to torture or enslave their own citizens, a finding that a nation has committed such acts, particularly where, as here, that finding comports with the prior conclusions of the coordinate branches of government, should have no detrimental effect on the policies underlying the act of state doctrine. Accordingly, the Court need not apply the act of state doctrine in this case"). As to these claims, therefore, the court finds that the predicate to application of the act of state doctrine has not been met.

### iii. *Sabbatino* Factors

■ Because it concludes that a ruling in plaintiffs' favor on their environmental and racial discrimination claims will necessarily imply the invalidity of official acts of the PNG government, the court turns to consideration of the *Sabbatino* factors. As noted, these include the degree of consensus concerning the area of international law in question, the implications of the issue on United States foreign relations, and whether the government that engaged in the challenged act of state continues in existence. See *Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. 923.

### (a) Degree Of International Consensus

The first factor to be considered in determining whether the act of state doctrine bars judicial review is "the degree of international consensus regarding [a challenged] activity." *Liu, supra,* 892 F.2d at 1433. Here, plaintiffs assert claims for environmental harm and racial discrimina-

tion based on Rio Tinto's and PNG's construction and operation of a copper mine on Bougainville. As discussed earlier, there is no international consensus regarding the environmental torts alleged, except as respects the claimed violation of UNC-LOS.

By contrast, there is a high degree of consensus regarding racial discrimination. See *Siderman de Blake, supra,* 965 F.2d at 717 (noting that the Restatement "identif[ies] *jus cogens* norms prohibiting genocide, slavery, murder or causing disappearance of individuals, prolonged arbitrary detention, and systematic racial discrimination"); *Hirsh, supra,* 962 F.Supp. at 381 ("A foreign state violates *jus cogens* when it participates in such blatant violations of fundamental human rights as genocide, slavery, murder, torture, prolonged arbitrary detention, and racial discrimination" (internal citations omitted)).

Consequently, the court concludes that the first *Sabbatino* factor weighs against applying the act of state doctrine to bar adjudication of plaintiffs' racial discrimination claims. It weighs in favor of applying the doctrine to plaintiffs' environmental tort claims.[264]

### (b) Implications For Foreign Relations

The court must next evaluate the implications for United States foreign relations if a decision is rendered on the environmental tort and racial discrimination claims in this case. The Supreme Court has stated that "where the impact on for-

eign relations of the international issues presented is small, the justification for application of the act of state doctrine is commensurately weak." *Unocal II, supra,* 176 F.R.D. at 354 (citing *Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. 923). Stated otherwise, "the application of the doctrine depends on the likely impact on international relations that would result from judicial consideration of the foreign sovereign's act." *Grupo Protexa, S.A. v. All American Marine Slip,* 20 F.3d 1224, 1236 (3d Cir.1994) (internal quotations omitted). While lower courts have wide discretion in deciding whether the act of state doctrine applies, "[i]f adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act." *Allied Bank International v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 520–21 (2d Cir.), cert. dismissed, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).

The Statement of Interest filed by the Department of State does not directly indicate whether it believes any of the act of state, political question or international comity doctrines applies. It does clearly express the view, however, that continued adjudication of this lawsuit will negatively impact United States foreign relations with PNG. Specifically, Mr. Taft explains that on August 30, 2001, the PNG government and representatives of Bougainville signed a peace agreement. He states that implementing this agreement "will require

---

**264.** Defendants argue that "[t]o the extent ... there is any international consensus that provides the standards by which plaintiffs' claims could be adjudicated, that international consensus requires that local remedies be exhausted before it is appropriate to adjudicate those claims under international law." (Defendants' Initial Memorandum Regarding the

Statement of Interest of the United States ("Defs.' Supp. Brief") at 18:6–10). This misapprehends the nature of the inquiry the Supreme Court has directed courts to make—i.e., to ascertain whether there is international consensus regarding the *substantive* violations alleged in the complaint.

sustained effort and maintaining a delicate political balance in the years ahead,"[265] and that, consequently, countries participating in the peace process, particularly PNG, have expressed concern that litigation of the action might disrupt the peace effort. Because the United States "cannot lightly dismiss such expressions of concern from a friendly foreign state,"[266] Mr. Taft proffers the following opinion on the State Department's behalf:

> "The success of the Bougainville peace process represents an important United States foreign policy objective as part of our effort at promoting regional peace and security. In our judgment, continued adjudication of the claims identified by Judge Morrow in her August 30 letter would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations."[267]

Plaintiffs argue that the court should disregard the State Department's opinion because it "does not [assert] that adjudication *will* have an impact on U.S. foreign policy, only that it *might*."[268] This is an inaccurate characterization of the Department's position. While the Department does not maintain that it is absolutely certain litigating this case will negatively impact the United States' foreign relations, neither it does restrict itself to stating that there *might* be such an impact. Rather, the Department opines that continued adjudication of the action "would" (not might) risk a "potentially serious adverse impact"

on the peace process and, consequently, on United States foreign relations.[269] Stated otherwise, the Department believes that continued prosecution of this action poses a serious risk for United States foreign policy objectives. This supports application of the act of state doctrine. Cf. *Unocal II, supra,* 176 F.R.D. at 354 ("where the impact on foreign relations of the international issues presented is small, the justification for application of the act of state doctrine is commensurately weak").

> Plaintiffs contend the court should discount the State Department's opinion because it "is entirely based on a self-serving statement from PNG concerning the effect the litigation has had, and will have on the peace process, which the U.S. accepted as true. PNG's statement is not only incompetent hearsay evidence submitted for the truth of the matter and full of factual conclusions drawn against the non-moving party, but also it is inherently suspect."[270]

There is no evidence that the United States' opinion is, as plaintiffs contend, based *entirely* on the statement of the PNG government. To the contrary, Mr. Taft's letter specifically states that *countries* participating in the peace process—not just PNG—have expressed concern that adjudication of this action could undermine the progress toward peace that has been made.[271] Additionally, the State Department indicates that it has taken into account information regarding the peace process, the negotiation of the peace

---

265. Statement of Interest, Ex. A. at 5.

266. *Id.,* Ex. A at 6.

267. *Id.,* Ex. A at 5.

268. Pls.' Supp. Brief at 1:13–14 (emphasis original).

269. See Statement of Interest, Ex. A at 5.

270. Pls.' Supp. Brief at 11–12.

271. See Statement of Interest, Ex. A at 5.

agreement, local customs of reconciliation, and implementation of the peace accord in addition to the statements of the PNG government.

Moreover, as noted earlier, the key inquiry for the court's purpose is whether there will be an impact on the United States' foreign relations, not whether the position adopted by the United States is well-founded or factually accurate. The State Department has received expressions of concern from countries it regards as allies. Based on these communications, and on its own evaluation of the facts, the State Department has concluded that, "in [its] judgment, continued adjudication of [plaintiffs'] claims ... would risk a potentially serious adverse impact on the peace process," which it describes as "an important United States foreign policy objective." Such a statement should not be disregarded. Rather, as the Second Circuit has stated, it is entitled to "respectful consideration." *Kadic, supra,* 70 F.3d at 250.

That being said, plaintiffs have not cited, and the court has not found, a single case in which a court permitted a lawsuit to proceed in the face of an expression of concern such as that communicated by the State Department here. This is probably because to do so would have the potential to embarrass the executive branch in the

conduct of its foreign relations, and "[t]he major underpinning of the act of state doctrine is ... [to] foreclos[e]" such a possibility. *Alfred Dunhill, supra,* 425 U.S. at 697, 96 S.Ct. 1854. See also *Banco Nacional de Cuba, supra,* 406 U.S. at 765, 92 S.Ct. 1808 ("The line of cases from this Court establishing the act of state doctrine justifies its existence primarily on the basis that juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government"); *Liu, supra,* 892 F.2d at 1432 ("The doctrine, today, is a flexible one designed to prevent judicial pronouncements on the legality of the acts of foreign states which could embarrass the Executive Branch in the conduct of foreign affairs"); *Environmental Tectonics, supra,* 847 F.2d at 1058 ("Thus, courts are required to decline to exercise jurisdiction over cases that may embarrass or impede the political branches of government in their conduct of foreign affairs").[272] Accordingly, this factor weighs in favor of applying the act of state doctrine.

**(c) Government Still In Existence**

The final *Sabbatino* factor is whether the government allegedly responsible for the challenged act is still in existence. See *Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. 923; *Roe III, supra,* 70 F.Supp.2d at 1081.

**272.** But see *Republic of the Philippines v. Marcos,* 818 F.2d 1473, 1488, n. 20 (9th Cir. 1987) ("If an inference is to be drawn from the State Department's pronouncements, it would be from its failure to speak in this case while it did in two others involving the same parties and somewhat related issues. But it is a highly sensitive and delicate undertaking to deduce our State Department's attitude from what it has failed to say. As the Court noted in *Sabbatino,* '[o]ften the State Department will wish to refrain from taking an official position, particularly at a moment that would

be dictated by the development of private litigation but might be inopportune diplomatically.' It suffices to conclude that we are not precluded from addressing this issue by what the executive branch has said and done in other cases. In any event, we doubt that a State Department pronouncement *even in this case* would materially change our analysis. While embarrassment of foreign relations is a matter we consider, it is a relatively minor consideration in light of the other serious issues raised by plaintiff's case").

There is no evidence in the record that control of the PNG government has changed since the alleged events giving rise to this lawsuit occurred. Hence, this factor also favors application of the act of state doctrine. See *id.* ("The final factor set out in *Sabbatino,* whether the government ... allegedly responsible for the challenged acts is still in existence, also supports application of the doctrine. Here, SLORC or the SPDC remains in existence and is the current government of Burma"). Cf. *Bigio, supra,* 239 F.3d at 452–53 ("In *Sabbatino,* the Court remarked that '[t]he balance of relevant considerations may ... be shifted if the government which perpetrated the challenged act of state is no longer in existence.' Plaintiffs assert that '[t]he Nasser government,' which effected the expropriation, 'is no longer in existence.' Defendants respond that '[t]he heads of state may have changed, but the government has remained the same.' We cannot resolve the question thus posed, at least not on the record before us. But there is little doubt that the Egyptian government that is now in power is far removed in time and circumstance from that which seized the Bigios' property. The expropriation took place thirty-four or more years ago; President Nasser has been dead for thirty years" (internal citations omitted)).

### (d) Conclusion

Two of the three *Sabbatino* factors support application of the act of state doctrine

to bar continued adjudication of plaintiffs' environmental tort and racial discrimination claims in the United States. For that reason, and particularly because "[t]he 'touchstone' or 'crucial element' [in the *Sabbatino* analysis] is the potential for interference with our foreign relations" (see *Liu, supra,* 892 F.2d at 1432), the court grants defendants' motion to dismiss those claims based on the act of state doctrine.

### 3. Political Question Doctrine

#### a. Legal Standard Governing The Political Question Doctrine

"The political question doctrine employs separation of powers principles to restrict the justiciability of certain issues." See *Custer County Action Association v. Garvey,* 256 F.3d 1024, 1031 (10th Cir.2001). See also *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[I]t is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question' "); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 164–66, 2 L.Ed. 60 (1803) ("Questions, in their nature political ... can never be made in this court").[273]

Most often, the doctrine is invoked in matters involving the foreign relations of the United States. See *Oetjen, supra,* 246

---

**273.** Courts and commentators have disagreed as to whether the political question doctrine is a jurisdictional or prudential limitation on the power of the federal courts. Compare *Kadic, supra,* 70 F.3d at 249 ("We therefore proceed to consider whether, even though the jurisdictional threshold is satisfied in the pending cases, other considerations relevant to justiciability weigh against permitting the suits to proceed. Two nonjurisdictional, prudential doctrines reflect the judiciary's concerns regarding separation of powers: the political question doctrine and the act of state

doctrine") with *767 Third Ave. Associates v. Consulate General of the Socialist Federal Republic of Yugoslavia,* 218 F.3d 152, 164 (2d Cir.2000) ("Although prudential considerations may inform a court's justiciability analysis, the political question doctrine is essentially a constitutional limitation on the courts"). The Supreme Court has stated that the political question doctrine "expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III." *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 215,

U.S. at 302, 38 S.Ct. 309; *Kadic, supra,* 70 F.3d at 248–49 ("We do not read *Filartiga* to mean that the federal judiciary must always act in ways that risk significant interference with United States foreign relations. To the contrary, we recognize that suits of this nature can present difficulties that implicate sensitive matters of diplomacy historically reserved to the jurisdiction of the political branches"); *Tel–Oren, supra,* 726 F.2d at 803 ("Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied").

Not every case implicating United States foreign relations involves a nonjusticiable political question, however. See, e.g., *Kadic, supra,* 70 F.3d at 249 ("Although these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions. The doctrine is one of political questions, not one of political cases" (internal citations omitted)); *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 49 (2d Cir.1991) ("The fact that the issues ... arise in a politically charged context does not convert what is essentially an ordinary tort suit into a nonjusticiable political question.... [B]ecause the common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of 'judicially discoverable and manageable standards' ").

■ To determine whether plaintiffs' claims raise a political question, the court must consider the following factors: "(1) the existence of any textually demonstrable constitutional commitment of the issue to a coordinate political department; ... (2) a lack of judicially discoverable and manageable standards for resolving the claims; ... (3) the impossibility of deciding without an initial, nonjudicial, policy determination; ... (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect

94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (citing *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)). It has also acknowledged, however, that the justiciability doctrine is "of uncertain and shifting contours," and noted that the "doctrine has become a blend of constitutional requirements and policy considerations." *Flast, supra,* 392 U.S. at 95–97, 88 S.Ct. 1942. See also *Schroder v. Bush,* 263 F.3d 1169, 1171, n. 1 (10th Cir. 2001) ("Deeply rooted ambiguity in the nature and justification of the political question doctrine has prevented clear classification of the appropriate type of dismissal in political question cases.... [I]n the end, clear classification is immaterial: '[T]here is probably more room for confusion than benefit in attempting to analogize [political question dismissal] to dismissal for failure to state a claim, or to dismissal for lack of jurisdiction,' " quoting 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Juris.2d, § 3534.3 (2d ed.1984)); *Hopson v. Kreps,* 622 F.2d 1375, 1378 & n. 3 (9th Cir.

1980) (declining to "resolve the longstanding debate as to the nature and proper scope of the political question doctrine," the court noted that "[i]t is difficult to reconcile the cases refusing to decide various issues, including those in the field of foreign relations, without acknowledging that the [political question] doctrine reflects prudential and functional concerns as well as Article III limitations on the use of judicial power"). There is no need to resolve this issue in the present case, because whatever its character, the political question doctrine mandates that the court not adjudicate plaintiffs' claims. See 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Juris.2d, § 3534.3 ("The clearest distinction between political question doctrine and other justiciability doctrines is the conclusion that a political question is never suitable for judicial disposition, no matter what individual injury is pressed").

for the coordinate branches of government; ... (5) an unusual need for unquestioning adherence to a political decision already made; [and] (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker, supra,* 369 U.S. at 217, 82 S.Ct. 691. If any one of these factors is "inextricabl[y]" involved in the case, the political question doctrine applies, and the court should dismiss the claims. See *id.*

### b. The Political Question Doctrine Bars All Of Plaintiffs' Claims

 Defendants assert that the court should decline to exercise jurisdiction over plaintiffs' claims because "[m]atters of war and peace and the legitimacy of foreign governments are quintessential political questions." [274] Plaintiffs counter that the political question doctrine does not apply because (1) Congress has determined that the federal courts are a proper forum in which to adjudicate ATCA claims; and (2) this case involves claims by private individuals against private companies and thus does not implicate the foreign policy of the United States.[275]

As respects plaintiffs' second argument, whether defendants are liable on several of plaintiffs' claim turns on whether PNG and/or its military violated international law. That the named parties are private entities does not change this fact. See *Frumkin v. JA Jones, Inc.,* 129 F.Supp.2d

370, 375 (D.N.J.2001) ("Plaintiff fundamentally misinterprets the nature of the political question doctrine, when he argues that 'Defendants rely on *Baker* and claim Plaintiff's claim is a political question. This is just plain wrong. Plaintiff is bringing an individual claim against a private company.' The issue is not how Plaintiff has styled his suit, but instead what the underlying controversy is" (internal citations omitted)).

Moreover, the fact that Congress enacted 28 U.S.C. § 1350, which provides that federal courts "shall" have jurisdiction over claims within its ambit, does not speak to the applicability of the political question doctrine. "Just as 'Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, or to entertain friendly suits,' it may not require courts 'to resolve political questions,' because suits of this character are inconsistent with the judicial function under Art. III." *767 Third Avenue Associates, supra,* 218 F.3d at 164 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 732, n. 3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). See also *Powell v. McCormack,* 395 U.S. 486, 512, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ("As we pointed out in *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 ... (1962), there is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable' ").[276]

It is for this reason that many courts evaluating properly filed ATCA claims

---

274. Defs.' Mem. at 29:14–16.

275. See Pls.' Opp. at 42–43; Pls.' Supp. Brief at 16–17.

276. In *Baker, supra,* the Court noted that there is a lack of subject matter jurisdiction when a claim "either does not 'arise under'

the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a 'case or controversy' within the meaning of that section; or ... is not one described by any jurisdictional statute." *Baker, supra,* 369 U.S. at 198, 82 S.Ct. 691. It then stated: "Our conclusion ... that this cause presents no

consider the applicability of the political question and/or act of state doctrines to such claims. See *Kadic, supra,* 70 F.3d at 249; *Abebe–Jira v. Negewo,* 72 F.3d 844, 848 (11th Cir.1996); *Tel–Oren, supra,* 726 F.2d at 801–05; *Roe III, supra,* 70 F.Supp.2d at 1076; *Iwanowa, supra,* 67 F.Supp.2d at 485–89; *Unocal II, supra,* 176 F.R.D. at 349–57.[277] In *Kadic,* for example, the court solicited the views of the executive branch, and was informed by the Solicitor General that " '[a]lthough there might be instances in which federal courts are asked to issue rulings under the Alien Tort Statute or the Torture Victim Protection Act that might raise a political question, this is not one of them.' " *Kadic, supra,* 70 F.3d at 250.

Consequently, it is appropriate to evaluate whether defendants have met their burden of demonstrating the applicability of the doctrine in this case. As an initial matter, the court notes that the same separation of powers principles that inform the act of state doctrine underlie the political question doctrine. See *Banco Nacional de Cuba, supra,* 406 U.S. at 785–93, 92 S.Ct. 1808 (Brennan, J., dissenting) (noting that the act of state doctrine, as articulated in *Sabbatino,* is equivalent to the political question doctrine); *Trajano v. Marcos,* Nos. 86–2448, 86–15039, 1989 WL 76894,

*2 (9th Cir. July 10, 1989) (Unpub.Disp.) ("The act of state doctrine is the foreign relations equivalent of the political question doctrine"). See also *Credit Suisse, supra,* 130 F.3d at 1346; *Tel–Oren, supra,* 726 F.2d at 803. Accordingly, the analysis set forth in the preceding section argues in favor of dismissal on political question grounds as well.

The court has also considered the *Baker v. Carr* factors, and finds that they support invocation of the political question doctrine. Since at least 1998, the executive branch has stated its support for the PNG government, and for PNG's efforts to negotiate a peace agreement resolving the Bougainville conflict.[278] On her trip to the region in 1998, Secretary of State Albright promised "that America [would] do all it [could] to help" the PNG government resolve the civil war in Bougainville.[279] More recently, in the Statement of Interest that it filed with this court, the executive branch reiterated its commitment to peace in Bougainville, and specifically to the peace accord that has been negotiated, *inter alia,* by PNG. It opined that continued adjudication of this lawsuit could negatively impact the peace process, and that the success of that process is an important United States foreign policy objective.[280] Were the court to ignore this statement of

---

nonjusticiable 'political question' settles the only possible doubt that it is a case or controversy. Under the present heading of 'Jurisdiction of the Subject Matter' we hold only that *the matter set forth in the complaint does* arise under the Constitution and is within 28 U.S.C. § 1343. . . ." *Id.* at 198–99, 82 S.Ct. 691. The Court thus analyzed its constitutional/statutory authority to entertain the suit separately from the action's justiciability. See also *Powell, supra,* 395 U.S. at 512, 89 S.Ct. 1944 (same).

**277.** Cf. 134 Cong. Rec. H9692–02 (daily ed. Oct. 5, 1988) (Statement of Rep. Mazzoli) ("In addition, the Torture Victim Protection Act

would accomplish [its] objectives without inhibiting the conduct of U.S. foreign policy. Suits brought under the act would be subject to the Foreign Sovereign Immunities Act, the Act of State Doctrine, *forum non conveniens,* and head of state immunity").

**278.** See Defs.' RJN, Ex. CC at 3.

**279.** *Id.*

**280.** Plaintiffs argue that the State Department expressly declines to "attack the Court's jurisdiction," and that it "simply cautions the Court on the potential impact that this case *might* have on *future* relations with PNG."

position, deny the motion to dismiss, and retain jurisdiction over this action, it would surely "express[ ] lack of the respect for the coordinate branches of government," and cause "the potentiality of embarrassment from multifarious pronouncements

(See Pls.' Supp. Reply at 3:13–4:1.) Given this fact, they assert, it "would be error for the Court not to assert jurisdiction." (*Id.* at 4:1–2.) In support, plaintiffs cite the Third Circuit's reversal of the district court in *Environmental Tectonics, supra.* (See *id.* at 4:23–28, n. 5.) This argument is unavailing. The Statement of Interest rather clearly indicates that the State Department has refrained from expressing a view on the ultimate legal question before the court—i.e., the applicability of the act of state, political question and international comity doctrines—because of the manner in which the court's letter to it was phrased. (See Statement of Interest at 4 ("Although Judge Morrow advises that defendants have raised the act of state and political question doctrines in a motion to dismiss, she has not expressly invited the Department to comment on these legal doctrines")). Thus, no inference can be drawn the fact that the Department failed specifically to request that the court dismiss the action. Additionally, the communication of the Legal Adviser considered by the court in *Environmental Tectonics* was of a considerably different character than that proffered here. *Environmental Tectonics* involved a United States corporation's alleged payment of a bribe to Nigerian government officials in order to secure a government contract. The State Department opined that inquiries regarding the motivation (as opposed to the validity) of a foreign sovereign's acts were not barred by the act of state doctrine, but cautioned that such inquiries might seriously affect the United States' foreign relations. It thus urged the court to assure that no unnecessary inquiries were made. Brief of the U.S., 1987 U.S. Briefs 2066 (1989). Based on this statement, the Third Circuit found that the district court's dismissal on act of state grounds was in error. See *Environmental Tectonics, supra,* 847 F.2d at 1061 (" The ... act of state doctrine ... does not allow a court to invoke the doctrine on the basis of mere conjecture about the effect that the disclosure of certain facts might have on the sensibilities of foreign governments. Instead, [it] require[s] that a defendant come forward with proof that adjudication of a plaintiff's claim poses a demonstrable, not a speculative, threat to the conduct of foreign relations by the political branches of the United States government. In the instant case, the district court's dismissal was based on little more than speculation about the effect that ETC's lawsuit might have on relations between the United States and Nigeria. The traditional justification for involving the doctrine, i.e., avoiding a judicial determination of the legal validity of a state's act within its own borders, is not present in this case.... [T]o resolve ETC's claims on their merits, the district court would be called on simply to determine as a factual matter whether the appellees' alleged bribery of Nigerian officials motivated the award of the contract.... [T]he State Department is satisfied that the conduct of American foreign policy relative to Nigeria will not be compromised by orderly federal court adjudication of ETC's lawsuit.... [T]he Department's factual assessment of whether fulfillment of its responsibilities will be prejudiced by the course of civil litigation is entitled to substantial respect"). As can be seen, far from treating the Department's comments as a mere "cautionary" remark, the *Environmental Tectonics* court focused on its statement that there was no act of state bar, and reversed the district court on that basis. Indeed, as respects the Department's "caution," the court stated: "The Legal Adviser's expressions of concern about the possible damage to foreign relations that may result from wide-ranging discovery against foreign officials should not have been interpreted as a sign of ambivalence about the act of state question. Rather, the Legal Adviser simply urged the court to exercise appropriate supervision over discovery and other trial preparation to limit damage to foreign sensibilities. This advice is far from impractical. Foreign governments have often expressed their dissatisfaction with the wide discovery authorized under the Federal Rules, finding it intrusive and overbroad when compared to the European version of the fact-finding process.... The State Department's advice on this matter should be read as nothing more than a reminder to the district court of the complaints about American litigation with which the executive has become familiar." *Id.* at 1062, n. 11.

by various departments on one question." *Baker, supra,* 369 U.S. at 217, 82 S.Ct. 691.

Stated otherwise, continued adjudication of this lawsuit implicates the fourth and sixth *Baker* factors, which factors warrant invocation of the political question doctrine. See *In re Nazi Era Cases Against German Defendants Litigation,* 129 F.Supp.2d 370, 382 (D.N.J.2001) ("While the policy interests articulated in the Statement of Interest do not in and of themselves provide an independent legal basis for dismissal, the long-standing foreign policy commitment to resolving claims arising out of World War II and the Holocaust at a governmental level does provide such a basis. If the Court were to allow this action to continue, it would run afoul of the political question doctrine as articulated in *Baker.* Without addressing all six *Baker* factors, prominent on the surface of this case are the fourth factor and the sixth factor, namely the impossibility of this Court's undertaking independent resolution without expressing lack of respect due coordinate branches of government, and the potentiality of embarrassment to our country from multifarious pronouncements by various departments on one question"). See also *Kadic, supra,* 70 F.3d at 249 ("The fourth through sixth *Baker* factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously inter-

fere with important governmental interests").

Plaintiffs contend that none of the rulings that would be issued in the course of this case would in fact interfere with the peace process. They assert that nothing in their complaint requires the court to "pronounce who was 'right' and who was 'wrong' in the war, or otherwise seek to resolve the conflict." [281] This cannot be so, as plaintiffs' entire lawsuit is premised on assertions that Bougainvilleans were forced to revolt because of environmental pollution and damage to health caused by the mine, and that island residents died by the thousands because a blockade deprived them of access to needed medical supplies, PNG soldiers tortured, raped and pillaged, and other human rights violations and atrocities occurred. Ruling on the merits of these allegations will inevitably require passing judgment on the pre-war and wartime conduct of the PNG government. It is this type of judgment that the Statement of Interest indicates may have serious implications for the future of the peace agreement that has been reached, and thus for the foreign policy objectives the executive branch has set. It is also the type of judgment that risks placing the court in the position of announcing a view that is contrary to that of a coordinate branch of government, with all the attendant embarrassment that would ensue.[282] The situation is thus quintessentially one that calls for invocation of the political question doc-

---

**281.** Pls.' Supp. Brief at 17:7–8.

**282.** Plaintiffs argue that "no prior political decision regarding the atrocities alleged" has been made by the executive or legislative branches, and thus that the case is different than the World War II reparations cases cited by defendants. (See Pls.' Supp. Reply at 10:21–22.) The Statement of Interest effectively refutes this assertion, noting that, whatever the State Department's *prior* concerns

regarding human rights abuses in Bougainville, its commitment *today* is to the success of the multilateral peace process, which requires, among other things, the establishment of a commission to address human rights issues. (See Statement of Interest at 5.) Inferentially, therefore, it appears a political decision *has been made.*

trine as to each of plaintiffs' causes of action.

### 4. Doctrine Of International Comity

#### a. Legal Standard Governing Doctrine Of International Comity

■ International comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Under this doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise the jurisdiction they otherwise have. See *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern Dist. of Iowa,* 482 U.S. 522, 544, n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states"); *Bigio, supra,* 239 F.3d at 454 ("When a court dismisses a complaint in favor of a foreign forum pursuant to the doctrine of international comity, it declines to exercise jurisdiction it admittedly has"); *In re Simon (Hong Kong & Shanghai Banking Corp. v. Simon),* 153 F.3d 991, 998 (9th Cir.1998) ("In the legal sense, comity ... 'is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws' "); *Sequihua v. Texaco, Inc.,* 847

F.Supp. 61, 63 (S.D.Tex.1994) ("Under the doctrine known as comity of nations, a court should decline to exercise jurisdiction under certain circumstances in deference to the laws and interests of another foreign country").

■ "Comity is a discretionary doctrine. It is 'not a rule of law, but one of practice, convenience and expediency.... [C]omity does not achieve the force of an imperative or obligation.' " *United Kingdom Mut. Steamship Assurance Ass'n [Bermuda] Ltd. v. Continental Maritime of San Francisco, Inc.,* No. C–91–2798 RFP, 1992 WL 486937, *8 (N.D.Cal. Aug.31, 1992) (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971)). See also *Bigio, supra,* 239 F.3d at 454 ("The decision whether to dismiss a case on international comity grounds ordinarily lies within the discretion of the district court").

■ In deciding whether to invoke international comity, courts frequently look to the standard set forth in section 403 of the Restatement, which provides that "a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." RESTATEMENT, § 403(1). See also *Marsoner v. United States,* 40 F.3d 959, 965 (9th Cir.1994) ("Under the revised Restatement, reasonableness is 'an essential element in determining whether, as a matter of international law, the state may exercise jurisdiction to prescribe' "); *Sequihua, supra,* 847 F.Supp. at 63. The Restatement identifies a number of factors that courts should consider in assessing whether the exercise of jurisdiction would be unreasonable:

"(a) the link of the activity to the territory of the regulating state, i.e., the

extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory; (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect; (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted; (d) the existence of justified expectations that might be protected or hurt by the regulation; (e) the importance of the regulation to the international political, legal, or economic system; (f) the extent to which the regulation is consistent with the traditions of the international system; (g) the extent to which another state may have an interest in regulating the activity; and (h) the likelihood of conflict with regulation by another state." RESTATEMENT, § 403(2).

See also *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 928–29 (2d Cir.1998); *Marsoner, supra,* 40 F.3d at 965. The party asserting the applicability of the comity doctrine bears the burden of proof. See *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir.1993) ("since comity is an affirmative defense, the Linter companies carried the burden of proving that comity was appropriate"); *Hobson v. Travelstead,* 227 B.R. 638, 656 (D.Md.1998) (same).

One of the factors identified in the Restatement as relevant to an evaluation of the reasonableness of exercising jurisdiction is a conflict between the laws of the interested states. Plaintiffs argue that such a conflict is a prerequisite to invocation of the doctrine, citing *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). There, the Supreme Court was asked to decide whether a court could decline to exercise Sherman Antitrust Act jurisdiction over foreign reinsurers on international comity grounds. *Id.* at 798, 113 S.Ct. 2891. The Court declined to reach the question because it concluded that international comity would not counsel against exercising jurisdiction in the action before it in any event. It stated: "The only substantial question in this litigation is whether 'there is in fact a true conflict between domestic and foreign law.'" *Id.* (quoting *Societe Nationale Industrielle Aerospatiale, supra,* 482 U.S. at 555, 107 S.Ct. 2542 (Blackmun, J., concurring and dissenting)). Because it concluded there was not, the Court found "no need to ... to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." *Id.* at 798–99, 113 S.Ct. 2891.

Since the "only substantial question" before the Court was whether domestic and foreign laws were in conflict, it is difficult to discern whether the Court intended to establish the existence of such a conflict as a threshold requirement for abstention on international comity grounds. It might, rather, have intended to suggest merely that a conflict in law was the only factor relevant to the comity analysis under the particular facts of the case before it. See *Metro Industries Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.1996) (treating the absence of a conflict between domestic and foreign law as merely one of several factors warranting exercise of jurisdiction and the denial of a motion to dismiss on international comity grounds).

Nonetheless, some courts have interpreted *Hartford Insurance* as imposing such as threshold requirement. See, e.g., *In re Simon, supra,* 153 F.3d at 999 ("general principles of international comity ... [are] limited to cases in which 'there is in

fact a true conflict between domestic and foreign law'"); *In re Maxwell Communication Corp. (Maxwell Communication Corp. v. Societe Generale)*, 93 F.3d 1036, 1049 (2d Cir.1996) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction"). Moreover, the authority the Supreme Court quoted in *Hartford Insurance* rather clearly articulates conflict as a threshold requirement. Justice Blackmun, in his concurrence and dissent in *Societe Nationale Industrielle Aerospatiale, supra*, 482 U.S. at 555, 107 S.Ct. 2542, stated:

"As in the choice-of-law analysis, which from the very beginning has been linked to international comity, *the threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law*. When there is a conflict, a court should seek a reasonable accommodation that reconciles the central concerns of both sets of laws. In doing so, it should perform a tripartite analysis that considers the foreign interests, the interests of the United States, and the mutual interests of all nations in a smoothly functioning international legal regime." *Id.* (emphasis supplied).

Consequently, while the matter is not free from doubt, the court will assume that such a threshold requirement exists.

### b. The Court Will Refrain From Exercising Jurisdiction Over The Environmental Tort And Racial Discrimination Claims On The Basis Of Comity

#### i. Whether There Is A Conflict Of Laws

■ Defendants argue that it would be unreasonable for the court to exercise jurisdiction in this case because PNG has a strong sovereignty interest in adjudicating claims of environmental harm involving its own territory and own people, and in resolving allegations regarding the conduct of its police and armed forces.[283] Defendants note that in 1995, PNG enacted the Compensation Act, which "prohibit[s] the taking or pursuing in foreign courts of legal proceedings in relation to compensation claims arising from mining projects and petroleum projects in Papua New Guinea."[284] Plaintiffs counter that "comity issues do not apply because there is no conflict between U.S. law and PNG law."[285]

There is, however, a direct conflict between the ATCA and the Compensation Act. While the ATCA vests jurisdiction in federal courts to hear plaintiffs' claims, the Compensation Act prohibits plaintiffs from filing the claims elsewhere than in PNG. The two laws are thus directly in conflict. A somewhat analogous situation confronted the court in *In re Nazi Era Cases Against German Defendants Litigation, supra*. There, the German Parliament passed the German Foundation Law, which prohibited victims who had suffered various types of injury during the Nazi regime from pursuing court actions for reimbursement. Rather, the victims were limited to seeking compensation from a foundation established for this purpose. *In re Nazi Era Cases Against German Defendants Litigation, supra*, 129 F.Supp.2d at 379–80. The law was passed, and the Foundation established, after several class action suits were filed in the United States. The United States and several other governments had participat-

---

**283.** See Defs.' Mem. at 26–29.

**284.** *Id.* at 27.

**285.** Pls.' Supp. Brief at 17:13–14.

ed in negotiations leading to the agreed-upon resolution (*id.* at 378–79), and the United States undertook to file Statements of Interest in the pending cases " 'advis[ing] U.S. courts of its foreign policy interests ... in the Foundation being treated as the exclusive remedy for World War II and Nazi era claims against German companies, and concomitantly, in current and future litigation being dismissed.' " *Id.* at 380.

Addressing the international comity doctrine, the court first examined whether a true conflict existed between German and United States law. Noting that "[w]hat is required to establish a true conflict is an allegation that compliance with the laws of both countries would be impossible," it concluded that "the Foundation ... [could] only function if all pending litigation in the United States cease[d]," and that it could "envision no clearer conflict of law." *Id.* at 387. Consequently, it proceeded to consider the balance of the comity factors. See also *Iwanowa, supra,* 67 F.Supp.2d at 490 (applying the international comity doctrine because "[t]he German Federal Government has taken the position that foreign citizens may not assert direct claims for wartime forced labor against private companies").

Here, although PNG initially declined to assert its rights under the Compensation Act, it has done so now.[286] Specifically, on October 17, 2001, PNG's Chief Secretary to Government, Robert Igara, furnished Susan Jacobs, the United States' Ambassador to PNG, a "Statement of the Government of Papua New Guinea's Position concerning the Class Action Lawsuit Against Rio Tinto in the United States of America." This document states, *inter alia:*

"The Papua New Guinea Constitution establishes a comprehensive human rights regime consistent with the highest international standards, including key United Nations Conventions. The National Goals and Directive Principles in the Constitution direct the Government to promote development on a sustainable basis. The Constitution also establishes mechanisms, which are elaborated elsewhere in the legal system, to enable citizens to secure their rights at law. The Papua New Guinea Courts have a proud record of judicial independence. Papua New Guinea's Constitution and System of Judiciary therefore provides more than adequate avenues through which citizens of Papua New Guinea and also foreign citizens, [may] seek redress from the Courts of Papua New Guinea.

It is also in this context that the National Parliament has enacted the law known as the *Compensation (Prohibi-*

---

**286.** Prior to the hearing on defendants' motion to dismiss, the court received correspondence from Francis Damem, PNG's Attorney General, in which he declined to comment on the propriety of adjudicating plaintiffs' claims in the United States, noting that the case involved claims by PNG citizens against a private party, Rio Tinto, that PNG was not a party, and that Damem did not wish "to interfere in the choice of forum in litigation brought by citizens of Papua New Guinea." (July 3, 2001, Letter from Francis Damem, Attorney General, Papua New Guinea, to the Honorable Margaret M. Morrow, United States District Court for the Central District of California.) Damem subsequently withdrew the letter, stating that it had not been his place to offer the opinion, and that it did not reflect the official position of the PNG government. (See Statement of Interest, Ex. A–3 at 099.) Damem also advised that "[t]he official position of the Government of Papua New Guinea [was] being conveyed to the United States Ambassador in Port Moresby for representation to the United States Department of State." (*Id.,* Ex. A–3 at 100.)

*tion of Foreign Proceedings) Act of 1995.*

This Act expressly protects the human rights of Papua New Guinea citizens, while encouraging and protecting the interests of foreign companies whose participation and investment is vital to improving the living standards and welfare of all Papua New Guineans. The Act prohibits and makes it a criminal offence for citizens to undertake or pursue legal proceedings in a foreign court over compensation claims arising from mining or petroleum projects in Papua New Guinea. It does so within a Constitutional framework which ensures that citizens can pursue their legitimate rights through the Papua New Guinea legal system.

Litigation of the kind envisaged by the writ of summons in the above case strikes at the heart not only of the *Compensation (Prohibition of Foreign Proceedings) Act 1995* but of the legitimate, democratic institutions which made it, as well as those which are responsible for its application and enforcement. The case, therefore, has potentially very serious social, economic, legal, political and security implications for Papua New Guinea. It has the potential to give rise to strong adverse effects on many different aspects of Papua New Guinea's international relations, especially its relations with the United States.

It is therefore with respect that the Government of Papua New Guinea requests the United States Department of State to draw these most serious implications to the urgent attention of the United States District Court.

In so doing, the Papua New Guinea Government draws attention to the doctrine of the comity of nations .... The present case clearly fails to meet the requirements in *Section 403 of the Restatement (3rd) of Foreign Relations Law of the United States;* it goes against the precedent cases cited; and it violates the fundamental principles of comity of nations." [287]

Plaintiffs have submitted evidence suggesting that the Compensation Act was passed to deal with litigation filed in Australia in the early 1990's that sought damages incurred arising out of mining operations conducted by the unrelated Broken Hill Proprietary Ltd. and Ok Tedi Mining

---

**287.** Statement of Interest, Ex A–3 at 093–94 (emphasis in original). Plaintiffs argue that this statement should be disregarded because Igara lacks standing to communicate with the State Department outside formal diplomatic channels, and because any statement he makes must be agreed to at the Cabinet level. (See Reply in Support of Plaintiffs' Response to U.S. Statement of Interest and in Opposition to Rio's Motion to Dismiss ("Pls.' Supp. Reply") at 5:13–21.) It is clear from the Statement of Interest that the executive branch accepts Igara's statement as the official position of the PNG government. (See Statement of Interest at 5–6 ("The Government of Papua New Guinea, in particular, has stated its objection to these proceedings in the strongest terms, as set forth in the attached letter of October 17 from PNG Secretary Robert Igara to U.S. Ambassador Susan Jacobs").) Because the executive branch is primarily responsible for the conduct of the nation's foreign affairs, the court defers to its assessment of this issue, and its acceptance of Igara's statement as reflective of the official position of the PNG government. See *Banco Nacional de Cuba, supra,* 406 U.S. at 766, 92 S.Ct. 1808 (emphasizing the "exclusive competence" of the executive branch in the field of foreign affairs); *Oetjen, supra,* 246 U.S. at 302, 38 S.Ct. 309 (emphasizing that foreign relations are committed to the executive and legislative branches and that their decisions are not subject to judicial scrutiny).

Ltd. in western PNG.[288] Statements made by PNG officials at the time indicated that the legislation was deemed necessary to "insure against the loss of investor confidence," and that it would "provid[e] for compensation in place of the villagers' common law and related rights claimed in . . . litigation."[289]

Whatever its purpose, it is clear that there is a conflict between the Act's prohibition on filing claims in foreign jurisdictions and the ATCA's vesting of jurisdiction to hear such claims in the United States. The threshold requirement for application of the international comity doctrine is thus met.

### ii. Whether PNG's Interests Should Be Taken Into Account

Plaintiffs argue that PNG's expressions of concern regarding litigation of this matter in the United States are entitled to no consideration, and that only the United States' interests are relevant.[290] In support, they rely on *Patrickson, supra.* The question in *Patrickson* was whether the federal court had jurisdiction over a class action brought by Latin American banana workers against multinational fruit and chemical companies alleged to have exposed the workers to a toxic pesticide. The action had been filed in state court and removed to federal court on the basis, *inter alia,* that it called for the application of the federal common law of foreign relations. *Patrickson, supra,* 251 F.3d at 799. The court rejected the notion that federal courts have subject matter jurisdiction in "all suits where the federal common law of foreign relations might arise as an issue."

*Id.* at 803. It was this context—i.e., the context of determining whether the district court could assert jurisdiction *in the first instance*—that the Ninth Circuit made certain observations about communications from foreign governments. Its comments had nothing whatsoever to do with application of the comity doctrine, which, of course, examines whether, in an exercise of discretion, there is a reason to refrain from exercising jurisdiction that is otherwise properly asserted. Indeed, while comity terminology is not used, the court acknowledged that, in appropriate circumstances (such as those here), the views of a foreign government regarding the impact of United States litigation is properly brought to the attention of the court: "If a foreign government finds the litigation offensive, it may lodge a protest with our government; our political branches can then respond in whatever way they deem appropriate. . . . Our government may, of course, communicate its own views as to the conduct of the litigation, and the court—whether state or federal—can take those views into account. . . ." *Id.*

The entire point of the comity doctrine is to afford consideration and respect to the laws and interests of foreign sovereign nations. See *Societe Nationale Industrielle Aerospatiale, supra,* 482 U.S. at 543, n. 27, 107 S.Ct. 2542 ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states"). Comity requires a reconciliation or balancing of the foreign sovereign's interests and those of the United States. See *id.* at 555, 107 S.Ct. 2542

---

288. See Declaration of Nicholas John Styant–Browne in Opposition to Defendants' Motion to Dismiss ("Styant–Browne Decl."), ¶¶ 3.3–8.1.

289. *Id.,* ¶ 4.3.

290. Pls.' Supp. Reply at 6:4–16.

(Blackmun, J., concurring and dissenting) ("a court should seek a reasonable accommodation that reconciles the central concerns of both sets of laws"). See also *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.,* 44 F.3d 187, 191 (3d Cir.1994) ("Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect").

### iii. Whether The United States' Interests Favor Exercising Jurisdiction

Plaintiffs argue that the interests of the United States would be not be served if the court were to refrain from exercising jurisdiction on comity grounds, as the ACTA represents a strong policy statement that overrides any expression of concern by a foreign government.[291] This overlooks the fact that the court has before it a specific expression of policy regarding this case by the Department of State. That expression states that continued adjudication of the action "would risk a potentially serious adverse impact on the [Bougainville] peace process, and hence on the conduct of [United States] foreign relations."[292] It further states that the State Department "cannot lightly dismiss [the] expressions of concern [regarding the litigation] from [PNG,] a friendly foreign state."[293] Based on the opinion expressed in the Statement of Interest, the court concludes that the United States' interests are aligned, or at least not inconsistent, with those of PNG, in a way that suggests it would be appropriate to refrain from exercising jurisdiction in this case. See *In re World War II Era Japanese Forced Labor Litigation,* 164 F.Supp.2d 1160, 1176 (N.D.Cal.2001) ("[T]he Japanese government has made clear that it is concerned about the effects of section 354.6 on Japan's relationship with the United States.... The Government of Japan is convinced that these issues should not be adjudicated in the courts in the United States.... To be sure, the court recognizes that Japan has a financial interest in repressing any demands for further compensation against its nationals arising out of the war. But Japan's submission nevertheless serves as a reminder that the United States also has its own interest in maintaining normal diplomatic relations with Japan. The protests of the Japanese government thus demonstrate that section 354.6 has 'great potential for [causing] disruption or embarrassment' here in the United States.... [T]he federal government, as represented by the State Department, agrees with defendants that section 354.6 impermissibly intrudes on the foreign affairs power of the federal government. The State Department represents one of the two political branches with the exclusive authority to handle the country's foreign affairs, and thus it is in a good position (and certainly better position than this court) to determine if that power has been intruded upon" (internal citations omitted)); *In re Nazi Era Cases Against German Defendants Litigation, supra,* 129 F.Supp.2d at 387 ("... a district court must generally make appropriate findings as to whether giving effect to a foreign judicial act would be prejudicial to the interests of the United States, and exercise its discretion in determining whether it will recognize foreign proceedings based

**291.** Pls.' Supp. Reply at 6:15:7:2.

**292.** Statement of Interest of the United States ("Statement of Interest"), Ex. A at 5.

**293.** Statement of Interest, Ex. A at 006.

on those findings.... The Court's task of determining whether dismissal would result in prejudice is simplified by the Statement of Interest that has been filed by the United States. The government has plainly demonstrated to the Court that not giving effect to a foreign judicial act (in this case the German Foundation Law) would be prejudicial to the overriding foreign policy interests of the United States, and accordingly should be avoided"). See also *Societe Nationale Industrielle Aerospatiale, supra,* 482 U.S. at 552, 107 S.Ct. 2542 (Blackmun, J., concurring and dissenting) ("It is the Executive that normally decides when a course of action is important enough to risk affronting a foreign nation or placing a strain on foreign commerce. It is the Executive, as well, that is best equipped to determine how to accommodate foreign interests along with our own").

#### iv. The Restatement Factors

The conclusion that the court should refrain from exercising jurisdiction is further supported by an examination of the factors set forth in section 403(2) of the Restatement. The alleged conduct about which plaintiffs complain occurred exclusively in PNG, and, with the exception of Sarei, all plaintiffs are PNG residents. Moreover, while defendants are not residents of PNG, they have conducted significant business there for a number of years. Thus, the first two Restatement factors—i.e., the link of the activity to the territory of the regulating state, and the connection between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect—suggest that it would be unreasonable for the court to exercise jurisdiction. Additionally, many of plaintiffs' claims allege injury that arises out of exploitation of PNG's natural resources. As noted earlier, this involves a right that is exclusively within the sovereign's control, indicating that regulation of such activity is important to PNG and that it has a high expectation it will be permitted to regulate the activity without outside interference. As to the environmental claims, therefore, all Restatement factors indicate the exercise of jurisdiction would be unreasonable. See *Sequihua, supra,* 847 F.Supp. at 63 ("Consideration of these factors leads to the inescapable conclusion that the Court should decline to exercise jurisdiction over this case. The challenged activity and the alleged harm occurred entirely in Ecuador; Plaintiffs are all residents of Ecuador; Defendants are not residents of Texas; enforcement in Ecuador of any judgment issued by this Court is questionable at best; the challenged conduct is regulated by the Republic of Ecuador and exercise of jurisdiction by this Court would interfere with Ecuador's sovereign right to control its own environment and resources; and the Republic of Ecuador has expressed its strenuous objection to the exercise of jurisdiction by this Court. Indeed, none of the factors favor[s] the exercise of jurisdiction. Accordingly, the case should be dismissed under the doctrine of comity of nations"). See also *Aquinda v. Texaco, Inc.,* 945 F.Supp. 625 (S.D.N.Y.1996) ("... after a full review of the underlying record, the Court finds itself obliged to dismiss this action on the same grounds of international comity and forum non conveniens so well stated in *Sequihua,* to which this Court can add little. While it is true that, in contrast to the situation in *Sequihua,* defendant Texaco is headquartered in this judicial district and the Complaint alleges that decisions made by its executives in New York were important to the alleg-

edly unlawful activities undertaken by the consortium in Ecuador, these differences are, in the Court's view, insufficient to overcome the balance of other factors that weigh so heavily against retaining jurisdiction, as outlined in *Sequihua.* As for the submissions offered here by the Congress of Ecuador asking this Court to disregard the submissions of the Government of Ecuador objecting to this Court's retention of jurisdiction, the litany of conflicting submissions from these representatives and officials further evidences the need for this Court to resist intruding on matters that are already the subject of intense political debate in the affected foreign country"), rev'd. on other grounds sub nom. *Jota, supra,* 157 F.3d at 153.[294] For all of these reasons, the court concludes that the environmental tort and racial discrimination claims should be dismissed on international comity grounds.

It does not so conclude with respect to the war crimes and crimes against humanity claims. First, such claims do not fall within the scope of the Compensation Act, which prohibits the filing of claims in foreign courts that arise out mining or petroleum projects in PNG. Plaintiffs' war crimes and crimes against humanity claims concern actions taken during the civil war on Bougainville, not Rio Tinto's mining operations, which were shut down during that period. Thus, there is no conflict with PNG, and the predicate for the application of the comity doctrine is not met. Second, comity, as noted, is a discretionary doctrine. The fact that the interests of a foreign sovereign are implicated by an ac-

tion, standing alone, does not require that a court abstain. Rather, the court must consider a range of factors, including the character of the activity to be regulated, the importance of regulation to the international community, and the extent to which regulation is consistent with the traditions of the international community. See RESTATEMENT, § 402(2). The fact that the conduct in which defendants engaged is alleged to constitute war crimes and crimes against humanity argues strongly in favor of the retention of jurisdiction. This is particularly true as the claims are brought, not against PNG itself, but against its purported private entity partner, Rio Tinto. Cf. *Kadic, supra,* 70 F.3d at 250 ("The act of state doctrine, under which courts generally refrain from judging the acts of a foreign state within its territory, . . . might be implicated in some cases arising under section 1350. However, as in *Filartiga,* 630 F.2d at 889, we doubt that the acts of even a state official, taken in violation of a nation's fundamental law and wholly unratified by that nation's government, could properly be characterized as an act of state"); *Liu, supra,* 892 F.2d at 1432–33 (holding that the act of state doctrine did not bar plaintiff's suit against the Republic of China (Taiwan) for the assassination of her husband after considering whether the foreign state had acted in the public interest, whether there was international consensus regarding the propriety of its alleged conduct, and whether adjudication of the controversy would hinder executive branch foreign policy).[295] As to these claims, therefore, the court does not find that a dismissal on international comity grounds is warranted.

**294.** The court finds apt the comments of the *Aguinda* court respecting the submission of conflicting information regarding the foreign sovereign's position. If anything, this merely highlights the political nature of the dispute,

and suggests that it is most appropriately resolved in a venue other than a court of law.

**295.** The court notes, as respects plaintiffs' war crimes and crimes against humanity allegations, that Statement of Interest submitted

### v. Whether PNG Is An Adequate Forum

In *Jota, supra,* the Second Circuit held that "[w]hen a court dismisses on the ground of comity, it should normally consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction against it in the foreign forum. That is the approach usually taken with a dismissal on the ground of *forum non conveniens* . . . and it is equally pertinent to dismissal on the ground of comity." *Jota, supra,* 157 F.3d at 160. In *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), by contrast, the Supreme Court stated that "[f]ederal courts abstain [on comity grounds] out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism. Dismissal for *forum non conveniens,* by contrast, has historically reflected a far broader range of considerations." *Id.* at 707, 116 S.Ct. 1712. *Jota* is arguably inconsistent with the Supreme Court's direction in *Quackenbush.* The court need not resolve the issue, however, as it has determined that an adequate forum exists in PNG. Plaintiffs assert that they are afraid to litigate in PNG

and that, having filed this action in the United States, the Compensation Act prohibits their bringing a second action in PNG. Defendants have represented that they will not raise the Compensation Act bar in PNG, however, and plaintiffs' fears, while an appropriate consideration in assessing whether private interest factors favor a *forum non conveniens* dismissal, do not render PNG an inadequate forum. Accordingly, even applying *Jota,* dismissal on grounds of comity is appropriate.

## III. CONCLUSION

Defendants' motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted is denied as to Counts I, II, IV, and VI, to the extent that Count VI states a claim for violation of international law as reflected in UNCLOS; it is granted with prejudice as to Counts III and VII; and granted without prejudice as to Count V. The court denies defendants' motion to dismiss on *forum non conveniens* grounds. As respects defendants' nonjusticiability arguments, the court concludes that plaintiffs' environmental tort and racial discrimination claims must be dismissed on act of state and international comity grounds. It concludes that all claims must be dismissed on

---

is careful to note that "[t]he Department of State has previously expressed its concern over human rights abuses in Bougainville during the protracted civil war with PNG authorities there, in particular in the annual publication *Country Reports on Human Rights Practices.* It would not wish any statement made today to detract from those concerns. However, the court's inquiry focuses on the foreign policy consequences today of the pending litigation." (Statement of Interest at 5.) The Department further advises the court that continued adjudication of the action would "risk a potentially serious adverse impact on . . . the conduct of [United States]

foreign relations." (*Id.*) The court accords this statement proper deference in its ruling on defendants' assertion that the political question doctrine requires dismissal of the pending claims. It does not believe that it additionally requires dismissal on grounds of international comity, as that doctrine requires a true conflict between the laws of the United States and the foreign sovereign, and there is none as respects the war crimes and crimes against humanity claims. This is particularly true as the State Department itself notes concern regarding human rights abuses that may have occurred during the course of the civil war.

the basis of the political question doctrine. These dismissals are contingent on the court's receipt, within thirty days of the date of this order, of defendants' written consent to have the action proceed in the Papua New Guinea courts despite the provisions of the Compensation Act or any other potential legal bar to adjudication in that forum that may exist. Such consent must expressly state that the Compensation Act and any other potential legal bar will not be raised as a defense to any action filed in the Papua New Guinea courts by any plaintiff to this action.